UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

WISTRON NEWEB CORPORATION,

                                          Plaintiff,        **COMPLAINT**

          -against-

GENESIS NETWORKS TELECOM SERVICES, LLC and
GNET ATC, LLC,

                                          Defendants.

------------------------------------------------------------------------ x

Plaintiff, Wistron NeWeb Corporation ("Plaintiff" or "WNC") by its attorneys, Lazare Potter Giacovas & Moyle LLP, brings this action against Defendants Genesis Networks Telecom Services, LLC ("GNTS") and GNET ATC, LLC ("GNET") (together "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff WNC, a leading international product design and manufacturing company, brings this action for breach of contract and for an account stated against GNTS to recover a total of $9,212,256.94 in unpaid invoices for products that it designed, manufactured, sold, and delivered to GNTS pursuant to the terms of a February 1, 2019, Non-Exclusive Distributor Agreement ("Distributor Agreement"), a copy of which is attached hereto as Exhibit 1 and incorporated by reference herein.

2. On two separate occasions, Plaintiff made written demand for payment of the total amount due and owing to Plaintiff. However, in order to escape its contractual liability to Plaintiff, GNTS now claims it unilaterally assigned the Distributor Agreement to GNET, a now-insolvent

affiliate of GNTS that itself asserts it has no money to pay Plaintiff the $9,212,256.94 that Defendants have admitted is rightfully owed to Plaintiff.

3. The purported assignment is null and void and of no legal effect since Plaintiff never consented to any such assignment, as required under the clear terms of the Distributor Agreement. GNTS therefore remains liable to Plaintiff for the full amount of the unpaid invoices, plus interest at the contractual interest rate of 1.5% per month running from the due date of each unpaid invoice, plus reasonable attorneys' fees as provided for in the Distributor Agreement.

4. In the alternative, and only if GNET is found to have assumed any of GNTS's obligations under the Distributor Agreement, Plaintiff also seeks judgment against GNET for all of the same damages as GNTS owes to Plaintiff.

## THE PARTIES

5. Plaintiff WNC is a corporation organized under the laws of Taiwan, with its principal place of business in Hsinchu, Taiwan. Plaintiff has a wholly owned subsidiary, W-NeWeb Corporation ("W-NeWeb"), that is based in Milipitas, California.

6. On information and belief, Defendant Genesis Networks Telecom Services, LLC is a limited liability company formed in Texas on or about September 30, 2008. Defendant GNTS entered into the Distributor Agreement with WNC effective February 1, 2019.

7. On information and belief, Defendant GNET ATC, LLC is a limited liability company formed in Texas on or about August 14, 2019. Upon information and belief, GNET is an affiliate of GNTS. GNET is the purported assignee of the Distributor Agreement from GNTS.

**JURISDICTION AND VENUE**

8. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of Taiwan, both Defendants are citizens of Texas, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

9. The Court has personal jurisdiction over Defendant GNTS pursuant to Section 19.12 of the Distributor Agreement, which provides for jurisdiction of the courts located in the State of New York.

10. The Court also has personal jurisdiction over Defendant GNET pursuant to the terms of the Distributor Agreement as GNET purports to be the assignee of the Distributor Agreement from GNTS and has therefore consented to jurisdiction in this Court.

11. Venue is also proper in this District pursuant to the terms of the Distributor Agreement.

**BACKGROUND**

**The Genesis of Plaintiff's Distributor Agreement with GNTS**

12. Plaintiff entered into a Material and Services Agreement with AT&T Services, Inc. ("AT&T") on March 6, 2018 ("MSA").

13. Under the MSA, Plaintiff was to manufacture and supply certain hardware to support AT&T's direct-to-home ("DTH") business (the "Products").

14. Rather than sell its Products directly to AT&T, the MSA required that Plaintiff contract with, and sell to, a Value Added Reseller ("VAR"), which AT&T required to be a Minority Owned Business as determined by AT&T, and which would then resell Plaintiff's Products at a slight markup to AT&T.

15. AT&T specifically identified Defendant GNTS as the approved VAR and GNTS was designated as such in the MSA.

16. For that reason, on February 1, 2019, Plaintiff entered into the Distributor Agreement with GNTS.  *See* Exhibit 1.

17. Under the Distributor Agreement, Plaintiff fulfilled orders for its Products, which were based upon AT&T's needs.

18. Plaintiff sold its Products to GNTS at agreed-upon prices set forth in the Distributor Agreement, and delivered its Products to pre-arranged warehouses from which GNTS could then retrieve and resell those Products to AT&T.

19. GNTS did not reject any Products that were duly delivered to the pre-arranged warehouses.

20. Upon information and belief, AT&T paid GNTS for all of Plaintiff's Products that were delivered to GNTS, and then resold to AT&T at a profit.

21. Per the payment terms set forth in the Distributor Agreement, payment to Plaintiff was due within 90 days after title to the Products transferred to GNTS.  *See* Exhibit 1, § 4.2.

22. Each invoice was submitted by Plaintiff (through its U.S.-based wholly owned subsidiary, W-NeWeb), and was billed to GNTS pursuant to the Distributor Agreement.

**The Ineffective Assignment**

23. Section 19.8 of the Distributor Agreement precludes any assignment of the Distributor Agreement to any third party, including Affiliates (as defined in Section 1.1 of the Distributor Agreement), without the prior written consent of Plaintiff.

24. A Change in Control (as defined in Section 1.2 of the Distributor Agreement) is also considered an assignment subject to the consent requirement of Section 19.8.

25. In August 2020, GNTS sent Plaintiff a draft "Assignment, Assumption and Consent" agreement ("Assignment Agreement") seeking Plaintiff's written consent to assign the Distributor Agreement from GNTS to GNET. A copy of the unsigned Assignment Agreement is attached hereto as Exhibit 2 and incorporated herein by reference.

26. The Assignment Agreement recited that "Assignor [GNTS] and Assignee [GNET] are parties to an Asset Purchase Agreement which includes the [Distributor Agreement]." Exhibit 2, at 1 (Second Recital).

27. Under this Assignment Agreement, GNTS agreed that it remained liable "for all obligations under the [Distributor Agreement] accrued through the Effective Date …." Exhibit 2, Section 1(B).

28. In accordance with its express rights under the Distributor Agreement, Plaintiff did not sign and thus rejected the Assignment Agreement.

29. Plaintiff has never provided its consent to any assignment of the Distributor Agreement, and has always maintained that GNTS, and not GNET, retains all payment obligations under the Distributor Agreement. As such, the purported assignment never became effective.

**The $9,212,256.94 in Unpaid Invoices**

30. After Plaintiff declined to sign the Assignment Agreement, Plaintiff continued to submit its Distributor Agreement invoices to GNTS' accounts payable department in the same manner as it always had, and Plaintiff continued to receive payment for those invoices, until those payments stopped on September 17, 2021.

31. By mid-October 2021, seventeen invoices issued to GNTS under the Distributor Agreement and totaling $7,108.087.12, were past due.

32. On October 19, 2021, Plaintiff received an email from James Frinzi ("Frinzi"), who introduced himself as the new CEO of GNET, which he asserted was the assignee of the Distributor Agreement, and therefore the party responsible for the debt to Plaintiff.

33. Frinzi informed Plaintiff that GNET had been terminated by AT&T and as a result, GNET apparently had no money to pay any of Plaintiff's open invoices.

34. Frinzi contacted Plaintiff again on October 20, 2021, and further asserted that "Goodman Networks acquired this business from [GNTS], and the contracts were assigned to GNET ATC. It is not evident to us that [GNTS] owes anything in this matter."

35. Goodman Networks, Inc. ("Goodman") is, on information and belief, another related entity to GNTS and wholly owns GNET. Plaintiff had been directed to copy Goodman's staff on each of its invoice submissions throughout its contractual relationship with GNTS.

36. As noted, Plaintiff never consented to any assignment of the Distributor Agreement and multiple other provisions of the Distributor Agreement render ineffectual any unilateral assignment by GNTS and/or GNET including: Section 19.13, which prohibits any modifications to that agreement unless such changes are "in writing and executed by a duly authorized representative of each Party"; and Section 19.10, which precludes the waiver of any provision of the Distributor Agreement by Plaintiff for its failure to enforce it. *See* Exhibit 1, pp. 30-31.

37. Thus, regardless of any corporate restructuring (or sale of assets) that may have occurred internally at GNTS, GNET, and/or Goodman, GNTS remains responsible for all obligations under the Distributor Agreement.

38. Though neither GNET nor GNTS have ever disputed the amounts owed under Plaintiff's invoices, neither Defendant has made any payment to Plaintiff since September 17, 2021.

39. As a result, Plaintiff (through W-NeWeb) sent a formal payment demand for the then overdue amount of $7,663,212.88 on October 26, 2021, to all three entities referenced by Frinzi: GNTS, GNET, and Goodman. *See* Exhibit 3, a copy of which is attached hereto and incorporated herein by reference.

40. Having received no payment from *any* entity, Plaintiff sent a second payment demand six weeks later, on December 3, 2021, for the full overdue amount, which by then totaled $9,212,256.94. A copy of the December 3, 2021, payment demand is attached hereto as Exhibit 4, and copies of all the corresponding invoices that had been previously submitted pursuant to the Distributor Agreement are collectively attached hereto as Exhibit 5. Both exhibits are incorporated herein by reference.

41. By way of both the prior submission of the invoices themselves, as well as through Plaintiff's two formal payment demands, both GNTS and GNET (and Goodman) were, and are, aware that there is an overdue amount totaling $9,212,256.94 plus interest owing to Plaintiff pursuant to the Distributor Agreement.

42. On or about January 26, 2022, Joseph Baum, a restructuring consultant purportedly retained by GNET, emailed Plaintiff and confirmed on GNET's behalf that "[t]he amount asserted as outstanding agrees with the company's accounts payable records."

43. However, since that time, neither GNET nor GNTS have paid Plaintiff a single penny towards the $9,212,256.94 due and owing, necessitating this lawsuit.

## AS AND FOR A FIRST CAUSE OF ACTION
## BREACH OF CONTRACT
## (Against GNTS)

44. Plaintiff repeats and realleges paragraphs 1 – 43 as if fully set forth herein.

45. Plaintiff has performed all its obligations under the Distributor Agreement.

46. Plaintiff is owed $9,212,256.94 for Products sold to GNTS pursuant to the Distributor Agreement.

47. By its express terms, the Distributor Agreement may not be assigned without the written consent of Plaintiff, and Plaintiff never provided written consent.

48. Any purported assignment by GNTS of the Distributor Agreement is therefore null and void and of no legal effect, and GNTS remains liable for all payment obligations to Plaintiff.

49. GNTS is in material breach of the Distributor Agreement as it has failed and refused to pay Plaintiff the $9,212,256.94 that Plaintiff is owed for Product Plaintiff sold to and invoiced GNTS for.

50. As a direct and proximate result of GNTS's material breaches of the Distributor Agreement, Plaintiff has been damaged in the amount of $9,212,256.94, plus 1.5% monthly interest calculated from the due date of each unpaid invoice, plus attorneys' fees, as provided for in the Distributor Agreement.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACT
## (Against GNET)

51. Plaintiff repeats and realleges paragraphs 1 – 50 as if fully set forth herein.

52. In the alternative, to the extent that GNET is found to have assumed any of GNTS's obligations under the Distributor Agreement, GNET is in material breach of the Distributor Agreement by failing to pay Plaintiff the $9,212,256.94 that Plaintiff is owed for Product sold and invoiced pursuant to the Distributor Agreement, as a direct and proximate result of which Plaintiff has been injured in that amount.

53. Plaintiff therefore seeks, in the alternative, a judgment against GNET for $9,212,256.94, plus 1.5% monthly interest calculated from the due date of each unpaid invoice, plus attorneys' fees as set forth in the Distributor Agreement.

### AS AND FOR A THIRD CAUSE OF ACTION
### ACCOUNT STATED
### (Against Both Defendants)

54. Plaintiff repeats and realleges paragraphs 1 – 53 as if fully set forth herein.

55. Plaintiff manufactured, delivered, sold, and, through its wholly owned U.S.-based subsidiary W-NeWeb, issued invoices for its Products in substantially the same manner throughout the term of its Distributor Agreement.

56. The invoices Plaintiff submitted were each billed to GNTS and reflect the quantity, type, and price for the Products sold and delivered, and indicated that shipments were "FOB." *See* Exhibit 5.

57. The total amount due under the invoices is $9,212,256.94. *See id.*

58. The invoices also each indicated that the Term of Payment was "Net 90 Days." *See id.*

59. These 90-day payment terms mirrored what was set forth in the Distributor Agreement, which payment terms were well known to both GNTS and GNET and were also reflected in the payment demands sent to GNTS and GNET (and Goodman). *See id;* Exhibits 3, 4.

60. Therefore, the payment due dates for each invoice fell between September 20, 2021 (when the first four invoices were due for payment) and November 12, 2021 (when the final invoice was due for payment). Accordingly, the entire amount of $9,212,256.94 was due and owing by November 12, 2021. *See id;* Exhibits 3, 4.

61. Plaintiff submitted these invoices in the same manner as it had throughout the term of the Distributor Agreement – to GNTS's accounts payable department.

62. At GNTS' direction, Plaintiff also submitted each invoice to the accounts payable department of Goodman.

63. In addition to submitting each invoice as explained above, Plaintiff also sent two formal payment demand letters directly to all three parties: GNTS, GNET, and Goodman.

64. Both demand letters identified each invoice number, as well as the associated due date, PO Number, and outstanding amount due for each such invoice.

65. Both GNTS and GNET accordingly received, and were aware of, the amount due under each invoice, the specific PO Number (and Product) to which it related, as well as the due date for payment and specific payment amount owed under each invoice.

66. Neither GNTS nor GNET ever timely objected to any of the invoices or to any of the Products received thereunder.

67. Neither GNTS nor GNET ever rejected any Product delivered pursuant to the invoices.

68. On or about January 26, 2022, GNET again confirmed to Plaintiff that the amounts claimed were due and owing.

69. Plaintiff accordingly has set forth the elements of an account stated against GNTS and/or GNET.

70. Therefore, Plaintiff seeks judgment against GNTS and GNET, jointly and severally, for an account stated, in the amount of $9,212,256.94, as collectively set forth on the invoices.

## JURY TRIAL

Plaintiff demands a trial by jury of all issues and claims in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Defendant GNTS in the sum of no less than $9,212,256.94, plus 1.5% interest per month measured from the due date of each unpaid invoice, plus reasonable attorneys' fees. In the alternative, Plaintiff seeks a judgment against GNET, in the sum of no less than $9,212,256.94, plus 1.5% interest per month measured from the due date of each unpaid invoice, plus reasonable attorneys' fees and such other and further relief as the Court deems just and proper.

Dated:	New York, New York
	March 29, 2022

**LAZARE POTTER GIACOVAS & MOYLE LLP**

By: /s/ Robert A. Giacovas
    Robert A. Giacovas
    Lainie E. Cohen
    Jacob A. Englander
    747 Third Avenue, 16th Floor
    New York, NY 10017
    (212) 758-9300
    rgiacovas@lpgmlaw.com
    lcohen@lpgmlaw.com
    jenglander@lpgmlaw.com

*Attorneys for Plaintiff
Wistron NeWeb Corporation*