UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

WISTRON NEWEB CORPORATION,

                                        Plaintiff,                    Case No. 22-cv-2538 (LJL)

                    vs.

                                                                      AMENDED COMPLAINT

GENESIS NETWORKS TELECOM SERVICES,
LLC and GNET ATC, LLC,

                                        Defendants.
_____

   Plaintiff, Wistron NeWeb Corporation ("Plaintiff" or "WNC") by its attorneys, Lazare Potter

Giacovas & Moyle LLP, brings this action against Defendants Genesis Networks Telecom Services,

LLC ("Genesis") and GNET ATC, LLC ("GNET") (together "Defendants") and for its Amended

Complaint alleges as follows:

## NATURE OF THE ACTION

   1.  Plaintiff WNC, a leading international product design and manufacturing company,

brings this action for breach of contract and for an account stated against Genesis to recover a total

of $9,212,256.94 in unpaid invoices for products that it designed, manufactured, sold, and delivered

to Genesis pursuant to the terms of a February 1, 2019, Non-Exclusive Distributor Agreement

("Distributor Agreement"), a copy of which is attached hereto as Exhibit 1 and incorporated by

reference herein.

   2.  As detailed below, Plaintiff spent months attempting to resolve the matter through an

informal dispute resolution process, including making formal written demand for payment of the total

amount due and owing to Plaintiff on two separate occasions. However, after effectively telling

Plaintiff to go "pound sand", and in order to escape its contractual liability to Plaintiff, Genesis claims

it unilaterally assigned the Distributor Agreement to GNET, a now-insolvent affiliate of Genesis that

itself asserts it has no money to pay Plaintiff the $9,212,256.94 that Defendants have admitted is rightfully owed to Plaintiff.

3.      This purported assignment took place less than seven months after Genesis executed the Distributor Agreement, and on information and belief, at a time when Genesis was aware that GNET, either alone or through its parent company, Goodman Networks, Inc. ("Goodman Inc.") would not be able to fulfill its obligations under the Distributor Agreement for much longer and was heading towards bankruptcy.

4.      Plaintiff never consented to any such assignment, as required under the clear terms of the Distributor Agreement, and Genesis' actions of assigning the Distributor Agreement to GNET were a direct cause of WNC's losses due to GNET's insolvency. Genesis therefore remains liable to Plaintiff for the full amount of the unpaid invoices, plus interest at the contractual interest rate of 1.5% per month running from the due date of each unpaid invoice, plus attorneys' fees and costs as a result of Genesis' breach of its non-waivable covenant not to assign the Distributor Agreement.

5.      Moreover, as the purported assignee of the Distributor Agreement, GNET is also responsible for WNC's damages and Plaintiff seeks judgment against GNET for its admitted breach in the same amounts as Genesis owes to Plaintiff.

## THE PARTIES

6.      Plaintiff WNC is a corporation organized under the laws of Taiwan, with its principal place of business in Hsinchu, Taiwan.   Plaintiff has a wholly owned subsidiary, W-NeWeb Corporation ("W-NeWeb"), that is based in Milpitas, California.

7.      On information and belief, Defendant Genesis Networks Telecom Services, LLC is a limited liability company formed in Texas on or about September 30, 2008.  Defendant Genesis entered into the Distributor Agreement with WNC effective February 1, 2019.

8.      On information and belief, Defendant GNET ATC, LLC is a limited liability company formed in Texas on or about August 14, 2019.  Upon information and belief, GNET is an affiliate of Genesis.  GNET is the purported assignee of the Distributor Agreement from Genesis.

9.      Non-Party, Goodman Networks, Inc., d/b/a Goodman Solutions ("Goodman Inc.") is, on information and belief, the parent company of GNET, which on information and belief, it wholly owns. On information and belief, Goodman Inc. is also a related entity to Genesis. On information and belief, James Goodman, who holds an ownership interest in Genesis, also holds an ownership interest in Goodman along with his brothers, one of which, John Goodman is the CEO of Goodman Inc.  It was Goodman Inc. that purportedly purchased substantially all the assets of Genesis, allegedly including the Distributor Agreement.

<u>**JURISDICTION AND VENUE**</u>

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of Taiwan, Genesis is a citizen of Texas and South Dakota and GNTS is a citizen of Texas, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

11.     The Court has personal jurisdiction over Defendant Genesis pursuant to Section 19.12 of the Distributor Agreement, which provides for jurisdiction of the courts located in the State of New York.

12.     The Court also has personal jurisdiction over Defendant GNET pursuant to the terms of the Distributor Agreement as GNET purports to be the assignee of the Distributor Agreement from Genesis and has therefore consented to jurisdiction in this Court.

13.     Venue is also proper in this District pursuant to the terms of the Distributor Agreement.

## BACKGROUND

**Plaintiff Enters Into Distributor Agreement with Genesis**

14.     Plaintiff entered into a Material and Services Agreement with AT&T Services, Inc. ("AT&T") on March 6, 2018 ("MSA").

15.     Under the MSA, Plaintiff was to manufacture and supply certain hardware to support AT&T's direct-to-home ("DTH") business (the "Products").

16.     Rather than sell its Products directly to AT&T, the MSA required that Plaintiff contract with, and sell to, a Value-Added Reseller ("VAR"), which AT&T required to be a Minority Owned Business as determined by AT&T, and which would then resell Plaintiff's Products at a slight markup to AT&T.

17.     AT&T specifically identified Defendant Genesis as the approved VAR and Genesis was designated as such in the MSA.

18.     For that reason, on February 1, 2019, Plaintiff entered into the Distributor Agreement with Genesis.  *See* Exhibit 1.

19.     Under the Distributor Agreement, Plaintiff fulfilled orders for its Products, which were based upon AT&T's needs.

20.     Plaintiff sold its Products to Genesis at agreed-upon prices set forth in the Distributor Agreement, and delivered its Products to pre-arranged warehouses from which Genesis could then retrieve and resell those Products to AT&T.

21.     Genesis did not reject any Products that were duly delivered to the pre-arranged warehouses.

22.     Upon information and belief, AT&T paid Genesis for all of Plaintiff's Products that were delivered to Genesis, and then resold to AT&T at a profit.

23.    Per the payment terms set forth in the Distributor Agreement, payment to Plaintiff was due within 90 days after title to the Products transferred to Genesis.  *See* Exhibit 1, § 4.2.

24.    Each invoice was submitted by Plaintiff (through its U.S.-based wholly owned subsidiary, W-NeWeb), and was billed to Genesis pursuant to the Distributor Agreement.

**The Purported Assignment Without Consent**

25.    Section 19.8 of the Distributor Agreement precludes any assignment of the Distributor Agreement to any third party, including Affiliates (as defined in Section 1.1 of the Distributor Agreement), without the prior written consent of Plaintiff.

26.    Under Section 19.8, a Change in Control (as defined in Section 1.2 of the Distributor Agreement) is  considered an assignment, and is therefore, also subject to the consent requirement of Section 19.8.

27.    On August 17, 2020, Steve W.  Seago, as Vice President, Business & Corporate Development for Goodman Inc. ("Seago"), sent an email to WNC, stating: "Wanted to catch up on something that has fallen through the cracks in our transition from Genesis to Goodman [Inc.]which is the assignment of the distributor agreement between WNC & Genesis. Attached is the assignment document that will take care of that. Can WNC please execute ASAP & then we will counter & return fully executed? Let us know if there are questions."

28.    Attached to this email was a draft "Assignment, Assumption and Consent" agreement ("Assignment Agreement") seeking Plaintiff's written consent to assign the Distributor Agreement from Genesis Inc. to GNET.

29.    WNC has since learned that the "transition from Genesis to Goodman [Inc.]" had occurred eleven months earlier, in September 2019, through an asset purchase of "substantially all"

of Genesis' assets by Goodman Inc., just over six months after WNC entered into the Distributor Agreement with Genesis.

30.     Having never been provided any notice of the change in ownership or any asset purchase, and lacking sufficient information to confirm the purported change, on August 18, 2020, WNC requested that Genesis provide proof that the Distributor Agreement was in fact, one of the assets of Genesis purchased by Goodman Inc.

31.     In response, Seago stated that the Assignment Agreement—once fully-executed— was the only proof necessary.

32.     On September 8, 2020, WNC sought clarification from Seago (on behalf of Goodman Inc.), asking: "(1) Will Genesis still [sic] the company issue PO/receive shipment/arrange payment to WNC? (2) If it will be changed, when will GNET ATC be the company issue [sic] new PO?" to which Seago replied, "Genesis will no longer be involved so purchase orders will come from GNET ATC LLC. GNET ATC is a wholly owned subsidiary of Goodman Networks. Hope this helps clarify."

33.     At this same time, WNC and its insurance carrier were attempting to investigate the credit of GNET, the purported assignee, but the carrier could not find any record of GNET being a registered entity. On September 21, 2020, and again on the 23rd, WNC requested help obtaining this information from Seago.

34.     Seago responded on September 23rd that he would gather the requested information. He also indicated that WNC's carrier had also requested additional information about GNET, stating "There seems to be some confusion regarding the acquisition of assets that occurred a year ago." Seago stated that he would copy WNC on further communications with WNC's carrier regarding this

confusion. However, no further communication regarding GNET's credit worthiness or the assignment was received from Goodman Inc.

35.     Ultimately, GNET failed the credit check run by WNC's carrier, and given that no further communication came from Goodman Inc. regarding WNC's—and its carrier's—concerns, in accordance with its express rights under the Distributor Agreement, Plaintiff did not sign the draft Assignment Agreement.

36.     Nonetheless, and although Genesis remained the party on every invoice to which each order was billed and shipped to, and each invoice continued to be submitted to Genesis' accounts payable department for processing (acctspayable@genesisnet.com), Genesis requested that Plaintiff also copy Goodman Inc. —not GNET—on each submission (aparatc@goodmansolutions.com). *No request was ever made by Genesis to stop sending invoices to its accounts payable department until after the payments stopped, an entire year later.*

37.     If Genesis and Goodman Inc. (and GNET) were truly separate, non-affiliated entities (which on information and belief, they are not), logic would dictate that once Genesis ceased to be a party to the Distributor Agreement, it would also cease to be the entity that Plaintiff was to address invoices and submit them to for payment.

38.     Indeed, contrary to Seago's statement on September 8, 2020, that "Genesis will no longer be involved so purchase orders will come from GNET ATC LLC", Genesis did not cease its involvement with WNC, or with Goodman Inc.

**Plaintiff's Attempts to Resolve the Issue of the $9,212,256.94 in Unpaid Invoices**

39.     On September 17, 2021, all payments on Plaintiff's submitted invoices stopped.

40.     On October 11, 2021, WNC sent an email to accounts payable at Genesis and to "APARATC" at GNET informing them that at that time, there were twelve outstanding invoices that remined unpaid.

41.     Hearing nothing, Plaintiff reached out to Seago at Goodman for help, to which Seago responded he would "escalate the request and press for a prompt reply."

42.     By October 19, Plaintiff informed Seago that there were now seventeen unpaid invoices.

43.     On October 19, 2021, Plaintiff received an email from James Frinzi ("Frinzi"), who introduced himself as the new CEO of GNET, which he stated was the assignee of the Distributor Agreement, and therefore the party responsible for the debt to Plaintiff.

44.     Frinzi informed Plaintiff that GNET had been terminated by AT&T as an approved VAR and as a result, GNET apparently had no money to pay any of Plaintiff's open invoices and had retained a consultant that was "investigating and advising as to what happened, and how we can resolve this." He further stated, "I probably need a week to ten days to have a thorough response. I apologize for this, but this is the best I can do at the moment."

45.     Frinzi contacted Plaintiff again the next day, on October 20, 2021, and further asserted that "Goodman Networks acquired this business from [Genesis], and the contracts were assigned to GNET ATC. It is not evident to us that [Genesis] owes anything in this matter." He continued:

> GNET ATC does not have the money to make these payments. I have hired a financial restructuring firm to: first do an independent financial analysis of where GNET ATC is financially, and how it got here, and second, develop a realistic plan to pay back our suppliers. In the meantime GNET ATC has been terminated by AT&T, which clearly hinders our efforts to pay you back. It is my understanding that that upon presenting an independently developed plan that is specific, and realistic, AT&T will consider bringing GNET ATC back into the fold. For the time being, all payments to suppliers are suspended until further notice. Please

> give us two weeks to allow the restructuring firm to aid in
> developing a plan.

46.     Copied on this email were Stephanie Elmore at Goodman Inc., Cathy Kincy, the CFO of Genesis, the "consultant" from the financial restructuring firm, and a bankruptcy attorney.

47.     Thus, as of October 20, 2021, GNET's CEO had informed Plaintiff that no resolution would be forthcoming and Plaintiff should just wait in line like all GNET's other suppliers, and Genesis' CFO was well aware of the situation.

48.     As a result, on October 26, 2021, Plaintiff (through W-NeWeb) sent a formal payment demand for the then overdue amount of $7,663,212.88 to all three entities referenced by Frinzi: Genesis, GNET, and Goodman Inc., in an effort to secure its place in the line for payment. *See* Exhibit 2, a copy of which is attached hereto and incorporated herein by reference.

49.     On October 28, 2021, Plaintiff emailed Frinzi and requested to speak with restructuring consultant. Plaintiff then reached out directly to the consultant, who never responded. Frinzi, Stephaine Elmore and Cathy Kincy were all copied on the email string.

50.     During this time (and continuing until March 4, 2022), Plaintiff was also sending weekly reminders to both Genesis' accounts payable and GNET (and Goodman Inc.) that the invoices had not been paid and providing the outstanding balance as of the date of each email.

51.     In response to Plaintiff's weekly email dated November 14, 2021 (sent as always to Stephanie Elmore at Goodman Inc. and Melissa Novak at Genesis, with a copy to Frinzi), Frinzi responded the following day (November 15): "This is a matter for GNET ATC and not Genesis. The contract was assigned to GNET ATC. That said, we have a restructuring consultant and a bankruptcy lawyer, both of which copied on this email, that are assessing the financial situation. We will reach out to you shortly with a status. Going further you can address all inquiries to me, Josh Eppich, and David Bitterman."

52.     Having received no payment from *any* entity, nor any indication as to when it would be provided with any sort of payment plan from either the consultant or the bankruptcy attorney, Plaintiff sent a second payment demand two weeks later, again to Genesis, Goodman Inc. and GNET, on December 3, 2021, for the full overdue amount, which by then totaled $9,212,256.94. A copy of the December 3, 2021, payment demand is attached hereto as Exhibit 3, and copies of all the corresponding invoices that had been previously submitted pursuant to the Distributor Agreement to Genesis, Goodman Inc. and GNET are collectively attached hereto as Exhibit 4. Both exhibits are incorporated herein by reference.

53.     By way of both the prior submission of the invoices themselves, as well as through Plaintiff's two formal payment demands, both Genesis and GNET (and Goodman Inc.) were, and are, aware that there is an overdue amount totaling $9,212,256.94 plus interest owing to Plaintiff pursuant to the Distributor Agreement.

54.     In response to Plaintiff's weekly reminder email dated December 13, 2021, the bankruptcy lawyer, Josh Eppich reached out, stating "I am happy to discuss with your counsel where the company is at and what the company is doing to work to resolve the outstanding issues." He copied both Stephanie Elmore (Goodman Inc.) and Melissa Novak (Genesis).

55.     In response to Plaintiff's weekly email reminding Genesis, Goodman Inc. and GNET that there was still an outstanding balance of $9,212,256.94 due, Frinzi responded: 'We hired a bankruptcy lawyer. Most people in the world would understand that when he corresponded with you, that he is the point of contact. You need to get your lawyer to connect with Josh. Your emails to 50 people including Stephanie are not going to produce anything."

56.     Thus, as of December 20, 2021, Plaintiff was informed by GNET (with Goodman Inc. and Genesis' knowledge) in no uncertain terms, that the only point of contact for resolving the dispute was Josh Eppich, the bankruptcy lawyer.

57.     As such, and as instructed by GNET, Plaintiff's in-house counsel responded to Eppich on December 24, 2021, stating that she "would like to have a con-call to know GNET's viewpoint, as one of the joint-debtors in the Genesis overdue dispute issue, for the total debt and the payment proposal. Please let me know your available time." Having no response, Plaintiff's counsel reached out again on January 10, 2022.  Eppich did not respond.

58.     On January 11, 2022, counsel for Plaintiff also emailed a copy of Plaintiff's December 3, 2021, demand letter to James Goodman and Stephanie Elmore at Genesis. The following email exchange ensued:

> "Hi James G, Stephanie,
> The paper copy of the payment claim letter I sent to you via FedEx on December 3rd, 2021, is now on the FedEx center, which FedEx has failed to deliver three times. Here I provide you with the scan file again. Please contact the local FedEx branch to get the package. Thank you."
>
> From James Goodman:
> "Genesis sold this business over 2 years ago and is not responsible, do not send this again to Genesis."
>
> "Mr. James Goodman,
> We disagree your email. Genesis is fully responsible for all due amount $9,212, 256.94 owed to WNC. We reserve all claim rights against Genesis, GNET. We ask your immediate proposal of payment plan."
>
> "Your wrong and do not contact me or Genesis or we will take your actions as harassment and take action.
> James Goodman"

59.     On January15, 2022, in response to that week's email reminder of the outstanding debt, Frinzi emailed WNC, stating, "Hi, we have a consultant who is settling our debts. He will reach out next week. I am confident we can work something out."

60.     On January 22, 2022, Frinzi responded to Plaintiff's weekly reminder email as follows: "I have a question. I believe our consultant that we hired to settle our debts has reached out to you, and you have not reached out to him. So why do you keep sending your request to 11 other people, when the single person charged with settlement you haven't contacted? It doesn't make sense. If you would like to obtain payment, I suggest that you reach Joe Baum."

61.     Plaintiff's counsel responded the next day: "We've reached out to your consultant, Joshua Eppich, twice in 2021/12/24 and 2022/1/11, respectively, but never got any response from him. We ask GNET, as one of the joint-debtors in the Genesis overdue dispute issue owed to WNC, to propose an immediate payment plan."

62.     Eppich finally joined in on January 24, 2022, and stated that he was "happy to discuss."

63.     Plaintiff's counsel then thanked Eppich for his reply and requested that he provide his client's position on the outstanding receivable in writing. Eppich was not heard from again.

64.     Instead, on January 26, 2022, a new restructuring consultant purportedly retained by GNET, Joe Baum responded, and confirmed on GNET's behalf that "[t]he amount asserted as outstanding agrees with the company's accounts payable records."

65.     Plaintiff asked Baum if GNET had worked out a payment plan, to which Baum responded on February 11, 2022, "Not yet. The company has secured debt that is in the process of trying to settle. We expect this process to be completed within the next 30 to 60 days."

66.     Then, during a phone conversation on February 17, 2022, Baum stated that GNET had secured creditors who were owed $82 million first, and a total of $150 million in accounts payable

owed to unsecured creditors, including Plaintiff. As such, there would be no payment plan to propose until the end of May, if that.

67.     Thus, as of February 17, 2022, four months after Plaintiff began the process of attempting to resolve the outstanding debt issue with Genesis, Goodman Inc. and GNET, both Genesis and GNET had effectively told Plaintiff to "go pound sand".

68.     Neither Genesis nor GNET have paid Plaintiff a single penny towards the $9,212,256.94 due and owing, or given any indication that they ever will, thus necessitating this lawsuit.

**AS AND FOR A FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against Genesis)**

69.     Plaintiff repeats and realleges paragraphs 1 – 68 as if fully set forth herein.

70.     Plaintiff has performed all its obligations under the Distributor Agreement.

71.     Plaintiff is owed $9,212,256.94 for Products sold to Genesis and/or GNET pursuant to the Distributor Agreement.

72.     By its express terms, the Distributor Agreement may not be assigned without the written consent of Plaintiff, and Plaintiff never provided written consent.

73.     By assigning the Distributor Agreement to GNET without Plaintiff's written consent, Genesis has breached its non-waivable covenant not to assign the contract, a duty that Genesis maintained under the Distributor Agreement regardless of the purported assignment.

74.     On information and belief, at the time Genesis purportedly assigned the Distributor Agreement to GNET, it knew or should have known that GNET (and/or its parent company Goodman Inc.) had a bad credit rating, that GNET (and Goodman Inc.) were insolvent and/or approaching bankruptcy, and that GNET would become unable to meet its assigned contractual obligations in the

near future. In spite of this knowledge, Genesis still assigned the Distributor Agreement to GNET without Plaintiff's consent.

75.     As a direct and proximate result of Genesis' material breach of the covenant not to assign the Distributor Agreement, Plaintiff has been damaged in the amount of $9,212,256.94, plus 1.5% monthly interest calculated from the due date of each unpaid invoice.

76.     Additionally, as a result of Genesis' breach, Plaintiff is entitled to recover its attorneys' fees and costs under Section 17.1 of the Distributor Agreement.

**AS AND FOR A SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against GNET)**

77.     Plaintiff repeats and realleges paragraphs 1 – 76 as if fully set forth herein.

78.     Plaintiff has performed all its obligations under the Distributor Agreement.

79.     As the purported (and admitted) assignee of the Distributor Agreement, GNET is in material breach of the Distributor Agreement by failing to pay Plaintiff the $9,212,256.94 that Plaintiff is owed for Product sold and invoiced pursuant to the Distributor Agreement, as a direct and proximate result of which Plaintiff has been injured in that amount.

80.     Plaintiff therefore seeks judgment against GNET for $9,212,256.94, plus 1.5% monthly interest calculated from the due date of each unpaid invoice.

81.      Additionally, as a result of GNET's breach, Plaintiff is entitled to recover its attorneys' fees and costs under Section 17.1 of the Distributor Agreement.

**AS AND FOR A THIRD CAUSE OF ACTION**
**ACCOUNT STATED**
**(Against Both Defendants)**

82.     Plaintiff repeats and realleges paragraphs 1 – 81 as if fully set forth herein.

83.     Plaintiff manufactured, delivered, sold, and, through its wholly owned U.S.-based subsidiary W-NeWeb, issued invoices for its Products in substantially the same manner throughout the term of its Distributor Agreement.

84.     The invoices Plaintiff submitted were each billed to Genesis and reflect the quantity, type, and price for the Products sold and delivered, and indicated that shipments were "FOB."  See Exhibit 4.

85.     The total amount due under the invoices is $9,212,256.94. *See Id.*

*86.*     The invoices also each indicated that the Term of Payment was "Net 90 Days."  *See Id.*

87.     These 90-day payment terms mirrored what was set forth in the Distributor Agreement, which payment terms were well known to both Genesis and GNET and were also reflected in the payment demands sent to Genesis and GNET (and Goodman). *See* Exhibits 1-3.

88.     Therefore, the payment due dates for each invoice fell between September 20, 2021 (when the first four invoices were due for payment) and November 12, 2021 (when the final invoice was due for payment). Accordingly, the entire amount of $9,212,256.94 was due and owing by November 12, 2021. *See* Exhibits 2-4.

89.     Plaintiff submitted these invoices in the same manner as it had throughout the term of the Distributor Agreement – to Genesis' accounts payable department.

90.     At Genesis' direction, Plaintiff also submitted each invoice to the accounts payable department of Goodman Inc., GNET's parent company.

91.     In addition to submitting each invoice as explained above, Plaintiff also sent two formal payment demand letters directly to all three parties: Genesis, GNET, and Goodman, Inc.

92.     Both demand letters identified each invoice number, as well as the associated due date, PO Number, and outstanding amount due for each such invoice.

93.     Both Genesis and GNET accordingly received, and were aware of, the amount due under each invoice, the specific PO Number (and Product) to which it related, as well as the due date for payment and specific payment amount owed under each invoice.

94.     Neither Genesis nor GNET ever timely objected to any of the invoices or to any of the Products received thereunder.

95.     Neither Genesis nor GNET ever rejected any Product delivered pursuant to the invoices.

96.     On or about January 26, 2022, GNET again confirmed to Plaintiff that the amounts claimed were due and owing.

97.     Plaintiff accordingly has set forth the elements of an account stated against Genesis and GNET.

98.     Therefore, Plaintiff seeks judgment against Genesis and GNET, jointly and severally, for an account stated, in the amount of $9,212,256.94, as collectively set forth on the invoices.

## JURY TRIAL

Plaintiff demands a trial by jury of all issues and claims in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment as follows:

(A) On the First Cause of Action against Defendant Genesis in the sum of no less than $9,212,256.94, plus 1.5% interest per month measured from the due date of each unpaid invoice, plus reasonable attorneys' fees and costs;

(B) On the Second Cause of Action against GNET, in the sum of no less than $9,212,256.94, plus 1.5% interest per month measured from the due date of each unpaid invoice, plus reasonable attorneys' fees and costs;

(C) On the Third Cause of Action against both Defendants in the alternative, and jointly and severally, in the sum of no less than $9,212,256.94, plus 1.5% interest per month measured from the due date of each unpaid invoice; and

(D) Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       August 8, 2022

                                         **LAZARE POTTER GIACOVAS & MOYLE LLP**

                                         By: /s/ Robert A. Giacovas
                                                   Robert A. Giacovas
                                                   Lainie E. Cohen
                                                   Jacob A. Englander
                                                   747 Third Avenue, 16th Floor
                                                   New York, NY 10017
                                                   (212) 758-9300
                                                   rgiacovas@lpgmlaw.com
                                                   lcohen@lpgmlaw.com
                                                   jenglander@lpgmlaw.com

                                                   *Attorneys for Plaintiff*
                                                   *Wistron NeWeb Corporation*