UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
WISTRON NEWEB CORPORATION,                                         :
                                                                   :
                              Plaintiff,                           :
                                                                   :
              -v-                                                  :
                                                                   :
GENESIS NETWORKS TELECOM SERVICES,                                 :
LLC and GNET ATC, LLC,                                             :
                              Defendants.                          :
                                                                   :
-------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/17/2022
```

22-cv-2538 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant GNET ATC, LLC ("GNET") moves for transfer of this action to the Northern District of Texas pursuant to 28 U.S.C. § 1404.  Dkt. No. 33.  GNET also moves to dismiss the complaint filed by Plaintiff Wistron Neweb Corporation ("Plaintiff" or "WNC") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 44.  Defendant Genesis Networks Telecom Services, LLC ("Genesis," and collectively with GNET, "Defendants") also moves to dismiss the operative complaint ("Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief.  Dkt. No. 41. For the following reasons, the Court denies the motions.

## BACKGROUND

The Court accepts as true for purposes of this motion the well-pleaded allegations of the Amended Complaint as supplemented by the documents attached to the Amended Complaint.

### I.       The Relevant Parties

This is an action for breach of contract and account stated to recover for unpaid invoices for products manufactured and delivered pursuant to a distributor agreement.  Dkt. No. 39 ¶ 1. WNC is a leading international product design and manufacturing company.  *Id.*  It is organized

under the laws of Taiwan and has its principal place of business in Taiwan; its wholly owned

subsidiary, W-NeWeb Corporation ("W-NeWeb") is based in California. *Id.* ¶ 6. WNC alleges,

on information and belief, that Genesis is a Texas limited liability company, *id.* ¶ 7, that GNET

is also a Texas limited liability company formed on or about August 14, 2019 and is an affiliate

of Genesis, *id.* ¶ 8, and that non-party Goodman Networks, Inc., d/b/a Goodman Solutions

("Goodman Inc.") is the parent corporation with whole ownership of GNET and is a related

entity to Genesis, *id.* ¶ 9. WNC also alleges that James Goodman holds an ownership interest in

Genesis. *Id.* He, along with his brother John Goodman, the CEO of Goodman Inc., holds an

interest in Goodman Inc. *Id.* Goodman Inc. purportedly purchased substantially all the assets of

Genesis, including the distributor agreement at issue. *Id.*

## II.    The Distributor Agreement

The dispute among the parties stems from a Non-Exclusive Distributor Agreement

("Distributor Agreement"). The basis for the Distributor Agreement was that WNC entered into

a Material and Services Agreement ("MSA") with AT&T Services, Inc. ("AT&T") to

manufacture and supply certain hardware to support AT&T's direct-to-home business (the

"Products") on March 6, 2018. *Id.* ¶¶ 14–15. The MSA required that WNC contract with, and

sell to, a Value-Added Reseller ("VAR"), which was required to be a Minority Owned Business

as determined by AT&T, and which would then resell Plaintiff's Products at a slight markup to

AT&T. *Id.* ¶ 16. AT&T specifically identified Genesis as the approved VAR and Genesis was

designated as such in the MSA. *Id.* ¶ 17.

For that reason, WNC entered into the Distributor Agreement with Genesis, defined as

the "Distributor," on February 1, 2019. Dkt. No. 39 ¶ 18; Dkt. No. 39-1 (Distributor

Agreement). The Distributor Agreement designated Genesis as Plaintiff's "non-exclusive

distributor of [WNC's] Products" in a territory defined to include North and South America.

Dkt. No. 39-1 §§ 1.10, 2.  Under the Distributor Agreement, Genesis agreed to purchase the Products based upon orders which, in turn, were based upon AT&T's needs, at agreed-upon prices set forth in the Distributor Agreement.  *Id.* ¶¶ 19–20.  Those Products were to be delivered to pre-arranged warehouses from which Genesis could then retrieve and resell those Products to AT&T.  *Id.* ¶ 20.

Among other duties, the Distributor Agreement required Genesis to "use its best efforts at all times to develop business for Products and to promote the sale of and sell the Products within the Territory," to "purchase the Products exclusively from WNC," and to "resell and deliver the Products on a first-in first-out method of withdrawing stock for shipment to Customer," defined to be AT&T.  Dkt. No. 39-1 § 3.1(a)–(c).  Section 6.1 of the Distributor Agreement provided that Genesis would place planning orders with WNC that would become firm purchase orders thirty days prior to the delivery date.  *Id.* § 6.1.  Genesis was required to "pay for all products within ninety (90) days after title transfer from WNC," which was defined to be delivery to the designated warehouse.  Dkt. No. 39 ¶ 23; Dkt. No. 39-1 §§ 4.2, 7.1(a).  The term of the Distributor Agreement was three years from February 1, 2019, Dkt. No. 39-1 § 16.1, and termination was permitted only by written notice and under specified contractual terms, *id.* § 16.2.

Importantly for this dispute, the Distributor Agreement required Genesis to obtain written consent from WNC before assigning the Distributor Agreement to any third party.  Dkt. No. 39 ¶ 25; Dkt. No. 39-1 § 19.8.  Section 19.8 of the Distributor Agreement, entitled "Assignment," provides as follows:

> This Agreement may not be assigned by Distributor, in whole or in part, to any third party, including any subsidiary or Affiliate of the Distributor or any subdistributor *without the prior written consent of WNC.  A Change of Control shall be deemed an assignment for purposes of this Section.*  WNC may assign its right and

3

obligations hereunder to any of its respective subsidiaries or Affiliates.  In the event of a proposed appointment by Distributor to any sub-distributor, Distributor shall obtain and provide to WNC such background and due diligence information with respect to such sub-distributor required by WNC.  Any approved appointment of a sub-distributor may only be made by WNC in writing and in its sole discretion and shall not release Distributor from its obligations hereunder.

Dkt. No. 39-1 § 19.8 (emphasis added).  Change of Control was defined as follows:

**"Change of Control"** shall be deemed to have occurred if Distributor sells substantially all of its assets or a change occurs in the current ownership of capital stock or other securities of the Distributor which results in a change of twenty percent (20%) or more of the ownership of Distributor . . . , whether pursuant to internal transfers of capital stock or securities of the Distributor among the beneficial owners of such capital stock or other securities, or a third party stock or other securities purchase, merger, consolidation or other similar transaction.

*Id.* § 1.2.

Section 3.1 of the Distributor Agreement required Genesis to "promptly provide written notice" to WNC of "a Change in Control or any other material change in Distributor's ownership or its principals" "in no case more than fifteen (15) calendar days following such event."  *Id.* § 3.1(k).  Section 5.2(e) required Genesis to furnish WNC "on an ongoing basis . . . [i]mmediate notification upon any proposed or actual change in management, control or ownership of Distributor, including without limitation a Change in Control."  *Id.* § 5.2(e).

WNC sold its Products to Genesis and Genesis did not reject any Products which were duly delivered to the pre-arranged warehouses.  Dkt. No. 39 ¶¶ 20–21.  Upon information and belief, AT&T paid Genesis for all of WNC's Products at a profit to Genesis.  *Id.* ¶ 22.

### III.    The Purported Assignment

In September 2019, Goodman Inc. purchased "substantially all" of Genesis's assets.  *Id.* ¶ 29.  This was just over six months after WNC entered into the Distributor Agreement with Genesis.  *Id.*  No notice of the change in ownership or any asset purchase involving the Distributor Agreement was provided to WNC.  *Id.* ¶¶ 29–30.

On August 17, 2020, Steve W. Seago, identified in the Amended Complaint as Vice President, Business & Corporate Development, for Goodman Inc., sent an email to WNC asking WNC to sign an attached draft "Assignment, Assumption and Consent" Agreement ("Assignment Agreement") to consent to assignment of the Distributor Agreement from Genesis to GNET.  *Id*. ¶¶ 27–28.  The cover email explained the matter was one that "ha[d] fallen through the cracks in our transition from Genesis to Goodman [Inc.]" and asked WNC to "execute ASAP & then we will counter & return fully executed?"  *Id*. ¶ 27.  The following day, WNC responded with the request that Genesis provide proof that the Distributor Agreement was, in fact, one of the assets of Genesis purchased by Goodman Inc.  *Id*. ¶ 30.  Seago replied that the Assignment Agreement—once fully executed—was the only proof necessary.  *Id*. ¶ 31.  Plaintiff sought clarification from Seago whether Genesis would continue to issue purchase orders or whether GNET would do so, to which Seago replied, "Genesis will no longer be involved so purchase orders will come from GNET ATC LLC.  GNET ATC is a wholly owned subsidiary of Goodman Networks.  Hope this helps clarify."  *Id*. ¶ 32.

Correspondence ensued about the credit of GNET.  WNC and its insurance carrier attempted to investigate the credit of GNET, but the carrier could not find any record of GNET being a registered entity.  *Id*. ¶ 33.  Plaintiff then requested help obtaining this information from Seago, who responded that he would gather the requested information, noting also that WNC's carrier had requested additional information about GNET.  *Id*. ¶ 34.  Although Seago stated he would copy WNC on further communications with WNC's carrier about Goodman Inc.'s acquisition of Genesis's assets, no further communications regarding GNET's creditworthiness or the assigned was received from Goodman Inc.  *Id.* ¶ 34.  GNET ultimately failed the credit check run by WNC's carrier, and WNC did not sign the Assignment Agreement.  *Id*. ¶ 35.

IV.     **Plaintiff's Continued Sales to Genesis**

Notwithstanding the purported assignment, WNC continued to list Genesis as the party on every invoice to which each order was billed and shipped to, and each invoice continued to be submitted to Genesis's accounts payable department for processing.  *Id.* ¶ 36.  At Genesis's request, Plaintiff also copied Goodman Inc., but not GNET, on each submission.  *Id.*

Each of the invoices from June 2021 to August 2021 were in identical form and in substantially the same form that they had been issued throughout the term of the Distributor Agreement.  Dkt. No. 39 ¶ 83; Dkt. No. 39-4 (invoices).  They reflected the quantity, type, and price for the Products sold and delivered, and indicated that shipments were "FOB."  Dkt. No. 39 ¶ 84.  They were issued by W-NeWeb with an address in Milpitas, California.  *See* Dkt. No. 39-4.  They bore the language: "Bill To: Genesis Networks Telecom Services, LLC."  *Id.*  They reflected a "Ship To" location of "Genesis Networks Telecom Services, LLC" in Southaven, Mississippi.  *Id.*  They also contained this language: "Term of Payment: Net 90 Days."  *Id.*

Genesis never requested WNC to stop sending invoices to its accounts payable department until payments ceased a year after WNC's communications with Seago concerning the Assignment Agreement.  Dkt. No. 39 ¶ 36.

On September 17, 2021, all payments on WNC's submitted invoices stopped.  *Id.* ¶ 39.  WNC then engaged in extended correspondence with Genesis, GNET, and Goodman Inc., which is discussed in more detail below.  In essence, on October 11, 2021, WNC sent an email to accounts payable at Genesis and to "APARATC" at GNET informing them that, at the time, there were twelve outstanding invoices that remained unpaid.  *Id.* ¶ 40.  By October 19, WNC informed Seago, who was the signatory on the Distributor Agreement, that there were now seventeen unpaid invoices.  *Id.* ¶ 42.  On that same day, the new CEO of GNET, James Frinzi, stated that GNET was the assignee of the Distributor Agreement and the party responsible for the

debts to Plaintiff and that GNET had been terminated by AT&T as an approved VAR and had no money to pay any of Plaintiff's open invoices. *Id.* ¶¶ 43–44. Frinzi subsequently told WNC that "Goodman Networks acquired this business from [Genesis], and the contracts were assigned to GNET ATC. It is not evident to us that [Genesis] owes anything in this matter." *Id.* ¶ 45. He also stated that GNET had hired a restructuring consultant and a bankruptcy attorney to assess its financial situation and assist it in paying back its suppliers. *Id.* ¶¶ 44–51. Ultimately, neither Genesis, nor GNET, nor Goodman Inc., paid Plaintiff on its outstanding balance of $9,212,256.94. *Id*. ¶¶ 67–68.

Plaintiff brings claims for breach of contract against Genesis for the Products sold and violation of the assignment provision of the Distributor Agreement, *id*. ¶¶ 69–76, breach of contract against GNET for the owed payments, *id*. ¶¶ 77–81, and for account stated against both Defendants, *id*. ¶¶ 82–98.

## PROCEDURAL HISTORY

This action was commenced by complaint filed on March 30, 2022. Dkt. No. 7.[1] On July 18, 2022, GNET filed its motion to transfer the case to the Northern District of Texas and its first motion to dismiss. Dkt. No. 33. Genesis filed a motion to dismiss the complaint for failure to state a claim for relief. Dkt. No. 30. Both motions were accompanied by memoranda of law and by declarations. Dkt. Nos. 32, 34–36. On August 8, 2022, Plaintiff filed its Amended Complaint, Dkt. No. 39, and its memorandum of law in opposition to GNET's motion to transfer, Dkt. No. 38.[2] Genesis filed a motion to dismiss the Amended Complaint on August 19, Dkt.

---

[1] Plaintiff attempted to file its complaint on March 29, 2022, but that filing was rejected by the Clerk of the Court due to a filing error. Dkt. No. 1.

[2] Because Plaintiff properly filed an Amended Complaint, the Court denies Genesis's and GNET's first motions to dismiss as moot. *See* Individual Practices in Civil Cases – June 21, 2022, Lewis J. Liman, United States District Judge, Rule 3(c); *see also Pettaway v. Nat'l*

Nos. 41–42, and GNET filed a motion to dismiss the Amended Complaint on August 22, 2022, Dkt. Nos. 44–45.  On September 12, 2022, GNET filed a reply memorandum of law in further support of its motion to transfer.  Dkt. No. 48.  On September 22, 2022, Plaintiff filed a memorandum of law in opposition to both motions to dismiss the Amended Complaint.  Dkt. No. 53.  On October 10, 2022, Defendants filed their reply memoranda of law in further support of their motions to dismiss the Amended Complaint.  Dkt. Nos. 54–55.

## DISCUSSION

The Court first addresses GNET's motion to transfer under 28 U.S.C. § 1404.  It then addresses the Defendants' motions to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

## I.      GNET's Motion to Transfer

Defendant GNET moves to transfer the case to the Northern District of Texas.  Dkt. No. 33.  It argues that the case should be transferred to that district because it and Genesis are both headquartered in the Northern District of Texas, none of the witnesses in this case reside in this District, none of the operative facts occurred in this District, and relevant documents are located in Texas.  *See generally* Dkt. No. 36; Dkt. No. 48.  Tellingly, GNET's co-defendant, Genesis, does not join the motion.

Plaintiff opposes the motion.  Dkt. No. 38.  Plaintiff counters that Genesis agreed in the Distributor Agreement that disputes could be submitted to courts located in New York, *see* Dkt. No. 39-1 § 19.12, and that under Defendants' own theory, the Distributor Agreement was assigned to GNET and GNET thus assumed the obligation to subject itself to an action in the

---

*Recovery Sols., LLC*, 955 F.3d 299, 304 (2d Cir. 2020) (providing that the district court has the option of denying a pending motion as moot when a plaintiff properly amends her complaint); *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000) (noting that an "an amended pleading ordinarily supersedes the original and renders it of no legal effect").

forum of New York.  It also emphasizes that Genesis has not moved to transfer venue, that GNET has not offered any information about the testimony that its witnesses will offer or its relevance to a defense, that the witnesses can testify remotely, that GNET has not shown that any of the non-party witnesses would be unwilling to testify voluntarily, that the locus of operative facts is not in Texas, and that a New York court would be more capable of resolving issues of New York law than a Texas court.  *See generally* Dkt. No. 38.   For the following reasons, the motion to transfer is denied.

Under Section 1404(a) of Title 28, district courts may exercise their discretion to transfer "[f]or the convenience of parties and witnesses [and] in the interest of justice . . . any civil action to any other district . . .  where it might have been brought or to any district . . . to which all parties have consented."  28 U.S.C. § 1404(a).  Although the Distributor Agreement contains a forum selection clause, the parties do not dispute that the clause is permissive, as the clause states that "the Parties hereby agree to submit to the *non-exclusive jurisdiction* of the courts located in the State of New York," with no additional limiting language, Dkt. No. 39-1 § 19.12.[3] *See NYC Vision Cap., Inc. v. C21FC, LLC*, 2022 WL 2527611, at *4 (S.D.N.Y. July 7, 2022) (describing how such language establishes that the clause is "facially permissive" (citing *Akers Biosciences, Inc. v. Martin*, 2015 WL 1054971, at *4 (S.D.N.Y. Mar. 10, 2015) (Nathan, J.))). "Because the forum selection clause is permissive, the 'normal forum non conveniens analysis is applicable here.'"  *Id.* (quoting *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 980 (2d

---

[3] The full text of Section 19.12 of the Distributor Agreement provides:
This Agreement shall be interpreted by and governed in accordance with the laws of the State of New York without regard to its choice of law provisions.  The Parties hereby agree to submit to the non-exclusive jurisdiction of the courts located in the State of New York.  For the avoidance of doubt, the United Nations Convention on Contracts for the International Sales of Products shall not apply to the supply of Products or other transactions contemplated under this Agreement.

Cir. 1993)); *see also Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009) ("[W]here parties contract to a so-called permissive forum selection clause, that is, one that designates a forum in advance, but does not preclude a different choice, the . . . presumption of enforceability does not apply.").

To determine whether transfer is appropriate, the Court applies a two-step inquiry.  First, it determines "whether the action could have been brought in the proposed transferee court," in this case the Northern District of Texas.  *Inventel Prods. LLC v. Penn LLC*, 2017 WL 818471, at *2 (S.D.N.Y. Feb. 28, 2017) (Nathan, J.).  Second, the Court "'balances the private and public interests' to determine whether transfer is warranted 'for the convenience of parties and witnesses, and in the interest of justice.'"  *Id.* at *2 (alterations adopted) (first quoting *Gross v. British Broad. Corp.*, 386 F.3d 224, 230 (2d Cir. 2004), and then quoting 28 U.S.C. § 1404(a)).  "Among the factors to be considered in determining whether to grant a motion to transfer venue 'are, *inter alia*: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.'"  *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006)).  The Court also considers "[(8)] the forum's familiarity with the governing law . . . and (9) trial efficiency and the interests of justice based on the totality of the circumstances."  *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp*, 457 F. Supp. 2d 474, 477 (S.D.N.Y. 2006).  "[T]he party requesting transfer carries the 'burden of making out a strong case for transfer.'"  *N.Y. Marine & Gen. Ins. Co.*, 599 F.3d at 114 (quoting *Filmline (Cross–Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989)).

Accordingly, "district courts in our Circuit have consistently applied the clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion." *Id.* (collecting cases). "The determination whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court." *United Artists Corp.*, 865 F.2d at 520. "The factors do not comprise an exclusive list, and they should not be applied mechanically or formulaically but rather to guide the Court's exercise of discretion." *Matthews v. Cuomo*, 2017 WL 2266979, at *2 (S.D.N.Y. May 1, 2017).

### A.   Whether the Action Could be Brought in the Northern District of Texas

There is no dispute that GNET has satisfied the first step of the two-step test. The Amended Complaint alleges that Defendants are both Texas limited liability companies, Dkt. No. 39 ¶¶ 7–8, and Plaintiff does not otherwise dispute that Defendants maintain their principal place of business in the Northern District of Texas and are subject to personal jurisdiction there, Dkt. No. 36 at 6. A "civil action may be brought in . . . a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Defendants are residents of Texas and thus the action could have been brought in the Northern District of Texas. *See* 28 U.S.C. § 1391(c)(2) (stating that an entity "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction"); *Ramirez v. Con-Way Multimodal, Inc.*, 2018 WL 6411276, at *1 (S.D.N.Y. Dec. 4, 2018) (stating that the "paradigm bases for general jurisdiction" are a corporation's principal place of business and place of incorporation (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014))); *see, e.g.*, *Fuji Photo Film Co. v. Lexar Media, Inc*., 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (similarly holding that action could have been brought in transferee district because defendant, "having its primary place of business in Fremont, California, is subject to personal jurisdiction in that district and venue is proper there").

B.      The Balancing Analysis

GNET fares less well, however, on the second step of the test.  The Court ultimately concludes that GNET has failed to satisfy its burden to make a "clear and convincing" case for transfer.  Under the first factor, the Plaintiff's choice of forum generally weighs in favor of the Southern District of New York.  Under the law of this Circuit, "a plaintiff's choice of forum is presumptively entitled to substantial deference" for "our legal system has traditionally deferred to the plaintiff's choice of forum."  *Gross*, 386 F.3d at 230 (citing *Iragorri v. United Techs Corp.*, 274 F.3d 65, 70–71 (2d Cir. 2001) (en banc)).  "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947); *see also In re Warrick*, 70 F.3d 736, 741 (2d Cir. 1995) (noting that a plaintiff's choice of forum is "entitled to substantial consideration" (citation omitted)); *C21FC, LLC*, 2022 WL 2527611, at *5 (same); *In re Bystolic Antitrust Litig.*, 2021 WL 148747, at *2 (S.D.N.Y. Jan. 15, 2021) (same).  Plaintiff's status as a Taiwanese corporation does not vitiate its choice of forum.  Although "it is true that in many cases, a foreign plaintiff's chosen forum in the United States will not be any more discernibly convenient than the alternatives and, as a result, will not merit a presumption to the contrary," "the deference due depends on the facts of the individual case."  *Medien Patent Verwaltung AG*, 749 F. Supp. 2d 188, 191 (S.D.N.Y. 2010).  Here, by agreeing to a New York forum selection clause, the parties agreed in advance that the New York forum would be discernibly more convenient at least for WNC than the alternatives.  Dkt. No. 39-1 § 19.12.  Thus, in selecting New York, WNC was doing no more than exercising the option it was given by contract.  There is no evidence that Plaintiff had an "improper motive," *Medien Patent Verwaltung AG v. Warner Bros*, 749 F. Supp. 2d at 191, *e.g.*, "forum-shopping reasons" or other justifications that the law recognizes to be invalid.  *Iragorri*, 274 F.3d at 72.  It is not wrongful for WNC to choose not to sue in

12

Defendants' home forum.  There was thus no impermissible forum-shopping rationale in Plaintiff's choice of New York.  For that reason, Plaintiff's choice of New York as the venue must be "given great weight."  *D.H. Blair*, 462 F.3d at 107.

GNET has not shown that the second factor, the "convenience of the witnesses," favors its motion.  This factor is typically the starting point of the analysis and considered to be "the most important . . . in considering a § 1404(a) motion to transfer."  *Larew v. Larew*, 2012 WL 87616, at *4 (S.D.N.Y. Jan. 10, 2012) (quoting *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004)).  However, "[i]n considering the convenience of the witnesses, the Court should not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum.  Instead, the Court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Pecorino v. Vutec Corp.*, 934 F. Supp. 2d 422, 436 (E.D.N.Y. 2012); *see also Johnson v. Costco*, 2021 WL 3128236, at *2 (S.D.N.Y. July 23, 2021) (same).  "Because of the importance of this factor, the party seeking transfer must clearly specify the key witnesses to be called and make a general statement of what their testimony will cover."  *Excelsior Designs, Inc. v. Sheres*, 291 F. Supp. 2d 181, 185–86 (E.D.N.Y. 2003) (internal quotation marks omitted) (quoting *Royal & Sunalliance v. British Airways*, 167 F. Supp. 2d 573, 577 (S.D.N.Y. 2001)); *see also Factors Etc., Inc. v. Pro Arts Inc.*, 579 F.2d 215, 218 (2d Cir. 1978) ("When a party seeks the transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover."), *overruled on other grounds by Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990); *IKB Int'l S.A. v. Wilmington Trust Co.*, 2017 WL 4084052, at *4 (S.D.N.Y. Sept. 14, 2017) (same); *YLD Ltd. v. Node Firm, LLC*, 2016 WL 183564, at *2 (S.D.N.Y. Jan. 14, 2016) ("[T]he movant must

identify material witnesses and supply a general description of what their testimony will cover."); *Larew*, 2012 WL 87616, at *4 (same).  "Vague generalizations and failure to clearly specify the key witnesses to be called are an insufficient basis upon which to grant a change of venue under § 1404(a)."  *In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392, 395 (S.D.N.Y. 2006) (quoting *Orb Factory, Ltd. v. Design Science Toys, Ltd.*, 6 F. Supp. 2d 203, 208–09 (S.D.N.Y. 1998)).  Furthermore, although the convenience of party witnesses is "not wholly insignificant," *Pilevesky v. Suntrust Bank*, 2010 WL 4879006, at *3 (E.D.N.Y. Nov. 22, 2010), it does not weigh as heavily as inconvenience to non-party witnesses, *id.*; *see also Payless Shoesource, Inc. v. Avalon Funding Corp.*, 666 F. Supp. 2d 356, 364 (E.D.N.Y. 2009).  Furthermore, "former employees are not entitled to the same deference shown to other non-party witnesses because . . . [they] are more likely willing to attend trial than other non-party witnesses."  *Pilevesky*, 2010 WL 4879006, at *3 (internal quotation marks and citation omitted).

GNET has identified four witnesses who are "located [either in] or within 100 miles of the Northern District of Texas: James Frinzi, GNET's current CEO, Jason Goodman, GNET's former CEO, Scott Greenwood, GNET's former Director of Finance and Treasury, and Brad Kozma, GNET's former [Chief Financial Officer]."  Dkt. No. 36 at 7; Dkt. No. 35-1.  Of those four witnesses, GNET has not identified whether three of them—Jason Goodman, Scott Greenwood, and Brad Kozma—have any testimony that would be relevant to the disposition of this lawsuit.  All that GNET offers in its motion is that they "can testify on matters germane to this case."  Dkt. No. 36 at 7.  But Jason Goodman, Greenwood, and Kozma are not mentioned at all in the Amended Complaint.  They were not included in Plaintiff's or Genesis's initial disclosures served before GNET subsequently named them in its initial disclosure as witnesses likely to have discoverable information.  Dkt. No. 35-3.  And all that GNET says about them in

14

its initial disclosures is that they can testify about the "GNET/WNC transaction"—the same

exact barebones entry for all the witnesses listed in GNET's initial disclosures.  Dkt. No. 35-1.

GNET thus only proffers "vague generalizations" insufficient to support their motion.  *In re*

*Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d at 395; *see also Mazuma Holding Corp. v.*

*Bethke*, 1 F. Supp. 3d 6, 30 (E.D.N.Y. 2014) (holding that defendant's failure to identify why

testimony is "material" weighs against transfer).  Moreover, even if they possessed relevant

information, as former employees, they would not entitled to the same deference as non-party

witnesses under the "convenience of witnesses" assessment.  *Pilevesky*, 2010 WL 4879006, at

*3.

GNET also identifies Frinzi as a relevant witness as he identified himself as the new CEO

of GNET to Plaintiff in October 2021.  Dkt. No. 39 ¶¶ 43, 44–45.  He is listed on Plaintiff's

initial disclosures.  *See* Dkt. No. 35-3 at 2–3.  Frinzi, however, is a senior officer of GNET and is

thus subject to GNET's control.  Under Federal Rule of Civil Procedure 30(b)(1), "a specific

officer, director, or managing agent of a corporate party may be compelled to give testimony

pursuant to a notice of deposition."  *Cambridge Cap. LLC v. Ruby Has LLC*, 2022 WL 889143,

at *1 (S.D.N.Y. Mar. 24, 2022).  The terms of the Distributor Agreement, though not dispositive

of the Section 1404(a) inquiry, are also not irrelevant.  Genesis and, now by virtue of the

assignment, GNET consented to be sued in the courts of the State of New York, and Frinzi

represented that the Distributor Agreement was assigned to GNET.  Dkt. No. 39 ¶¶ 43–45.  He

cannot legitimately now be heard to complain when WNC has exercised its right and sued his

company in the courts of New York.  Nor given his continuing relationship with Genesis can he

legitimately complain if that relationship give rise to a right by WNC to hail him into the courts

of New York.  Thus, GNET has not identified any witnesses in or within 100 miles of the

courthouses of the Northern District of Texas who would offer material testimony and for whom New York would be inconvenient.

GNET mentions three other witnesses affiliated with Genesis or Goodman, Inc. who purportedly "have information directly relevant to this action." Dkt. No. 36 at 7. Those are James Goodman, Cathy Kincy, and Steve Seago. *Id.* Seago and James Goodman apparently do have testimony relevant to the case. Seago was Vice President, Business & Corporate Development for Goodman Inc. and was copied on numerous exchanges with Plaintiff regarding the assignment. *See* Dkt. No. 39 ¶¶ 27, 31, 32, 34, 41 (describing exchanges with Seago). He was also, at some point, the President of Genesis. Dkt. No. 39-1 at 32. Cathy Kincy was the CFO at Genesis during the relevant events and copied on several emails. Dkt. No. 39 ¶¶ 46, 49. James Goodman holds an ownership interest in both Genesis and Goodman Inc. *Id.* ¶ 9. Goodman and Seago are included in Plaintiff's Rule 26(a) initial disclosures. *See* Dkt. No. 35-3. Kincy, Goodman, and Seago are also included in Genesis's initial disclosure. *See* Dkt. No. 35-2.

The fact that the three witnesses reside near the Northern District of Texas does not satisfy GNET's burden of showing that that district is more convenient for the witnesses than the Southern District of New York. All GNET says about them is that they reside in or near the Northern District of Texas—it does not offer evidence that they are within one hundred miles of the courthouse. GNET also does not identify how and why they would be inconvenienced by venue in the Southern District of New York. For a person outside the district and at least a two-hour drive from the courthouse, the Northern District of Texas is not necessarily more convenient to them than the courthouse in New York (or a law office in New York). Geographic proximity is not necessarily equivalent to convenience; in the modern age, a venue that may be more distant by miles may be more easily accessible by transportation. GNET does not identify

or argue any specific reason why litigation in the Northern District of Texas would be more convenient or impose less hardship on them or Goodman, Inc. than litigation in New York. *See Soto v. Bey Transp. Co.*, 1997 WL 407247, at *3 (S.D.N.Y. July 21, 1997) ("[D]efendants neither describe the testimony of prospective witnesses nor explain how the witnesses would be inconvenienced by appearing in this Court. . . .  Consequently, the Court cannot effectively weigh the convenience of witnesses in the analysis.").  Even if Texas was marginally more convenient than New York (a point that has not been established), none of the three would have basis to complain.  Seago signed the Distributor Agreement on behalf of Genesis as its President, Dkt. No. 39-2 at 32; Goodman is affiliated with the two companies who are parties to that Distributor Agreement and are Defendants herein; and  Kincy is affiliated with the party that signed the Distributor Agreement.  Any purported inconvenience to all of them counts for very little.

Because Defendant has not shown that there are key witnesses for whom the Southern District of New York would be more inconvenient than the Northern District of Texas, Plaintiff need not identify witnesses for whom New York is a more convenient forum. *See IKB Int'l S.A.*, 2017 WL 4084052, at *4 (holding that "[t]he party resisting transfer . . . do[es] not need to make the same showing of specific witnesses or their locations as [d]efendant because '[i]n a motion to transfer venue, the movant bears the burden of identifying any and all potential witnesses who would [be] inconvenienced if the suit were to remain in the forum chosen by plaintiff'" (quoting *Caldwell v. Slip-N-Slide Records, Inc.*, 2011 WL 3251502, at *3 (S.D.N.Y. July 26, 2011))).  Even then, Plaintiff would have likely satisfied its burden.  The Amended Complaint alleges that the invoices were sent through Plaintiff's United States subsidiary, Dkt. No. 39 ¶ 24, and Plaintiff has identified two employees of that subsidiary—Jon Peacock and Margaret Wang of

W-NeWeb—who have relevant testimony.  Dkt. No. 35-3.  Genesis has identified Peacock and another employee, Chun Lee, from W-NeWeb as being likely to have discoverable information. Dkt. No. 35-2.  Although the three appear to be located in California, GNET has not consented to suit in that venue or offered to transfer venue there.   WNC consented to be sued in New York For these reasons, there is every reason to believe New York is more convenient.

As for the third factor, the location of relevant documents and relative ease of access to sources of proof do not favor transfer.  "[A]ccess to documents and other proof is not a persuasive factor in favor of transfer without proof that documents are particularly bulky or difficult to transport."  *IKB Int'l S.A.*, 2017 WL 4084052, at *6 (quoting *Constitution Reinsurance Corp. v. Stonewall ins. Co.*, 872 F. Supp. 1247, 1251 (S.D.N.Y. 1995)) (citations and internal quotation marks omitted).  From the facts presented to the Court, this case involves a limited number of agreements and purchase orders sent by Defendants and invoices received by Defendants.  This factor thus does not favor transfer.

As for the fourth factor, the "convenience of the parties" cuts in favor of keeping the action in the Southern District of New York.  GNET admitted that that it has the "means to conduct this litigation in either District."  Dkt. No. 36 at 8; *see Sugarhill Recs. Ltd. v. Motown Rec. Corp.*, 105 F.R.D. 166, 171 (S.D.N.Y. 1985) ("Motown is a large corporation and cannot seriously contend that travel on behalf of the corporation by one of its managing agents is unexpected or that such travel to New York for deposition imposes a severe burden on it.").  It and Genesis consented in advance to suit in New York.  Such "[a] permissive forum selection clause . . . is determinative of the parties' convenience."  *Hummingbird USA, Inc. v. Texas Guaranteed Student Loan Corp.*, 2007 WL 163111, at *3 (S.D.N.Y. Jan. 22, 2007) (citing *Richardson Greenshields Sec., Inc. v. Metz*, 566 F. Supp. 131, 134 (S.D.N.Y. 1983)); *see also*

*MAK Marketing, Inc. v. Kalapos*, 620 F. Supp. 2d 295, 310 (D. Conn. 2018) (same); *Orix Credit*

*All., Inc. v. Mid-S. Materials Corp.,* 816 F. Supp. 230, 234 (S.D.N.Y. 1993) (same). "This

approach respects the agreement of the parties that this district is an appropriate forum, while

also recognizing that the parties' agreement does not exclude the possibility that another forum

might be more appropriate faced on factors other than the convenience of the parties." *High*

*Tech Nat'l, LLC v. Wiener*, 2019 WL 6329654, at *9 (S.D. Ind. Nov, 26, 2019) (citing cases).

      GNET also argues strenuously that the fifth factor, the locus of operative facts, weighs in

favor of Texas or Taiwan and not in favor of New York, and that such a factor is sufficient to

overcome Plaintiff's choice of forum. It notes that the contract was negotiated in Texas and in

Taiwan, that orders were placed by GNET from its headquarters in Texas, that Plaintiff decided

to accept the orders in Taiwan, and that GNET was billed at its facility in Texas. *See* Dkt. No.

36 at 8; Dkt. No. 48 at 6. But GNET does not explain how any evidence relating to any of those

events would be "material to proving liability." *Larew*, 2012 WL 87616, at *6 (quoting

*Amardeep Garmets Indus., Pvt. Ltd. v. Cathay Bank*, 2011 WL 1226255, at *3 (S.D.N.Y. Mar.

23, 2011)). The determination of the locus of operative facts for purposes of choice of venue is

not a mechanical exercise divorced from the substance of a dispute. The factor is addressed to

determining the venue which has the greatest interest in the resolution of the dispute and where

evidence relevant to its resolution may be located. To be sure, there is a "local interest in having

localized interests decided at home," *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of*

*Texas*, 571 U.S. 49, 64 n.6 (2013) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241

(1981)), but the facts before the Court do not demonstrate that Texas has any greater interest in

the resolution of this dispute than New York. While the contract was negotiated by Genesis

from Texas, purchase orders were placed by the Defendants from Texas, and invoices were

billed to Defendants in Texas, that is merely a function of the location of GNET and Genesis's principal place of business.  The Court, however, has already accounted for the location of the parties in its analysis of the convenience of the witnesses; that Genesis and GNET do business in Texas does not add appreciably to the resolution of this dispute or implicate a local interest such as to shift the balance of the factors in favor of Texas.  The Distributor Agreement designated Genesis as Plaintiff's non-exclusive distributor for a territory that was defined to include all of North and South America.  Dkt. No. 39-1 § 1.10.  The goods at issue here were shipped to Mississippi.  Dkt. No. 39-4.  If the Products for which Defendants failed to pay were not particularly or exclusively destined for Texas, there is no reason to believe that a jury in Texas would have any greater interest in the resolution of this dispute than a jury in New York.

The sixth factor, the availability of process to compel the attendance of unwilling witnesses, also does not favor transfer.  GNET argues that Jason Goodman, Kozma and Greenwood are no longer employed by GNET but reside within "100 miles of the Northern District of Texas" and thus would be subject to subpoena.  For this factor to have weight, however, GNET would have to show both that the three have relevant testimony and that they would be unwilling to testify without a subpoena.  "Nothing has been presented to suggest that any of the non-party witnesses would be unwilling to testify.  Therefore, this factor does not enter the Court's analysis."  *Soto*, 1997 WL 407247, at *4; *see also Cosa Xentaur Corp v. Bow*, 2014 WL 1331030, at *14 (E.D.N.Y. Mar. 31, 2014) (describing the factor as "inapplicable" when defendant did not allege that witness "indicated that he would be unwilling to testify . . . absent compulsion").  GNET has shown neither materiality of testimony nor that they would be unwilling to testify.

GNET concedes that the seventh factor of the relative means of the parties does not favor the Northern District of Texas over New York, stating that the factor "is generally neutral as both WNC and GNET ha[ve] the means to conduct this litigation in either District."  Dkt. No. 36 at 8.

The eighth factor of the forum's familiarity with the governing law typically is accorded little weight on a motion to transfer venue "because federal courts are deemed capable of applying the substantive law of other states." *Hummingbird USA*, 2007 WL 163111, at *3 (quoting *KPMG Consulting, Inc. v. LSQ II, LLC*, 2002 WL 1543907, at *5 (S.D.N.Y. July 12, 2002)).  But that does not mean that the factor should be given no weight.  The parties chose for New York law to govern the Distributor Agreement and federal courts in New York routinely apply New York law in cases before them.  This factor tends to cut against transfer. *See Capitol Recs., LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 368 (S.D.N.Y. 2009) (stating that when claims arise under state law, the forum's familiarity "weighs slightly, but not substantially, against transfer").

Finally, the ninth factor of trial efficiency and the interests of justice is neutral and does not favor transfer.  "[T]his case is in the early stages of litigation, and no other litigation appears to be pending.  There is no compelling reason to transfer." *Hummingbird USA*, 2007 WL 163111, at *4.

The balance of the factors thus does not support transfer.  GNET's argument amounts to the contention that a claim by Plaintiff arising from the Distributor Agreement is *ipso facto* more efficiently and conveniently tried in Texas simply because it arises from the Distributor Agreement and is brought by Plaintiff against GNET.  But, by assuming the Distributor Agreement, GNET agreed that suits against it arising from the Distributor Agreement could be brought in courts located in the State of New York.  GNET has not identified any reasons based

on the facts of this case that that choice should not be honored.  It has not identified third parties with material testimony who would be inconvenienced by a trial in the Southern District of New York or any persons whose testimony would be unavailable to it if the case were handled here. Nor has it identified any disputed facts that are relevant to the resolution of this case that arose outside of New York or any particular interest that a court or a jury in Texas, as opposed to a court or a jury in New York, would have in resolving this dispute.  Thus, to agree with GNET's argument would be to render illusory the choice of forum clause to which the parties agreed before they knew the nature of any dispute that would arise between them.  GNET could invoke it, in the rare cases where it decided not to sue in its own court, but WNC could not.  Under GNET's reading, the Distributor would agree to litigation in the courts of New York, except where the Distributor later decided not to agree.   The provision would be enforceable only if the Distributor agreed to its enforcement.  That would be to give it no force at all.  If the Distributor decided it did not want to litigate in New York, it could simply assert and prevail upon the sole argument that it was a Texas corporation which formed an agreement with a Taiwanese corporation.  The Court declines to adopt an approach which would fundamentally do violence to the agreement of the parties and to the respect they are owed for the decision they reached on where disputes such as this should be litigated.

For all of those reasons, the motion to transfer is denied.

## II.     Defendants' Motions to Dismiss

Genesis and GNET independently move to dismiss the Amended Complaint for failure to state a claim for relief.  Dkt. No. 41; Dkt. No. 44.  Genesis argues that the breach of contract claim against Genesis should be dismissed because the Distributor Agreement does not require Plaintiff's consent to a Change of Control; Plaintiff's damages were not caused by Genesis's purported assignment of the Distributor Agreement to GNET because Plaintiff had notice of the

assignment.  *See* Dkt. No. 42 at 7–10.  Genesis also contends that the account stated claim should be dismissed because Plaintiff's damages arise out of unpaid invoices dated one year after the assignment of the Distributor Agreement to GNET, and thus any agreement as to those invoices only bound GNET, not Genesis.  *Id.* at 10.  GNET argues that the Amended Complaint should be dismissed because of Plaintiff's alleged failure to meet the contractual condition precedent of mediation, Dkt. No. 45 at 4–6, and because the account stated claim is duplicative of Plaintiff's contract claim, *id.* at 6.

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  However, although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  The ultimate issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235–36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (internal quotation

marks and citation omitted).  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

The Court first addresses Defendants' arguments for dismissing Plaintiff's contract claims and then those for dismissing Plaintiff's claim for account stated.

### A.      Failure to Mediate

GNET argues that the Amended Complaint must be dismissed because it fails to allege that Plaintiff followed the procedures set forth in Section 19.11(a) of the Distributor Agreement, which require that WNC engage in a three-step mediation process before filing suit.  *See* Dkt. No. 45 at 4–5.  GNET also argues that it did not waive its contractual right to mediation.  *Id*. at 5–6.  Plaintiff responds that the Distributor Agreement does not require mediation and that it has pleaded satisfaction with the dispute resolution provisions of Section 19.11(a).  Plaintiff argues that it was not required to do anything more before suing.  It also argues that to the extent anything more was required, GNET frustrated Plaintiff's performance of the mediation obligation by insisting that Plaintiff direct all inquiries to outside consultants and the bankruptcy attorney.  *See* Dkt. No. 53 at 14–19.

Section 19.11 of the Distributor Agreement outlines the "Dispute Resolution" mechanism of the contract.  It specifically provides the following:

19.11 Dispute Resolution – Mediation

a.  Any dispute or disagreement between WNC and Distributor arising out of this Agreement shall be resolved according to the following dispute resolution procedure: (a) such dispute shall first be addressed to each Party's project manager (or other appropriate person as identified by the particular party) for discussion and attempted resolution; (b) if any such dispute is not resolved by such project managers within five (5) business days from the date that either Party gives written notice that such dispute or disagreement exists, then such dispute shall be

24

immediately referred to the Vice President, in the case of WNC, and to the business manager for the WNC account, in the case of Distributor, for discussion and attempted resolution; and (c) if the dispute is not resolved within five (5) business days after such second-tier referral, it shall be referred to the President, in the case of WNC, and to the President, in the case of Distributor.

b.  Should the meeting between the Parties' respective personnel and/or officers as outlined above fail to resolve the dispute, the Parties agree to attempt to resolve the dispute through litigation.

Dkt. No. 34-1 § 19.11.

Plaintiff has pleaded at least substantial compliance with the provision.  Notably, GNET does not identify the respect in which Plaintiff failed to comply with Section 19.11 in its opening brief or its reply brief.  The Amended Complaint alleges that Plaintiff directed its dispute to the appropriate person at GNET and Genesis for discussion and attempted resolution as required in step one.  It sent an email to accounts payable at Genesis and to GNET informing them of the outstanding invoices that, at that point, remained unpaid.  Dkt. No. 39 ¶¶ 2, 40.  It is unclear who the relevant "business manager" would be if not its President; neither party identifies anyone other than the President.  In any event, more than five days after addressing the dispute to the accounts payable department, Plaintiff informed Genesis President Seago of the dispute, which would be required by step three.  *Id.* ¶¶ 41–42.  That same day, it also received a writing from GNET CEO Frinzi regarding the dispute and asking for "a week to ten days to have a thorough response."  *Id.* ¶¶ 43–44.  The following day, Frinzi informed Plaintiff that "all payments to suppliers are suspended until further notice" and asked for "two weeks to allow a restructuring firm to aid in developing a plan."  *Id.* ¶ 45.  At that point, Plaintiff arguably could have brought suit—the President of GNET and Plaintiff had failed to reach a resolution.  As it happened, Plaintiff did not resort immediately to litigation.  More than five days later, Plaintiff sent a written demand for payment addressed to GNET CEO Frinzi, Genesis CEO Goodman, and Goodman Solutions CEO Goodman.  *Id.* ¶ 48; Dkt. No. 39-2.  Two days later on October 28,

2021 Plaintiff emailed Frinzi to speak to the restructuring consultant; the request was ignored.

Dkt. No. 39 ¶ 49.  In response to one of Plaintiff's weekly reminders on November 14 to

Genesis's accounts payable department and to GNET that the invoices had not been paid, Frinzi

responded on November 15, 2021 that the matter was one for GNET, that he would be reaching

out "shortly" with a status update, and that going forward all inquiries should be addressed to

him and to bankruptcy lawyer Josh Eppich and restructuring consultant David Bitterman.  *Id.*

¶ 51.  Hearing nothing, Plaintiff sent another written demand letter to Frinzi and Eppich, as well

as to Goodman Solutions and Genesis, on December 3, 2021.  *Id.* ¶ 52; Dkt. No. 39-3.  In

response to a weekly reminder dated December 13, 2021, Eppich responded that he was happy to

discuss with Plaintiff's counsel "what the company is doing to work to resolve the outstanding

issues."  Dkt. No. 39 ¶ 54.  In response to Plaintiff's reminder, Frinzi stated that "[Eppich] is the

point of contact.  You need to get your lawyer to connect with [Eppich].  Your emails to 50

people including Stephanie [Elmore of Goodman Inc.] are not going to produce anything."  *Id.* ¶

55.  Plaintiff's counsel reached out to Eppich, on December 24, 2021 and again on January 10,

2022, but Eppich did not respond.  *Id.* ¶ 57.  On January 11, 2022, Plaintiff emailed a copy of its

December 3, 2021 letter to Goodman and Elmore; Goodman replied with "do not contact me or

Genesis or we will take your actions as harassment and take action."  *Id.* ¶ 58.  Ultimately, in

February 2022, a new restructuring consultant Joe Baum purportedly retained by GNET

responded to Plaintiff that GNET had secured creditors who were owed $82 million first, and a

total of $150 million in accounts payable owed to unsecured creditors, and that there would be

no payment plan to propose for months under the end of May 2022, if that.  *Id.* ¶ 67.

    Plaintiff's actions substantially satisfied Section 19.11 of the Distributor Agreement.  It

raised the issue with the responsible lower-level personnel and when that initiative failed to

result in a resolution, the issue was elevated to the highest levels of both companies.  This ranged

from the accounts payable staff at GNET, Josh Eppich, Joe Baum, and James Frinzi, all

associated with GNET at various instances, as well as James Goodman, Stephanie Elmore, Cathy

Kincy, Melissa Novak, and Steve Seago, all affiliated with Genesis and Goodman Inc.  It waited

the requisite amount of time and escalated appropriately.  Those discussions failed to resolve the

dispute.  At that point, pursuant to Section 19.11, the parties "agree[d] to resolve the dispute

through litigation."  Dkt. No. 34-1 § 19.11(b).  Having first raised the issue in October 2021,

Plaintiff was not required to wait until May 2022 to see if GNET would agree to a resolution.

Plaintiff was permitted to avail itself of the litigation remedy after GNET had not offered a

resolution.

The primary case GNET relies upon, *ISS Facility Servs., Inc. v. Fedcap Rehabilitation

Servs., Inc.*, 2021 WL 2784550 (S.D.N.Y. July 2, 2021), does not support its argument.  There,

the court dismissed a complaint alleging that Fedcap failed to pay for invoices for services by

ISS due to the parties' failure to satisfy the dispute resolution provision in the relevant

subcontracts.  *Id.* at *5.  The subcontracts provided that "[i]f a dispute or misunderstanding arises

between the parties . . . then every reasonable effort will be made to settle the dispute without

resorting to litigation."  *Id.* at *1–2.  It then specified three levels of dispute resolution: (1)

dispute resolution by the "managers at the level at which the dispute arose"; (2)  the submission

in writing of the dispute "to the executive of each party with direct responsibility for

administering this Subcontract"; and (3) the submission of the issue, as refined by the executives

with direct responsibility for administering the subcontract, to the "President and Chief

Executive Officer . . . of each party."  *Id.*  The provisions stated that "[i]n the event that the

dispute, claim, or controversy has not been resolved through informal dispute resolution within

[certain] days after a party requests mediation, the party seeking relief may file suit in a court of competent jurisdiction." *Id*. The court found that the dispute resolution provision had not been satisfied. *Id.* at *4.

That case is clearly inapplicable to Plaintiff's circumstances here. There, ISS "seems to [have] concede[d] that it did not complete the dispute resolution process" and only "argue[d] that the process need[ed] only be completed if the parties failed to reach a resolution." *Id*. It then argued that it had reached a resolution. *Id*. But the court concluded that a "contractual dispute does in fact still exist between the parties and that a condition precedent has thus not been met." *Id*. The complaint there otherwise only alleged that the parties "initiated" the dispute resolution process, but not that they completed the remaining steps of that process. *Id*. Here, Plaintiff does not allege that there was any resolution at all. Further, unlike ISS, it contends that it completed the dispute resolution process and has adequately alleged in its Amended Complaint an extensive history of escalation and exchanges between Plaintiff and employees and officers at GNET and Genesis.[4]

## B.     Assignment of the Agreement

Genesis argues that the Amended Complaint fails to state a claim of breach of contract against it for two related reasons. First, it claims that Goodman Inc.'s agreement to purchase all of Genesis's assets constituted an assignment as a matter of law which did not require Plaintiff's agreement. Dkt. No. 42 at 2. Second, and in the alternative, it argues that even if it breached the Distributor Agreement, such breach did not cause Plaintiff's damages. The Court holds that, even presuming there was a valid assignment, Genesis would be jointly liable with GNET for its

---

[4] Because GNET has adequately pleaded that it met the mediation conditions within the contract, the Court need not reach the question of whether GNET waived the mediation provisions through its conduct.

obligations under the Distributor Agreement.  Plaintiff has pleaded damages because it has not

been paid on its invoices.  The Court also finds that Genesis required consent from Plaintiff

before assigning the Distributor Agreement through a change in control.

### 1.    Whether Assignment Relieves Genesis of Liability

Under New York law, it is clear that "[a] party to a contract is not relieved of his

obligations by a simple assignment of the contract; the assignment must *specifically provide for

a release from liability upon assignment*."  *Auerbach v. State Tax Comm'n*, 536 N.Y.S.2d 557,

560 (4th Dep't 1988) (emphasis added); *see also Holland v. Fahnestock & Co.*, 2002 WL

1774230, at \*9 (S.D.N.Y. Aug. 1, 2002), *report and recommendation adopted*, 210 F.R.D. 487

(S.D.N.Y. 2002) ("Absent an express discharge of Fahnestock's obligations, the assignment

provision can be interpreted as merely a consent to Fahnestock's delegation of duties. . . .

Fahnestock remained liable jointly with any assignees."); *see also id.* (distinguishing between an

assignment, and a novation that would "extinguish and discharge the prior obligation").  "[A]

novation must never be presumed."  *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,

736 F. Supp. 1281, 1284 (S.D.N.Y. 1990), *aff'd*, 925 F.2d 566 (2d Cir. 1991); *Barr v. Country

Motor Car Grp., Inc.*, 635 N.Y.S.2d 370, 371 (4th Dep't 1995) ("Plaintiff did not release the

Country defendants from their obligations under those agreements and, therefore, the Country

defendants remain liable to perform those obligations following the assignment to the Carbone

defendants.").

To repeat, the operative language is in Section 19.8, entitled "Assignment."  That section

provides the following:

> This Agreement may not be assigned by Distributor, in whole or in part, to any third
> party, including any subsidiary or Affiliate of the Distributor or any subdistributor
> without the prior written consent of WNC.  A Change of Control shall be deemed
> an assignment for purposes of this Section.   WNC may assign its right and
> obligations hereunder to any of its respective subsidiaries or Affiliates.  In the event

of a proposed appointment by Distributor to any sub-distributor, Distributor shall obtain and provide to WNC such background and due diligence information with respect to such sub-distributor required by WNC.  Any approved appointment of a sub-distributor may only be made by WNC in writing and in its sole discretion and shall not release Distributor from its obligations hereunder.

Dkt. No. 39-1 § 19.8.  The Distributor Agreement elsewhere provides that a "'Change of Control' shall be deemed to have occurred if Distributor sells substantially all of its assets . . . ." *Id*. § 1.2.

Even if there had been a valid assignment from either the Change in Control or the subsequent assignment to GNET, Genesis points to no language in the Distributor Agreement that establishes that Genesis would be relieved of its duties and liabilities under the Distributor Agreement.  Nor has the Court been able to find any such language on its own independent review.  That language is necessary in order to relieve Genesis of liability.  Otherwise, even if the assignment from Genesis to GNET was valid, Genesis and GNET are both jointly liable for the violations of duties to Plaintiff.  *See*, *e.g.*, *Holland*, 2002 WL 1774230, at *9; *see also Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir. 1977) (stating that assignment of a bilateral contract involves assignment of rights and delegation and of duties, but that "[w]hen duties are delegated, however, the delegant's obligation does not end"); *see, e.g.*, *Warberg Opportunistic Trading Fund L.P. v. GeoResources, Inc.*, 58 N.Y.S.3d 1, 8 (1st Dep't 2017) (finding no existence of a novation due to "repeated references in the documents . . . to an 'assignment,' and defendant's insistence . . . [of] tender to . .  an 'assignment form'").  Given that Genesis admits it did not seek Plaintiff's consent before the assignment through the Change in Control, Genesis's argument also forecloses the possibility of there having been any "subsequent contract [that] discharges a party's obligations under a previous contract" because there "the parties' intentions are determinative."  *Star Trading & Marine, Inc.*, 736 F. Supp. at 1283.  There being no specific indicia of Plaintiff's intent to release Genesis from its duties and

liabilities following an assignment in the Distributor Agreement, the Amended Complaint has sufficiently pleaded that Genesis is jointly liable with any purported assignees for Plaintiff's claim of breach of contract.  Even if Plaintiff had consented, the consent requirement does not serve as such indicia.  It functions to allow Plaintiff to exercise control over whether an additional party may assume duties under the Distributor Agreement, and not whether Genesis ceases to bear those liabilities and duties.  *Cf. Holland, Inc.*, 2002 WL 1774230 at *9 (stating that language allowing obligors to assign "without the consent of" the obligees does not show the existence of a novation absent an express discharge of the obligations in the assignment language).  This reading is consistent with the general understanding that "[a] contract term prohibiting assignment of rights under the contract . . .  is for the benefit of the obligor."  Restatement (2d) Contracts § 322(2)(c).

### 2. Whether Consent Was Required for the Change in Control

Genesis also argues that under the terms of the Distributor Agreement, a Change of Control is a "de facto permitted assignment" and does not require Plaintiff's consent.  Dkt. No. 42 at 7.  Plaintiff contends that consent was required.  *Id.*  The Court finds that Plaintiff has plausibly alleged a breach of contract based on the terms of the Distributor Agreement.

The elements of a claim of breach of contract under New York law are: (1) the existence of a contract; (2) performance by plaintiff; (3) a breach by the defendant; and (4) damages. *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000); *see also Advanced Water Tech., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 318 (S.D.N.Y. 2020) (same).  In interpreting the Distributor Agreement, the Court looks to the contract as a whole to "ensure that undue emphasis is not placed upon particular words and phrases."  *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007).  "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Greenfield v. Philles Records, Inc.*,

780 N.E.2d 166, 170 (N.Y. 2002).  The Court must guard against adopting a contractual interpretation that would "render any individual provision superfluous."  *Axiom Investment Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 534 (S.D.N.Y. 2017); *see also Thompson v. Mun. Credit Union*, 2022 WL 2717303, at *4 (S.D.N.Y. July 13, 2022); *Kolmar Ams., Inc. v. Bioversal Inc.*, 932 N.Y.S.2d 460, 494 (1st Dep't 2011) (explaining that a court must "adopt an interpretation that renders no portion of the contract meaningless") (quoting *Diamond Castle Partners v. IAC/Interactive Corp*., 918 N.Y.S.2d 73, 75 (1st Dep't 2011)); *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) (similar).  Under New York law, a covenant not to assign a contract is treated as a personal covenant "whose breach justifies only an award of damages, unless the language of the covenant clearly indicates a stronger intent." *Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir. 1983); Restatement (2d) Contracts § 322.

The Distributor Agreement, when read as a whole, required Genesis to obtain the consent of Plaintiff before effecting a Change of Control as an "assignment" of any of the rights or obligations under the agreement.  The thrust of the "Assignment" provision is to permit the Distributor to assign its rights and obligations only with consent.  The point is made clear by the Distributor Agreement's reference that a Change of Control is deemed an assignment "for purposes of this Section."  Dkt. No. 39-1 § 19.8.  Section 19.8 refers only once elsewhere to an assignment by Distributor, and that is in the first sentence where the provision mandates that an assignment by the Distributor requires "the prior written consent of WNC."  *Id.*

This interpretation also makes commercial sense.  *See Greenwich Cap. Fin. Prod., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (1st Dep't 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable

expectations of the parties" (internal quotation marks and citation omitted)); *see*, *e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Monarch Payroll, Inc.*, 2016 WL 634083, at *10 (S.D.N.Y. Feb. 17, 2016) (holding that a contract outcome would be "absurd and commercially unreasonable" if provided an unjustified windfall to a party). The Distributor Agreement repeatedly references the rights and obligations of the Distributor. For example, the Distributor is required to comply with "any and all applicable tax, foreign exchange and economic controls relating to sales of the Products," Dkt. No. 39-1 § 2.3, to "fully cooperate with [Plaintiff] in the conduct of [Plaintiff's] due diligence review of Distributor . . . ," *id.* § 3.1(l), to "employ suitable trained personnel for sales, sales support, and post-sales activities," *id.* § 3.2(a), to "have suitable storage facilities for the Products in stock," *id.* § 3.2(b), to "be primarily responsible for Customer Support," *id.* § 3.2(c), among other duties. It makes commercial sense then that Plaintiff would have reserved for itself the right to approve any assignment of the Distributor Agreement, including one that may be effected by the sale of all of Genesis's assets.

This interpretation is not in tension with the Distributor Agreement's notice provision for a Change in Control. That provision states that "[i]n the event of Change in Control or any other material change in Distributor's ownership or its principals, promptly provide written notice to WNC, but in no case more than fifteen (15) calendar days following such event." Dkt. No. 39-1 § 3.1(k). The assignment provision requires "*prior* written consent" before any such "Assignment," which includes a "Change of Control" as defined under the Distributor Agreement. *Id.* § 19.8 (emphasis added). The two provisions serve different purposes. The "prior written consent" required GNET to obtain consent from WNC before agreeing to a Change of Control transaction. WNC, on the one hand, and GNET and its counterparty to the Change of Control on the other, would need to know whether there was consent. Ordinarily, no

seller or purchaser would agree to a change of control transaction without knowing what assets would be or could be transferred in that transaction. The notice provision, by contrast, is triggered at a different time and serves a different purpose. It is intended to give WNC notice, promptly after the "event" of a Change of Control transaction has transpired, that there has been a change of control. It ensures that WNC, having consented to a Change of Control and an assignment, is given the notice it needs to ensure that it is discharging its obligations to its new contractual counterparty and that such a counterparty is discharging the duties owed to it.

This interpretation does not mean, as Genesis argues, that Plaintiff has "absolute control over whether Genesis (a non-exclusive distributor) underwent a merger or sold nearly all of its assets." Dkt. No. 54 at 1; *see also id*. at 5. Genesis can undergo a merger or sell its assets. It can agree to a Change in Control. What the provision does mean, however, is that such a sale of substantially all of Genesis's assets may not include the Distributor Agreement or if it does without WNC's consent, then Genesis will be in breach of the Distributor Agreement and potentially liable for any damages that flow from that breach.

For these reasons, Plaintiff has adequately stated a breach of contract claim for the consent provision in the assignment contract.

### C.      The Account Stated Claim

GNET argues that an account stated claim cannot be maintained where a valid contract exists between the parties, and Plaintiff's account stated claim is duplicative of its breach of contract claim and should be dismissed for that reason. Dkt. No. 45 at 6. Genesis argues that the alleged damages arise out of unpaid invoices dated one year after the purported assignment, and thus only GNET is responsible. Dkt. No. 42 at 10. Plaintiff responds that its account stated claim states a plausible basis for relief because it seeks different remedies from the breach of contract claim, which allows attorneys' fees unavailable in an account stated claim. Plaintiff also

states that whether Genesis is responsible for paying the invoices is a question of fact not subject to dismissal under Rule 12(b)(6).  Dkt. No. 53 at 19–20.

### 1.       Whether the Account Stated Claim is Duplicative

GNET argues that Plaintiff's account stated claim against it should be dismissed as duplicative.  The Court finds this argument unpersuasive.  "Two claims are duplicative of one another if they 'arise from the same facts and do not allege distinct damages.'"  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (alterations accepted) (quoting *Sitar v. Sitar*, 854 N.Y.S.2d 536, 538 (2d Dep't 2008)).  "Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."  *Id*.  Under this standard, "when a party has both a claim for account stated and a claim under a contract that provides for an award of attorneys' fees, the claims for breach of contract and account stated are not duplicative."  *Id*.  In *NetJets*, the Second Circuit held that a valid breach of contract claim, based on an agreement that contained a clause allowing recovery of reasonable attorneys' fees, was not duplicative of an account stated claim where the contract claim sought attorneys' fees. *Id*. at 176.

The courts in this District have held that the reciprocal is also true.  An account stated claim is not duplicative of a contract claim where the account stated claim seeks lesser relief than the contract claim.  *See Locus Techs. v. Honeywell Int'l Inc.*, 2022 WL 4592891, at *14 (S.D.N.Y. Sept. 30, 2022) ("As numerous courts have found, *NetJets* does not require the dismissal of a claim as duplicative merely because it offers a narrower set of remedies than those available under a related claim.") (citing cases).   Plaintiff seeks reasonable attorneys' fees and costs under its contract claim but not its account stated claim.  Dkt. No. 39 ¶¶ 76, 81 ("Additionally, as a result of GNET's breach, Plaintiff is entitled to recover its attorneys' fees

and costs under Section 17.1 of the Distributor Agreement.").[5]  Accordingly, its account stated

claim is not duplicative of its contract claim.

### 2.      Whether GNET is Responsible for the Account Stated

Genesis also argues that Plaintiff fails to adequately plead a claim for account stated.  It

contends that because the damages arise out of unpaid invoices dated after the assignment, any

agreement was only between Plaintiff and GNET.  The Court has already dismissed this theory

because even presuming that there was a valid assignment, such an assignment does not relieve

Genesis of liability as the counterparty to the Distributor Agreement.  *See supra* Section II.B.1.

The Court also concludes Plaintiff has adequately alleged an account stated claim against

Genesis.  "Under New York law, a plaintiff can establish a claim for account stated by showing:

'(1) an account was presented; (2) it was accepted as correct; and (3) Defendant promised to pay

the amount stated.'"  *Fed. Corp. v. Future Tire Co., Ltd.*, 2021 WL 2550472 (E.D.N.Y. June 22,

2021) (quoting *Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, 2021 WL 1225447, at *9

(S.D.N.Y. Mar. 31, 2021)).  "An account stated assumes the existence of some indebtedness

between the parties, or an express agreement to treat the statement as an account stated."

*Erdman Anthony & Assoc. v. Barkstrom*, 747 N.Y.S.2d 670, 671 (4th Dept. 2002) (quoting *M.

Paladino, Inc. v. J. Lucchese & Son Contracting Corp.*, 669 N.Y.S.2d 318, 319 (2d Dep't 1998)).

It requires "an agreement between the parties to an account based upon prior transactions

between them."  *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d

Cir. 1999) (quoting *Chisholm -Ryder Co. v. Sommer & Sommer*, 421 N.Y.S.2d 455, 457 (4th

Dep't 1979)).  "The second and third elements 'may be implied if a party receiving a statement

---

[5] Plaintiff asserts that the Distributor Agreement allows for attorneys' fees in Section 17.1.
Because GNET does not disagree with this reading in its reply brief, the Court does not reach the
question of whether the Distributor Agreement allows for attorneys' fees under Section 17.1.
*See* Dkt. No. 29-1 at ECF p. 25.

of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment.'" *Fed. Corp.*, 2021 WL 2550472, at *3 (quoting *IMG Fragrance Brands, LLC. v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)); *see also LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999) (holding that an agreement to pay the account presented "may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment"); *Fort Prods., Inc. v. Men's Medical Clinic, LLC*, 2016 WL 797577, at *4 (S.D.N.Y. 2016) (same).

Based on the Amended Complaint,[6] Genesis relies on the facts that in August 2020, Seago—while wearing his hat as an officer of Goodman Inc.—asked Plaintiff to execute an assignment of the Distributor Agreement to GNET, Dkt. No. 39 ¶ 27, and that in September 2020, stated that "Genesis will no longer be involved so purchase orders will come from GNET ATC LLC," *id.* ¶ 32. But Plaintiff did not sign the Assignment Agreement. *Id.* ¶ 35. And from June 2021 until August 2021, Plaintiff continued to send invoices to Genesis and Genesis continued to receive them as they had always been, without complaint either that they were being

---

[6] Although Genesis submits with its motion to dismiss an "Asset Purchase Agreement," *see* Dkt. No. 43-1 (Declaration of Anthony Rao), pursuant to which Goodman Inc. allegedly purchased "substantially all" of Genesis's assets, Dkt. No. 39, this agreement is not cognizable to the Court at the motion to dismiss stage. "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (alterations omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)). The Asset Purchase Agreement is not attached as an exhibit to the complaint, and it is not integral to the complaint, and the claims in the complaint of breach of contract and account stated do not "rel[y] heavily upon its terms and effect," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Nor is the Asset Purchase Agreement incorporated by "clear, definite and substantial reference," *McLennon v. City of New York*, 171 F.Supp.3d 69, 88 (E.D.N.Y. 2016), as the asset purchase is only briefly mentioned in two paragraphs of the Amended Complaint, with no specific reference to the Asset Purchase Agreement itself or its terms. Dkt. No. ¶¶ 9, 29, 30, 34. Genesis's contention that there was substantial reference relies on references to the assignment—which is a separate agreement—and not to the asset purchase itself. *See* Dkt. No. 54 at 8.

sent to Genesis or as to the amount. *Id.* ¶ 36; Dkt. No. 35-5. It was not until November 15, 2021, when payment on the last of the invoices was overdue, that GNET's CEO Frinzi stated to Plaintiff that Plaintiff's invoices were "a matter for GNET ATC and not Genesis" because "[t]he contract was assigned to GNET ATC," Dkt. No. 39 ¶¶ 51, 88. "No request was ever made by Genesis to stop sending invoices to its accounts payable department until after the payments stopped, an entire year later." *Id.* ¶ 36 (emphasis omitted).

Accordingly, Plaintiff has stated a claim for relief for account stated against Genesis. It has alleged "an agreement between the parties to an account based upon prior transactions between them." *Worsham*, 185 F.3d at 64 (quoting *Chisholm-Ryder Co.*, 421 N.Y.S.2d at 457). Genesis agreed to the Distributor Agreement, under which it was obligated to pay Plaintiff for purchase orders placed, and Genesis did so prior to the events at issue. Plaintiff has also alleged that an account was presented. Each of the invoices for which payment was due between September 20, 2021 and November 12, 2021 were billed to Genesis and sent to Genesis. *See* Dkt. No. 39-4. Plaintiff also has alleged facts to establish that the invoices were accepted as correct and that Defendant promised to pay the amount stated. While GNET through its CEO eventually denied liability for payment, *see* Dkt. No. 39 ¶¶ 45, 51, Genesis never asked that the invoices not be sent to it or disputed the amounts at issue until James Goodman responded in January 11, 2022. Those facts are sufficient for Plaintiff to state a claim against Genesis. *See Fort Prods*, 2016 WL 797577, at *4 (stating that account stated claim may survive motion to dismiss if party received statement of account and kept it without objecting to it within a reasonable time).

## CONCLUSION

The Defendants' motion to transfer and motions to dismiss are DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 30, 33, 41, 44.


SO ORDERED.


Dated: November 17, 2022
      New York, New York                      LEWIS J. LIMAN
                                     United States District Judge