UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/12/2023
```

-------------------------------------------------------------------X
                                                          :
WISTRON NEWEB CORPORATION,                                :
                                                          :
                               Plaintiff,                 :
                                                          :               22-cv-2538 (LJL)
                  -v-                                      :
                                                          :               OPINION AND ORDER
GENESIS NETWORKS TELECOM SERVICES, LLC                    :
and GNET ATC, LLC,                                        :
                                                          :
                               Defendants.                :
                                                          :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       Plaintiff Wistron NeWeb Corporation ("Plaintiff" or "Wistron") moves for summary

judgment, pursuant to Federal Rule of Civil Procedure 56, awarding Plaintiff no less than

$9,212,256.94 plus interest, attorneys' fees, and costs, jointly and severally against defendants

Genesis Networks Telecom Services LLC ("Genesis") and GNET ATC, LLC ("GNET")

(collectively, "Defendants"), on Plaintiff's breach of contract claims, and in the alternative, its

account stated claims against both Defendants.  Dkt. No. 67.  Genesis moves to strike portions of

materials filed in connection with Wistron's motion for summary judgment.  Dkt. No. 73.

GNET joins Genesis's motion to strike in its entirety.  Dkt. No. 81.

       For the following reasons, the Plaintiff's motion for summary judgment is granted in part

and denied in part[1] and Defendants' motion to strike is denied.

---

[1] Plaintiff also moves for summary judgment for an award of contractual interest and attorneys'
fees and costs, *see* Dkt. No. 67, but neither Plaintiff nor Defendant address the issue.  The motion
for contractual interest and attorneys' fees is denied without prejudice to renewal.

**BACKGROUND**

The following facts are drawn from the materials submitted in connection with Plaintiff's motion for summary judgment. The facts are undisputed except where otherwise indicated, and all reasonable inferences are drawn in favor of the non-movant.

## I.     The Entities

This action seeks to recover for unpaid invoices for products manufactured and delivered pursuant to a distributor agreement.

Plaintiff Wistron is a corporation organized under the laws of Taiwan, with its principal place of business in Hsinchu, Taiwan. Dkt. No. 69-4 ¶ 6. Wistron manufactures and sells wireless communication products. Dkt. No. 69-1 at ECF p. 9; Dkt. No. 69-9 at 20. Wistron has a wholly owned subsidiary, W-NeWeb Corporation ("W-NeWeb"), that is based in Milpitas, California. Dkt. No. 69-4 ¶ 6. For customs clearing purposes, and during all relevant time periods, W-NeWeb acted as a U.S. importer, and issued invoices and collected payments for products that were manufactured and sold by Wistron to Genesis. Dkt. No. 70 ¶¶ 2, 8; Dkt. No. 76 ¶ 36.

Defendants Genesis and GNET are Texas limited liability companies. Dkt. No. 69-1 at ECF p. 9; Dkt. No. 69-4 ¶¶ 7–8. Goodman Networks, also known as Goodman Solutions, is the parent company of GNET and owns 100% of its shares. Dkt. No. 69-4 ¶ 8; Dkt. No. 69-5 ¶ 10; Dkt. No. 76 ¶¶ 6–7. Goodman Networks does not own any part of Genesis. Dkt. No. 78 ¶ 4; Dkt. No. 91 ¶ 1. Genesis, however, is related to GNET though James Goodman, who holds an ownership interest in Genesis and also has an ownership interest in Goodman Networks, along with his four brothers, including John Goodman, and through other entities with approximately 250 other common and preferred shareholders. Dkt. No. 69-4 ¶ 9; Dkt. No. 76 ¶ 5. During

certain relevant time periods, John Goodman was the chief executive officer ("CEO") of

Goodman Networks and GNET.  Dkt. No. 76 ¶ 9.

## II.    The Distributor Agreement

On February 1, 2019, Wistron and Genesis entered into a Non-Exclusive Distributor

Agreement ("Distributor Agreement").  Dkt. No. 69-1; Dkt. No. 77 ¶ 5.  Under the Distributor

Agreement, Wistron and Genesis agreed that Genesis would "engage in the business of selling

and distributing the [p]roducts for [Wistron] in the [t]erritory" of North and South America.  Dkt

No. 69-1 at ECF p. 9, § 1.10.  The products were devices for satellite television reception and

video output to television sets or other display devices.  *Id*. § 1.7.  The agreement appointed

Genesis as a non-exclusive distributor in North and South America for a term of three years.  *Id*.

§ 16.1.  Under the agreement, Genesis ordered products from Wistron and resold them to AT&T.

Dkt. No. 77 ¶ 5.

Several provisions of the Distributor Agreement are relevant to this action.  First, the

Distributor Agreement contained detailed terms with respect to the placement of orders and the

payment for orders.  The Distributor Agreement provided that Genesis, defined as "Distributor,"

would "place planning orders . . . for all Products with WNC [Wistron] by using WNC's then

current purchase form."  Dkt. No. 69-1 § 6.1.  Upon the placement of a planning order, Wistron

was required either to accept the order (by completing an order acknowledgment form) or to

provide notice of its inability to fulfill the order or its rejection of the order.  *Id.*  An order would

become firm 30 days prior to delivery date and neither party was permitted to cancel an order

without providing written notice of a breach justifying cancellation.  *Id.* §§ 6.1, 6.2.  Genesis was

required to pay for the products within 90 days after title transfer from Wistron.  *Id.* § 4.2.

Second, the Distributor Agreement also outlined protocols for the exchange of documents

in the case of a transaction under the agreement.  Section 11, entitled "Electronic Data

Interchange" ("EDI"), provided that "[a]t the request of either Distributor or [Wistron] and the mutual agreement of both Parties, the Parties shall exchange orders, payments, acknowledgments, invoices, remittance notices, and other records . . . electronically, in place of tangible documents.  EDI requirements and transactions are outlined in Exhibit G."  *Id*. § 11.  Of relevance here, Exhibit G to the Distributor Agreement described a transaction of a category number "850" as a "Purchase order" in which the "Sender" is the "Distributor" (Genesis), and the "Receiver" is Wistron.  *Id*. at ECF p. 42.  It also described another transaction of a category number "867" as a "Product Transfer (Consumption)," in which the "Sender" is Genesis, and the "Receiver" is Wistron.  *Id*.  Consumption referred to consumption by the "Customer," who in this case is AT&T.  *Id*. at ECF p. 36.

Third, the Distributor Agreement required Genesis, "at all times" during the term of the agreement, to maintain insurance at its sole cost and expense, including policy or policies with at least $20 million in coverage specially allocated to Wistron and on which Wistron would be named as a loss payee, covering losses for products provided by Wistron while on Genesis's premises.  *Id.* § 17.4.  The Distributor Agreement also recited that Wistron would be providing Genesis confidential information and required Genesis to keep that information confidential, *id.* §§ 13.1, 13.2, and required Genesis to take measures to strictly control access to facilities where Wistron's products and/or confidential information was stored, *id.* § 14.1.

Fourth, the Distributor Agreement prohibited Genesis from assigning the agreement to any third party, including to a subsidiary or affiliate of Genesis, without the prior written consent of Wistron.  *Id.* § 19.8.  In the event of a proposed appointment by Genesis to any sub-distributor, the agreement also required Genesis to obtain and provide to Wistron background and/or due diligence information required by Wistron.  *Id.*  There was no equivalent condition

for an assignment by Wistron to a subsidiary or affiliate.  *Id*.  Section 19.8 of the Distributor

Agreement, entitled "Assignment," provided as follows:

> This Agreement may not be assigned by Distributor, in whole or in part, to any third party, including any subsidiary or Affiliate of the Distributor or any subdistributor without the prior written consent of WNC.  A Change of Control shall be deemed an assignment for purposes of this Section.  WNC may assign its right and obligations hereunder to any of its respective subsidiaries or Affiliates.  In the event of a proposed appointment by Distributor to any sub-distributor, Distributor shall obtain and provide to WNC such background and due diligence information with respect to such sub-distributor required by WNC.  Any approved appointment of a sub-distributor may only be made by WNC in writing and in its sole discretion and shall not release Distributor from its obligations hereunder.

*Id*.  A Change of Control was defined as follows:

> **"Change of Control"** shall be deemed to have occurred if Distributor sells substantially all of its assets or a change occurs in the current ownership of capital stock or other securities of the Distributor which results in a change of twenty percent (20%) or more of the ownership of Distributor . . . , whether pursuant to internal transfers of capital stock or securities of the Distributor among the beneficial owners of such capital stock or other securities, or a third party stock or other securities purchase, merger, consolidation or other similar transaction.

*Id.* § 1.2 (bolding in original).

Fifth, the Distributor Agreement provided that its provisions "shall not be extended,

varied, changed, modified or supplemented unless in writing and executed by a duly authorized

representative of each Party."  *Id*. § 19.13.  In addition, the Distributor Agreement also contained

what is commonly termed a "no-waiver provision."  Section 19.10 stated that "[e]xcept as

otherwise expressly stated herein, the failure of any [p]arty to enforce at any time or for any

period of time, any of the provisions of this Agreement shall not constitute a waiver of such

provisions or of the right of [Wistron] to enforce each and every provision."  *Id*. § 19.10.

Sixth, as for termination, the Distributor Agreement provided that "[e]ither [p]arty may

terminate this Agreement by written notice in the event of: . . . a material breach of any provision

of this Agreement where the breaching party fails to cure such breach within thirty (30) days following receipt of notice of such breach from the non-breaching party." *Id*. § 16.2.

Finally, the Distributor Agreement also contained additional terms and conditions relevant to the damages available to Wistron in the case of a breach. As to the interest rate that accrued on damages and attorneys' fees, Section 4.2 of the Distributor Agreement, entitled "Payment Terms," provided that:

> After the due date for any payment, the lesser of one and one-half (1.5%) percent of the unpaid balance (annual rate of 18%) or the maximum late payment penalty charge permitted by law may be added for each month or part thereof that payment is delayed. Distributor shall also reimburse [Wistron] for all costs associated with [Wistron's] attempt to collect amounts due under an order, including all costs associated with employing a collection agency or initiating legal action to collect amounts due.

*Id*. § 4.2.

## III.    The Parties' Transactions under the Distributor Agreement

When Genesis and Wistron first established their relationship, Genesis requested use of the EDI system and worked with Wistron's IT team to configure it to Genesis. Dkt. No. 69-9 at 33. Thereafter, and throughout the term of the Distributor Agreement and as contemplated by that agreement, Genesis placed orders for Wistron's products through Wistron's EDI system. *Id*. at 16–20; Dkt. No. 76 ¶ 20. The orders in the EDI system were depicted as being sent from Genesis. *See* Dkt. Nos. 69-14, 69-15. In that system, Wistron would receive an e-mail from its own internal EDI system once Defendants submitted a purchase order. Dkt. No. 69-9 at 17, 156–57; Dkt. No. 95 ¶ 5. Those communications, colloquially termed an "EDI 850" as described under the Distributor Agreement, would show the "[purchase order] number[,] where to bill the products when we ship them[,] and where to send the products to which warehouse, [and] information like that." Dkt. No. 69-9 at 17. Once orders were placed in the EDI system, they could not be changed. *Id*. at 41. In the rare instance that an order quantity had to be changed, it

6

had to be manually changed by resubmitting a hard copy purchase order via email. *Id.*; Dkt. No. 76 ¶ 21.

A hyperlink was also on the EDI 850. By clicking the link on the EDI 850, the user would be taken to the "purchase order itself that was submitted." No. 69-9 at 17; Dkt. No. 76 ¶ 25. The purchase order would include the purchase order number, model number, bill to address, ship to address, product model, and product quantity. Dkt. No. 69-9 at 160; Dkt. No. 69-15; Dkt. No. 69-16. That information was not automatically populated. The purchaser had to enter it through the EDI to send it to Wistron, and "[o]nly Genesis has the access for this EDI to create the 850 [purchase order]." Dkt. No. 69-9 at 160. Within Wistron's EDI system, Wistron had assigned Genesis a unique buyer ID, "2104896689," Dkt. No. 69-9 at 162–63; Dkt. No. 76 ¶ 22, and an abbreviated naming code, "GNSS." Dkt. No. 69-9 at 158–59; Dkt. No. 69-14; Dkt. No. 76 ¶ 22; Dkt. No. 91 ¶ 4.

As previously noted in the Distributor Agreement, when products were "consumed" by AT&T due to Defendants taking the products from U.S. warehouses, Dkt. No. 69-1 § 3.1, Dkt. No. 69-9 at 48, Defendants would initiate an EDI 867 automail to Plaintiff reflecting that consumption, Dkt. No. 69-9 at 13; Dkt. No. 69-18; Dkt. No. 76 ¶ 29. Each EDI 867 automail bore Genesis's unique buyer ID and the abbreviated naming code "GNSS." Dkt. No. 69-18. Upon consumption of the products by AT&T, Wistron would then generate an invoice that "reflected the specific quantity of product that was 'consumed' by Genesis on a particular date from the U.S. warehouse where [Wistron] had already delivered that product." Dkt. No. 70 ¶ 4. Because consumption of the entire product quantity from a purchase order often did not occur in a single day, product from the same purchase order was invoiced on multiple days depending on

when it was consumed, resulting in the same purchase order number sometimes appearing on multiple invoices.  *Id.*

Genesis made payment within 90 days after the invoices were issued.  *Id.* ¶ 8.  Customers often used affiliates or third-party entities to pay invoices to W-NeWeb.  *Id.* ¶ 9.  Throughout the term of the Distributor Agreement, multiple different entities made payments to W-NeWeb for the invoices issued for Wistron products sold to Genesis, including Genesis Networks OEM, Genesis Telecom Payables, and GNET.  *Id.*  Once a payment was received, W-NeWeb would correlate that payment to an open invoice and apply that payment to the respective invoice that was issued to Genesis under the Distributor Agreement.  *Id.* ¶ 10.

## IV.    Genesis and Goodman Networks Enter into an Asset Purchase Agreement

On September 14, 2019, Genesis entered into an asset purchase agreement with Goodman Networks, providing for the purchase by Goodman Networks of substantially all of the assets of Genesis, including the Distributor Agreement ("Asset Purchase Agreement").  Dkt. No. 78-1; Dkt. No. 78-2; Dkt. No. 91 ¶ 6.  Genesis represented to Goodman Networks that the delivery of the acquired assets, including the Distributor Agreement, did not require a notice under that agreement, Dkt. No, 78-1 § 4.3, and agreed to use its best efforts to obtain any necessary third-party consents to the transfer of the assets, including the Distributor Agreement, *id.* § 5.2.  A post-closing covenant also required Genesis and Goodman Networks, in the event that they discover a contract that is to be acquired by Goodman Networks, to cooperate in good faith to assign, transfer, and convey such contract to Goodman Networks subject to any consent requirements.  *Id.* § 6.2.  It also contemplated that Goodman Networks would retain certain Genesis employees and integrate them into Goodman Networks' operations.  *Id.*

In connection with the Asset Purchase Agreement, Goodman Networks formed GNET and assigned to GNET the rights Goodman Networks had acquired in the Distributor Agreement. Dkt. No. 77 ¶ 10; Dkt. No. 91 ¶ 7.

After the asset sale and through September 2020, Genesis provided certain transitional services to Goodman Networks in connection with the transfer of Genesis's business to Goodman Networks under the Asset Purchase Agreement.  Those transitional services included accounting services as they related to customers and vendors such as Wistron.  Dkt. No. 77 ¶ 11; Dkt. No. 78 ¶¶ 8–9; Dkt. No. 91 ¶ 8.  Genesis contends that the transitional services performed by it included the submission of EDI orders on GNET's behalf because "Goodman Networks/GNET had not set up their own EDI system," Dkt. No. 77 ¶ 11, although, as will be described later, there is no evidence that Genesis notified Wistron that the orders were being placed on GNET's behalf.

## V.     Genesis and GNET Interactions with Wistron Following the Asset Purchase Agreement

On December 11, 2019, Steve Seago notified Wistron that the Genesis division handling the Distributor Agreement had been sold to Goodman Networks by James Goodman "in a related party transaction," noting that James Goodman was "co-owner with his brothers" of Goodman Networks.  Dkt. No. 77 ¶ 14; Dkt. No. 77-1 at ECF p. 1.  Seago notified Wistron that Wistron would have to execute an assignment of the Distributor Agreement.  Dkt. No. 77-1 at ECF p. 1. Seago's email is on the top of an email chain from Jo Ella Terhesh, who identifies herself as "Vice President of Supply Chain and Logistics" of Genesis ATC, and the email chain includes a discussion of price changes that will be effective beginning on January 1, 2020.  *Id.*  At the time of his email, Seago had transitioned from Genesis—where he had been an employee for ten years rising to the level of President—to being an employee at Goodman Networks and GNET, Dkt.

9

No. 77 ¶¶ 2–3, and his email was sent from a "GoodmanNetworks.com" email address.  The email recites that Seago's higher priority was an amendment for the price changes and that there was no urgency to the assignment.  The relevant paragraph reads as follows:

> As you are likely aware, James Goodman sold our division (Genesis ATC) in a related party transaction to Goodman Networks where he is a co-owner with his brothers. I do not want to de-rail the execution of the amendment but we will need an assignment of the agreement executed as well.  This will formally move the distributor agreement from Genesis to Goodman.  We are fine for now, but will need to work that once the amendment is finalized.

Dkt. No. 77-1 at ECF p. 1.

Prior to the Asset Purchase Agreement, Wistron held biweekly conference calls called "Collaborative Planning, Forecasting, and Replenishment calls," with Terhesh, Grayson Goudeau, and Letitia Diaz of Genesis, and representatives of AT&T, to discuss the status of current orders, upcoming shipments, and AT&T's plans for future orders under the Distributor Agreement.  Dkt. No. 69-9 at 43–44; Dkt. No. 76 ¶ 17; Dkt. No. 77 ¶ 9.  All three employees used an email address that included their name and "@genesisnet.com."  Dkt. No. 76 ¶ 17; Dkt. No. 77 ¶¶ 22, 24, 26.  After the Asset Purchase Agreement, all three persons ended their employment with Genesis and subsequently became employees of Goodman Networks.  Dkt. No. 76 ¶ 17.  The reporting relationships of the three employees did not change—Terhesh who had reported to Seago in the latter's capacity as a Genesis employee continued to report to Seago in his capacity as a Goodman Networks employee and Goudeau and Diaz continued to report to Terhesh.  *Id.* ¶¶ 22–27.  As Goodman Networks' employees, however, the three used email addresses that included their name and the domain name "@goodmannetworks.com," later replaced by the domain name "@goodmansolutions.com."  Dkt. No. 69-9 at 126–27; Dkt. No. 76 ¶ 18; Dkt. No. 77 ¶¶ 23–27.  Although the email accounts changed, the persons on these biweekly calls remained the same.  Dkt. No. 69-9 at 177.  Wistron did not know whether they

were employees of Genesis or Goodman and the calls discussed the "Genesis order to [Wistron] .

. . or how [to] fulfill Genesis order." *Id*. at 126–28.  It is undisputed that the parties discussed

Genesis purchase orders and not Goodman purchase orders on the calls.  *Id*.

It also is undisputed that the orders in the EDI system were depicted as being sent from

Genesis.  When Genesis and Wistron first established their relationship, Genesis requested use of

the EDI system and worked with Wistron's IT team to configure it to Genesis.  *Id*. at 33.  Under

Wistron's EDI system, there was no "way to change the party who is sending the purchase order

. . . because the EDI is specific [sic] defined from Genesis to [Wistron]."  *Id*. at 19.  Instead, if

there was a "new customer, then [Wistron would] set up EDI with this new customer."  *Id*.

While Genesis also had its own separate EDI system established to submit purchase orders to

Wistron, Dkt. No. 77 ¶ 6, there is nothing in the record indicating that Genesis or GNET ever

sought to reconfigure Wistron's EDI system to indicate that orders were being sent from GNET.

Wistron never received notifications of EDI transactions that had been sent from GNET.  Dkt

No. 69-9 at 84.  Although GNET states that it sent the purchase orders connected to the unpaid

invoices, Dkt. No. 91 ¶ 46, there is no evidence that the hard copy purchase orders were ever sent

to Wistron, *id.*; *see also* Dkt. No. 69-9 at 151–67.

## VI.    Attempted Assignment of the Distributor Agreement

On August 17, 2020, nine months after he first informed Wistron of the transfer of the

Genesis business to Goodman Networks and said that an assignment agreement would be

needed, Seago, whose title then was Vice President, Business and Corporate Development for

Goodman Networks, sent Plaintiff a draft "Assignment Assumption and Consent" ("Draft

Assignment Agreement"), seeking Plaintiff's written consent to the assignment of the Distributor

Agreement from Genesis to GNET.  Dkt. No. 69-7; Dkt. No. 76 ¶ 10.  Seago's message stated

that it was "something that has fallen through the cracks in our transition from Genesis to

Goodman" and requested that Wistron "please execute ASAP & then we will counter & return fully executed."  Dkt. No. 77-3 at ECF p. 6.

The Draft Assignment Agreement recited that Genesis, as assignor, assigned to GNET, as assignee, "all covenants, agreements, obligations, and liabilities" of Genesis under the Distribution Agreement.  Dkt. No. 69-7.  It makes no mention of the term "novation" and does not specifically discharge Genesis from its obligations under the Distributor Agreement.  *Id.*  Its only two sections indicate the following:

> **Section 1. Assignment and Assumption.**
>
> (A) The Assignor hereby assigns and the Assignee hereby expressly assumes as of the Effective Date all covenants, agreements, obligations and liabilities of the Assignor under the Contract as if it were the original party thereto, including, without limitation, all indemnity and responsibilities set forth therein.
>
> (B) The Assignor hereby agrees that it remains liable for all obligations under the Contract accrued through the Effective Date, including, without limitation, all indemnity and other obligations that by their nature survive termination arising on or after the Effective Date in connection with any event or incident occurring prior to such date.
>
> (C) Assignor hereby represents, warrants and agrees it has full power and authority to make the assignment described herein and to enter into this Assignment.
>
> **Section 2. Consent.** Effective upon execution of this Assignment by all of the parties hereto, [Wistron] hereby consents to the assignment set forth in Section 1 hereof.

*Id.* at ECF p. 3 (bolding in original).  It contained signature blocks for each of Genesis, GNET, and Wistron, but was not signed by any of them.

Also, on August 11, 2020, Deborah Calderon, writing as an employee of Genesis Networks Global Services, sent an email to Wistron asking Wistron to copy GNET's accounts payable department on all invoice emails sent to Genesis's accounts payable department.  Dkt. No. 69-9 at 71–72; Dkt. No. 76 ¶ 40.

Wistron employees internally discussed the signature of the Draft Assignment Agreement after they received it.  Eventually, in response, Sonia Wang, an in-house counsel at Wistron, expressed her opinion internally to others within Wistron suggesting that Wistron receive a formal notification with Genesis's signature before Wistron would sign the Draft Assignment Agreement.  Wang's email stated:

> According to the distributor agreement, "A Change of Control shall be deemed an assignment", it's not necessary for WNC to sign this Assignment Contract since Genesis undertakes a change of control.  It only needs a one-way notification from Genesis to prove such change.

> Usually the acquisition parties will send a notice of their M&A first, instead of asking suppliers to consent.  In consideration that we could hardly confirm Genesis' M&A, legal team suggest to obtain a formal notification with Genesis' signature before WNC sign the Assignment Contract.

Dkt. No. 77-3 at ECF pp. 4–5.  Another employee at Wistron, Oscar Lu, forwarded her opinion internally to Jon Peacock, asking for the formal notice from Genesis and adding an additional point about insurance.  First, Lu referenced the need for notification from Genesis: "Please refer to WNC legal's feedback as follow[s].  Before signing the Consent Assignment Agreement, WNC shall have a notice from Genesis for illustration of their company change.  Are [sic] Genesis acquired by GNET?  If yes, is there any M&A notice . . . from Genesis?"  *Id*. at ECF p. 4.  Second, Lu also indicated his concern about credit limits of Defendants, asking that "Another important thing about Genesis is their credit limit.  Based on WNC insurance company, Genesis credit limit will be expired in the end of this month and Genesis [is] still pending on provid[ing] financial data to WNC insurance company.  If GNET will take over genesis, will WNC need to check with GNET for credit limit?"  *Id.*

Peacock forwarded the email with the comments and questions of Wang and Lu to Seago with the request "Can you help address these questions?"  *Id*. at ECF p. 3.  Seago responded several days later.  *Id*.  As to the notice by Genesis, Seago did not provide a formal notification

with Genesis's signature or a notice from Genesis.  Instead, he responded on behalf of Goodman

Networks, in relevant part:

> Goodman Networks acquired certain assets from Genesis Networks Telecom
> Services (dba Genesis ATC) and acquired those assets through a wholly owned
> subsidiary legally named GNET ATC LLC.  Only certain assets were acquired and
> not the legal entity of Genesis. Since only assets, including the agreements with
> AT&T to support purchase of equipment such as that which is purchased from
> WNC, are effected there is not a formal notice however, Genesis is a signatory on
> the assignment agreement which, in effect, serves as a notice.  WNC will receive a
> fully executed copy of the assignment when all parties have executed.

*Id*.  As for the credit limit, Seago stated that "Goodman Networks has met with and shared all

pertinent financial information with WNC's insurance company Atradius.  WNC will need to

follow up with Atradius to understand their decisioning for a credit limit as this is not shared

with us."  *Id*.

Lu then made several comments and posed several questions in an email to Peacock, that

was forwarded by Peacock to Seago.  *Id.* at ECF p. 2.  Lu expressed his understanding of the

company doing business with Wistron: "For now, Genesis ATC is the company doing business

with WNC (issue PO to WNC.)  Will it change to GNET ATC?  If not, why [does] Genesis need

to assign Contract (Non-Exclusive Distributor Agreement . . . ) to GNET ATC?"  *Id*.  Lu also

asked whether there was a formal document or announcement about the relationship between

Goodman, Genesis, and GNET and stated that Wistron legal would check with its insurance

company about their review of Genesis's financial information.  *Id*.  That same day, Peacock sent

Lu's email to Seago with the request that they speak, noting that there was an issue with respect

to the insurance company's review of Genesis's financial information and that if it did not meet

requirements, Wistron's shipments would not be insured and would be at risk.  *Id*.

A few weeks later, Lu emailed Seago directly.  Dkt. No. 77-4.  He asked two questions:

> To be more clear to our team, I would like to double check with you on 2 questions.
> (1) Will Genesis still [be] the company issue PO/ receive shipment/ arrange

payment to WNC? (2) If it will be changed, when will GNET ATC be the company [to] issue new PO?

*Id.* at ECF p. 3.  Seago responded in the future tense, stating that "Genesis will no longer be involved so purchase orders will come from GNET ATC LLC.  GNET ATC is a wholly owned subsidiary of Goodman Networks.  Hope this helps clarify."  *Id*. at ECF p. 2.  Lu replied requesting "some basic information of GNET ATC LLC," including company address and company DUNS number so that Wistron could check with the insurance company.  *Id.* at ECF p. 2.  Peacock asked Seago whether there was any luck with the insurance company.  *Id.*  Seago replied that he had reached out to the insurance company to ask if they needed anything but they had not responded, and promised to reply with answers to Lu's questions.  *Id.*

Partially simultaneous with this email exchange, Seago sought himself to investigate the issue of the credit limit with Atradius, asking an Atradius representative: "Are we closed off on Atradius' review & assessment?  If not, what needs to happen to bring this to closure."  Dkt. No. 77-5 at ECF p. 4.  The representative from Atradius, Jonathan Starck, responded that Wistron, Atradius's customer, was "still seeking cover on Genesis Networks" and asked the question, based on prior conversations, whether there would be "more business with Genesis???"  *Id.* at ECF p. 3.  On behalf of Goodman Solutions, Seago sent a reply email on September 23, 2020, copying Peacock and Lu, outlining his view that, *inter alia*, Goodman acquired the value-added resale business line of purchasing material from Wistron and resold it to AT&T, and that "[a]ll contracts with AT&T pertaining to the purchase of WNC materials previously distributed through Genesis Networks Telecom Services, LLC have been assigned to GNET ATC LLC.  No contracts governing value-added resale to AT&T remain with Genesis."  *Id*. (emphasis and bolding omitted).  Peacock responded directly to Seago, thanking him for speaking to Atradius, and Seago then sent a separate follow-up email to Peacock stating that:

> If you read Jon Starck's email he says WNC is "still seeking cover" on Genesis. This means that WNC views Genesis as making the payments, which they aren't. If payment is still coming from Genesis then it's Goodman funding the Genesis account because the contract hasn't been assigned. But I think Goodman is sending the payments & has been for some time.

*Id*. at ECF p. 2. Peacock responded with "[l]et me see if I can correct this." *Id*.

Atradius investigated GNET and Goodman Networks to determine whether Atradius would insure Wistron for any credit limit for GNET or Goodman Networks as buyers of Plaintiff's products under the Distributor Agreement. Dkt. No. 69-9 at 60–63; Dkt. No. 76 ¶ 11. Atradius then declined coverage for Goodman Networks in June 2020, and for GNET twice in September and October 2020. Dkt. No. 69-9 at 62–63; Dkt. No. 69-11; Dkt. No. 76 ¶ 12. The decision for Goodman Networks flagged that "Please be informed that this buyer was emerged from bankruptcy on August 14, 2018." Dkt. No. 69-11. Atradius twice declined coverage for GNET because it could neither identify the entity GNET, nor confirm GNET's financial condition. Dkt. No. 69-12; Dkt. No. 69-13; Dkt. No. 76 ¶ 14. Wistron, however, extended the credit line with Genesis through the end of 2021 because "Genesis ke[pt] issuing [purchase orders] with WNC, and we need[ed] to fulfill the [purchase order] under the distributor agreement." Dkt. No. 91 ¶ 41; Dkt. No. 69-9 at 123.

Genesis never obtained Wistron's written consent to the Draft Assignment Agreement.

## VII.    The Unpaid Invoices and Wistron's Attempt to Collect on Them.

After the date of the Asset Purchase Agreement and pursuant to the Distributor Agreement, Wistron designed, manufactured, sold, and delivered $9,212,256.94 worth of product for which invoices were duly issued to Genesis and have not been paid.[2] Dkt. No. 69-2.

---

[2] The unpaid invoice numbers include the following purchase order numbers: "21923812; 21923816; 21923821; 21923825; 21890724; 21890725; 21923795; 21923800; 22215711; 20363559; 22215713; 22215709; and 21923833." Dkt. No. 70 ¶ 5. Purchase order 22215713 was mistakenly identified with a different third digit as "227157123" on unpaid invoice number

The invoices date from June 22, 2021 to August 11, 2021, for purchase orders made from April 2, 2020 to January 6, 2021. *Id.*; Dkt. No. 69-14. Each of the invoices provided the following language: "Bill To: Genesis Networks Telecom Services, LLC," with an address in San Antonio, Texas, and a "Ship To: Genesis Networks Telecom Services, LLC," with a shipping location in Southhaven, Missouri. Dkt. No. 69-2. The invoices were issued in batches on dates from June 25, 2021 to August 18, 2021. *Id.* GNET received all the unpaid invoices and did not object to them when they were issued. Dkt. No. 76 ¶ 27. All were dated after the date of the Asset Purchase Agreement between Genesis and Goodman Networks. It is also undisputed that Wistron fulfilled the purchase orders sent by Defendants in connection with these unpaid invoices. *Id.* ¶ 34. Wistron sent these invoices via email to both the Accounts Payable Department at Genesis and to Goodman Solutions. Dkt. No. 69-2 at ECF pp. 2, 7, 14, 16, 18, 24, 26, 28; Dkt. No. 77 ¶¶ 28–28. The unpaid orders generated EDI 850 notifications. *See* Dkt. No. 69-14; Dkt. No. 76 ¶ 26. Each of the EDI 850 notifications generated for the unpaid orders indicate "Sender Name: GNSS." Dkt. No. 69-14.

On October 18, 2021, Wistron sent an "aging report" via email to GNET and Genesis indicating that the total amount due to Wistron was $7,108,087.12. Dkt. No. 69-23 at ECF p. 8. Such "aging reports" stated which invoices were coming due for payment and which invoices were already overdue for payment. Dkt. No. 70 ¶ 11. The aging report generated some consternation within Genesis. Cathy Kincy, then Genesis's Chief Financial Officer, wrote Seago, among others: "This concerns me that the subject line on this e-mail from WNC today says Genesis AR Aging. Did WNC never get reassigned to Goodman two years now after the

---

56212. However, the correct quantity and price for the product corresponding to purchase order 22215713, was billed on unpaid invoice number 56212. *Id.* ¶ 6; *see also* Dkt. No. 70-2.

[Asset Purchase Agreement] transaction? . . . Do we know if the WNC Service agreement was reassigned?  [I]s there a copy somewhere?"  Dkt. No. 69-8 at ECF p. 3.  Seago replied, stating in reference to his initial August 17, 2020 email seeking a signature from Wistron, that "I can find an email where I sent the assignment to them 8/2020.  Evidently with the changes caused by divesting [Genesis] this assignment didn't get done.  I can not find where they returned it signed."  *Id.* at ECF p. 2; Dkt. No. 76 ¶ 15.  Kincy then responded: "Based on last night's email where the reassignment was never executed . . . seems Genesis is on the hook."  Dkt. No. 69-10 at ECF p. 2.

On October 21, 2021, James Frinzi, the CEO of GNET, sent an email to Wistron indicating that "GNET ATC does not have the money to make these payments" and that it had hired a financial restructuring firm.  Dkt. No. 69-20.  He also added that GNET had been "terminated by AT&T" and that "all payments to suppliers are suspended until further notice."  *Id.*  On October 27, 2021, Wistron sent Genesis, Goodman Solutions, and GNET a payment claim letter.  Dkt. No. 69-21.  On October 28, 2021, Kincy emailed James Goodman confirming that the "Amount owed" to W-Neweb was "[$]9,212,256.94."  Dkt. No. 69-24 at ECF p. 2.  Wistron sent another payment claim letter on December 3, 2021.  Dkt. No. 69-22.  On January 11, 2022, James Goodman, responded by stating that "Genesis sold this business over 2 years ago and is not responsible, do not send this again to Genesis."  Dkt. No. 69-25 at ECF ¶¶ 2–3.  Wistron sent yet another aging report to GNET and Genesis on January 22, 2022, stating that the total amount due was $9,212,256.94.  Dkt. No. 69-23 at ECF p. 5.  The consultant hired by GNET confirmed on January 26, 2022 that the outstanding amount aligned with the company's accounts payable records.  *Id.* at ECF p. 2.  To date, no payment towards the $9,212,256.94 has been made.  Dkt. No. 76 ¶ 51.

## PROCEDURAL HISTORY

Plaintiff commenced this action by filing its original complaint on March 30, 2022.  Dkt. No. 7.[3]  On July 18, 2022, Genesis filed its first motion to dismiss the complaint for failure to state a claim for relief, Dkt. No. 30, and GNET filed its motion to transfer the case to the Northern District of Texas and its first motion to dismiss, Dkt. No. 33.  On August 8, 2022, Plaintiff filed an amended complaint, Dkt. No. 39, and its memorandum of law in opposition to GNET's motion to transfer, Dkt. No. 38.[4]  On August 19, 2022, Genesis filed a motion to dismiss the amended complaint, Dkt. Nos. 41–42, and, on August 22, 2022, GNET likewise filed a motion to dismiss the amended complaint, Dkt. Nos. 44–45.  After subsequent briefing, the Court issued an Opinion and Order denying Defendants' motion to transfer the case or to dismiss it for failure to state a claim for relief.  Dkt. No. 58.

On March 2, 2023, Plaintiff filed this motion for summary judgment along with a memorandum of law, two declarations, and a Rule 56.1 statement.  Dkt. Nos. 67–71.  On April 3, 2023, Genesis filed a memorandum of law in opposition to the motion for summary judgment with a counterstatement to Plaintiff's Rule 56.1 statement and three declarations.  Dkt. Nos. 75–79.  On April 4, 2023, a day past the deadline for their opposition brief, GNET filed a memorandum of law in opposition to the motion for summary judgment and a counterstatement to Plaintiff's Rule 56.1 statement.  Dkt. Nos. 82–83.  On May 8, 2023, Plaintiff filed a reply memorandum of law in further support of its motion for summary judgment, a declaration in support of that motion, and a response to Genesis's Rule 56.1 counterstatement.  Dkt. Nos. 89–91.

---

[3] Plaintiff attempted to file its complaint on March 29, 2022, but that filing was rejected by the Clerk of the Court due to a filing error.  Dkt. No. 1.
[4] Because Plaintiff properly filed an amended complaint, the Court denied Genesis's and GNET's first motions to dismiss as moot.

On April 3, 2023, Genesis filed a motion to strike portions of the materials filed with

Plaintiff's motion for summary judgment and a supporting memorandum of law.  Dkt. Nos. 73–

74.  GNET joined that motion.  Dkt. No. 81.  On May 8, 2023, Plaintiff filed a memorandum of

law in opposition to the motion to strike with two declarations.  Dkt. Nos. 92–94.  Genesis filed a

reply memorandum of law in support of its motion to strike on May 24, 2023.  Dkt. No. 97.

On June 28, 2023, GNET indicated that it was withdrawing its opposition to summary

judgment.  Dkt. No. 101.  The Court held oral argument on the motions on June 29, 2023.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might

affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *WWBITV, Inc. v. Village of Rouses Point*, 589

F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137

(2d Cir. 2009)).  "[I]n assessing the record to determine whether there is a genuine issue to be

tried as to any material fact, the court is required to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought."

*Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The party seeking summary judgment bears the burden of demonstrating that "there is no

genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  If the movant meets its burden,

"the nonmoving party must come forward with admissible evidence to raise a genuine issue of

fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d

140, 145 (2d Cir. 2008).  To survive summary judgment, the nonmoving party "may not rely on

mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159,

166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc*., 68 F.3d 1451, 1456 (2d Cir. 1995)), and must

"do more than simply show that there is some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-

moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on

conclusory statements, or on mere assertions that affidavits supporting the motion are not

credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation

omitted).  But if "the party opposing summary judgment propounds a reasonable conflicting

interpretation of a material disputed fact," summary judgment must be denied.  *Schering Corp. v.

Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

## DISCUSSION

## I.      Defendants' Motion to Strike

Genesis moves to strike certain portions of the Wang declaration and the Englander

declaration, both submitted in support of Plaintiff's motion for summary judgment, and

corresponding portions of Plaintiff's brief.  The motion to strike is denied in its entirety.

### A.      Wang Declaration and Chu's Testimony

With respect to the Wang declaration, Genesis argues that there are numerous factual

assertions that are not based on Wang's personal knowledge.  Genesis argues that Wang's

declaration does not "provide a specific basis supporting her having personal knowledge as to

GNET's intent in sending payments to W-NeWeb."  Dkt. No. 74 at 3–4.  Genesis also objects to

portions of Chu's testimony on the same basis.  *Id*. at 6.  The motion to strike is denied as to both

Wang's declaration and Chu's testimony.

Federal Rule of Civil Procedure 56(c)(4) requires that "[a]n affidavit or declaration used

to support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 530 (S.D.N.Y. 2020), *aff'd*, 2022 WL 2759055 (2d Cir. July 13, 2022). "'[P]ersonal knowledge' includes basic, commonsensical inferences, so long as they are 'grounded in observation or other first-hand personal experience' and are not 'flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" *In re Bridge Const. Servs. of Fla., Inc.*, 39 F. Supp. 3d 373, 383 (S.D.N.Y. 2014) (quoting *Visser v. Packer Eng'g Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)). Further, "it is 'axiomatic that a corporate representative may testify and submit affidavits based on knowledge gained from a review of corporate books and records.'" *Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) (quoting *Harrison–Hoge Indus., Inc. v. Panther Martin S.R.L.*, 2008 WL 905892, at *28 (E.D.N.Y. Mar. 31, 2008) (Bianco, J.)); *see also Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (describing the standard for the personal knowledge requirement).

Wang is the Vice President of Finance and Administration with W-NeWeb. Dkt. No. 70 ¶ 1. In that role, she oversees W-NeWeb's finance team. *Id*. She has been employed with W-NeWeb since 2008 and is familiar with the facts surrounding the issuing of invoices and receipt of payments pursuant to the Distributor Agreement. *Id*. She submitted her declaration "based on [her] personal knowledge and/or a review of Plaintiff's business records, including W-NeWeb's business records." *Id*. Chu has been at Wistron for over fifteen years, starting as a senior manager before occupying the role of senior director in sales and operations since 2015. Dkt. No. 69-9 at 20–21. She described some of her "day-to-day tasks" as dealing with "customer

order[s], how to fulfill customer orders.  When we ship products, how to invoice customer to track when customer need to pay WNC." *Id.* at 22.

Genesis objects to the following portions of Wistron's brief, citing Wang's declaration and Chu's testimony, with the portions that Genesis seeks to strike italicized:

> 1. "Customers often use affiliates or third-party entities to pay invoices. *Throughout the term of the Distributor Agreement, Genesis had multiple different entities make payments to W-NeWeb for the invoices issued for WNC products sold to Genesis, including Genesis Networks, Genesis Networks OEM, Genesis Telecom Payables, and GNET*."  Wang Decl. ¶ 9; *see also* WNC's 56.1 Statement ¶ 39.

> 2. "Plaintiff's customers often pay for invoices through affiliates or third-party entities, *and this was also the case for Genesis, which issued payments for invoices billed to Genesis through multiple related entities including Genesis Networks, Genesis Networks OEM, Genesis Telecom Payables, and GNET.  Wang Decl., ¶ 9.*" Br. at 6.

> 3. "The fact *that GNET (and other affiliated / third party entities) made payments on invoices issued to Genesis (Wang Decl. ¶ 12; Ex. 9, 222:5-11)*—payment parties over which Plaintiff had no control—in no way demonstrates that Plaintiff released Genesis from its ultimate payment obligations under the Distributor Agreement." Br. at 15.

> 4. "Indeed, *it is common in Plaintiff's business for customers to make payments through affiliates or third-party entities. Wang Decl., ¶ 9; Ex. 9, 218:13-20.* Plaintiff's receipt of same hardly suggests that it routinely releases customers from their contractual obligations in favor of whichever party happened to remit payment, a circumstance over which Plaintiff has no control."  Br. at 15 n.13.

Dkt. No. 74.  Genesis also seeks to strike the following italicized portions of Chu's testimony.

> Q. And does the fact that GNET made payment to W-Neweb for purchase orders generated from Genesis, the fact that I learned that sometime in 2021, did that matter to you?

> MS. BROWN: Objection. You can answer.

> THE WITNESS: No, because *it is a third party payment on behalf of Genesis against W-Neweb invoice to Genesis* and we have other customers that we issue the invoice to a certain customer but it is another entity that pay for this invoice.  *It's a third party payment.*

Dkt. No. 69-9 at 218.

Q. And as you sit here today, do you have any reason to believe that any of these payments for example listed in this e-mail here from Ms. Wang were not actually made by GNET?

A. Not actually made by GNET, any invoice?  Yes.  So there are many invoice paid by Genesis, by Goodman Telecom, by Genesis Network, by Genesis Telecom. There are many entities in Goodman group.  So that's why I said that *there's a third party payment against W-Neweb invoice to Genesis.*

*Id*. at 221–22.

The motion to strike is denied.  First, the motion is denied as moot because how Wang and Chu characterize the payments to Plaintiff is irrelevant to the determination of whether Genesis is liable for GNET's breaches.  None of the statements are material for this Court's conclusion that Genesis did not effectuate a valid novation and thus would also be held liable for GNET's breaches.  All parties agree that GNET breached the agreement by failing to pay for the products from Plaintiff.

The motion to strike is also denied on its own terms.  Wang attested that her knowledge was based on "review of Plaintiff's business records, including W-NeWeb's business records." Dkt. No. 70 ¶ 1.  The business records of W-NeWeb support those conclusions.  The invoices themselves were billed to Genesis.  *See* Dkt. No. 70-1.  Chu testified as Wistron's Rule 30(b)(6) witness.  Dkt. No. 69-9 at 12–13.  She saw the orders from Genesis and Wistron's email to Genesis, and the overdue amount that Genesis owes Wistron.  *Id*. at 15.  She also saw the documents from the EDI portal.  *Id*. at 16–17.  Genesis objects that Wang and Chu are incorrectly identifying and describing the purpose of the payments.  The statements, however, are admissible and relevant to Plaintiff's contemporaneous understanding of the relationship of GNET and Genesis and the reasonableness of that understanding.  It does not necessarily come in for the truth of that relationship—*e.g.*, which of the two Defendants was actually paying for whom in their transactions with Plaintiff.  Genesis is incorrect that they are testifying, or

24

speculating, as to Genesis's or GNET's "intent."  Clearly, both Wang and Chu are describing

what they saw on the relevant documentation regarding the transactions between Wistron and

Genesis.  Those statements are not mere conjecture, as those documents bore the unique

identifiers and other identifying information of Genesis, rather than GNET or Goodman

Solutions.

### B.   Englander Declaration

Genesis also moves to strike two exhibits attached to the declaration of Plaintiff's

counsel, Jacob Englander, as lacking authentication.  One is a pdf of an excel report detailing all

purchase orders submitted to Plaintiff, *see* Dkt. No. 69-15, and another is an excerpt that

Englander created showing only purchase order numbers corresponding to the unpaid invoices,

*see* Dkt. No. 16-16.  The motion to strike is denied.  The documents are authentic and

admissible.  Shin Lu, Assistant Director at Wistron, confirms in his reply declaration that the

excel report is a business record that is automatically and contemporaneously created within

Plaintiff's computer system.  Dkt. No. 93.  He also confirms that it is "kept in the course of

[Wistron]'s regularly conducted business and it is a regular practice of [Wistron] to create and

maintain this report, which is regularly updated each time a new EDI 850 purchase order is

received."  *Id.* ¶ 6.  He attests that Exhibit 15 is "simply a compilation of the information

generated with each individual EDI 850 purchase order."  *Id.*  Exhibit 16 is based on Exhibit 15.

Dkt. No. 69 ¶ 17; *see Davis v. Peake*, 2011 WL 4407551, at *4 (S.D.N.Y. Sept. 22, 2011), *aff'd*,

505 F. App'x 67 (2d Cir. 2012) (considering reply declaration to show personal knowledge in

response to motion to strike); *Discover Re Managers, Inc. v. Preferred Emps. Grp., Inc.*, 2006

WL 2838901, at *6 (D. Conn. Sept. 29, 2006) (same).

II.      **Plaintiff's Motion for Summary Judgment**

Plaintiff moves for summary judgment on its breach of contract claims against Genesis and GNET.  Dkt. No. 68 at 9.  It argues that Genesis's assignment to GNET does not relieve it of liability to Plaintiff.  *Id.* at 12.  Plaintiff also argues that GNET is liable as an assignee under the Distributor Agreement, and that absent an effective novation, Genesis is liable as the assignor. *Id.* at 16.  Finally, in the alternative, Plaintiff argues that it is entitled to summary judgment on its account stated claim against both Defendants.  *Id.*

GNET does not oppose the entry of summary judgment against it and at oral argument, its opposition brief was deemed withdrawn.  Dkt. No. 101.  Genesis does not appear to dispute two elements of Plaintiff's breach of contract claim: (1) the existence of an agreement and (2) that Plaintiff performed under an agreement.  *See* Dkt. No. 75.  It, however, argues that there are disputes of material fact that prevent the grant of summary judgment.[5]  It asserts that the conduct of the parties evinces an "implied novation."  It further argues that there was "latent ambiguity" in the consent provision of the Distributor Agreement and that there is a genuine dispute over proximate causation for damages.  It also asserts that there are genuine disputes of fact as to affirmative defenses to the cause of action—namely, election of remedies, waiver, and equitable estoppel.  *Id.*  Finally, it argues that Plaintiff lacks standing for asserting their claims.

The Court first addresses whether certain defenses were waived by Genesis's failure to plead them in its answer.  The Court then addresses the question of an implied novation. Concluding that no evidence supports the existence of an implied novation, the Court proceeds to address the remaining defenses of latent ambiguity, election of remedies, waiver, and equitable

---

[5] Neither Defendant joins the other Defendant's brief opposing summary judgment.

estoppel.  For the following reasons, the Court grants Plaintiff summary judgment for an award in an amount of $9,212,256.94 jointly and severally against Genesis and GNET.

### A.      Waiver

The Court first addresses whether Defendants have waived their defenses of implied novation and latent ambiguity raised in opposition to Plaintiff's motion for summary judgment. Plaintiff argues in its reply brief that neither Defendant made any affirmative defense concerning ambiguity in their answers and that therefore they waived the defense.  Dkt. No. 89 at 4–6. Plaintiff also argues that the defense of implied novation was never raised prior to the opposition brief in their answers.  *Id*. at 8 n.8.  The Court concludes that Defendants have not waived the defense of latent ambiguity because the ambiguity of a contract is not an affirmative defense that must be pleaded in the answer.

Neither Genesis nor GNET raised ambiguity in their answers.  *See* Dkt. No. 59 (Genesis answer); Dkt. No. 60 (GNET answer).  Under Federal Rule of Civil Procedure 8(c), affirmative defenses "are waived unless they are raised in a responsive pleading."  *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50, 63 (2d Cir. 2021).  The Second Circuit has identified an affirmative defense as a "defense that 'will defeat the plaintiff's . . . claim, even if all allegations in the complaint are true,' rather than an attack on the truth of the allegations, or a rebuttal of a necessary element of the claim."  *Id*. (quoting *Saks v. Franklin Covey Co*., 316 F.3d 337, 350 (2d Cir. 2003)).  Courts are divided as to whether ambiguity constitutes an affirmative defense.  New York courts have not explicitly determined whether ambiguity constitutes an affirmative defense.  *See*, *e.g.*, 17B C.J.S. Contracts § 899 (2023) ("Ambiguity has been considered an affirmative defense although there is also authority that the meaning of the contract is a part of the plaintiff's case.").  Certain courts from within the Second Circuit have, in an offhand manner and in conjunction with language from the parties' submissions in their cases,

described ambiguity as an "affirmative defense," without explaining why it would be so. *See, e.g.*, *State St. Glob. Advisors Tr. Co. v. Visbal*, 2023 WL 4053170, at *41 (S.D.N.Y. June 16, 2023) ("[B]ecause Visbal has not shown that any material provision of the contract is ambiguous, State Street will be granted summary judgment on her twelfth and thirteenth affirmative defenses."); *Dorchester Pub. Co. v. Lanier*, 2006 WL 4388035, at *7 (S.D.N.Y. Mar. 19, 2006) ("Lanier's affirmative defense that the contract is ambiguous is without merit.").  None of those cases, however, distinctly address whether a defendant *must* plead ambiguity as an affirmative defense in an answer, lest it be waived as a defense.

The Court concludes that latent ambiguity need not be pleaded as an affirmative defense in an answer.  An assertion of ambiguity challenges "an integral part" of an element of the plaintiff's breach-of-contract claim.  *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 526 (2d Cir. 2004).  To repeat, "[u]nder New York law, the elements of a breach of contract claim are (1) the existence of an agreement, (2) performance of the contract by the plaintiff, (3) breach of the agreement by the defendant, and (4) damages."  *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007).  As explained by one of the state supreme courts squarely addressing the question, ambiguity "is not a rule of law external to the contract.  It is if anything internal, concerned with what the contract means and not with whether the contract should be enforced.  Clearly, one cannot determine the enforceability of a contract until one first determines its meaning."  *Century 21 Deep S. Properties, Ltd. v. Keys*, 652 So. 2d 707, 717 (Miss. 1995).  Indeed, it would be difficult, if not impossible, to determine whether there was an agreement, performance, or breach—all essential elements of a breach of contract claim—if the Court had not made a preliminary determination that the language unambiguously imposed obligations on the parties.  Therefore, it is often treated as a preliminary or necessary question

when addressing a breach of contract claim.  *See, e.g.*, *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) ("[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." (internal quotation marks omitted)); *cf. Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) ("At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous.").  Examination of the question of ambiguity is thus "by its very nature a necessary step in the examination of every contract." *Keys*, 652 So. 2d at 717.  Therefore, "even when ambiguity is an affirmative defense, a court may conclude that a contract is ambiguous despite the absence of a pleading to that effect."  17B C.J.S. Contracts § 899.  That conclusion aligns with guidance of the Second Circuit as to when an assertion constitutes an "affirmative defense" and thus must be pleaded, or else be waived. *See*, *e.g.*, *Utica Mut. Ins. Co.*, 7 F.4th at 63 ("[I]t was no affirmative defense to assert that an intervening cause broke the chain of causation, because the intervening cause challenged 'an integral part' of the causation element of the plaintiff's breach-of-contract claim." (citing *Sterling Nat. Bank*, 392 F.3d at 526)).[6]

As for the affirmative defense of implied novation, the Court construes Genesis's opposition to the motion for summary judgment as a motion to amend its answer.  *See Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, 123 F. Supp. 3d 343, 354 (D. Conn. 2015); *see*

---

[6] The Court is unpersuaded by Plaintiff's contention at oral argument that because implied ambiguity raises a question of fact, it necessarily means that it must have been pleaded in the answer.  That argument is all but rebutted by the Second Circuit's decision in *Sterling National Bank*, 392 F.3d 520, in which the court held that the defense of an intervening act that broke the chain of causation between breach and damages for a breach-of-contract claim was not required to be pleaded as an affirmative defense because it was "an integral part of the proximate cause analysis."  *Id.* at 527.

*also Trustees of the United Plant & Prod. Workers Loc. 175 Benefits Fund v. Am. Paving & Masonry Corp.*, 2016 WL 4991551, at \*4 (E.D.N.Y. July 12, 2016), *report and recommendation adopted*, 2016 WL 4991542 (E.D.N.Y. Sept. 15, 2016) ("[P]ursuant to Rule 15(a)(2), a court has discretion, when a party omits a defense, to nevertheless allow the defense at any time 'when justice so requires.'" (internal quotation marks omitted)); *Ebert v. Holiday Inn*, 2014 WL 349640, at \*9 (S.D.N.Y. Jan. 31, 2014), *aff'd*, 628 F. App'x 21 (2d Cir. 2015) (same).  This conclusion is particularly appropriate given that the parties were aware of the novation defense since the Court's Opinion and Order on the motion to dismiss and thus during discovery.  *See, e.g.*, *Cal-Regent Ins. Servs. Corp.*, 123 F. Supp. 3d at 354 (finding that in light of parties' awareness of claim during discovery, particularized denial, and multiple opportunities to respond in summary judgment briefing, leave should be granted).  No prejudice for allowing amendment at this juncture has been shown.

### B.    Standing

Genesis also argues that Plaintiff lacks standing for its account stated claims.  Dkt. No. 75 at 21; Dkt. No. 82 at 2–3.  GNET argues that Plaintiff lacks standing for its account stated as well as its breach of contract claims.  Dkt. No. 82 at 3.[7]  The Court finds that Plaintiff has standing for its claims.

For the account stated claims, Genesis argues that the evidence does not show an indebtedness to Wistron because Wistron did not issue the unpaid invoices.  Dkt. No. 75 at 21.  As for the breach of contract claims, GNET argues that Plaintiff's "breach of contract claim

---

[7] Although GNET has since withdrawn its opposition to summary judgment and its brief in opposition, Dkt. No. 101, such an argument potentially raises both Article III and prudential standing barriers.  *See Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 612 F. Supp. 3d 263, 279 (S.D.N.Y. 2020), *aff'd sub nom. Phoenix Light SF DAC v. U.S. Bank Nat'l Ass'n*, 2021 WL 4515256 (2d Cir. Oct. 4, 2021).  The Court thus addresses standing for both the breach of contract and account stated claims.

against GNET is premised upon contractual language allowing it to assign rights and obligation to W-NeWeb.  There is a material question of fact regarding whether the Distributor Agreement was assigned to W-NeWeb."  Dkt. No. 82 at 3.  Under New York law, only the parties to and intended third-party beneficiaries of a contract have standing to enforce the contract.  *See Rajamin v. Deutsche Bank Nat'l Trust Co*., 757 F.3d 79, 86 (2d Cir.2014).  "An unequivocal and complete assignment extinguishes the assignor's rights . . . and leaves the assignor without standing to sue."  *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984).  However, the evidence establishes at most that W-NeWeb undertook a limited set of duties on behalf of Wistron.  Defendants do not point to anything in the record that indicates that there was a complete assignment sufficient to extinguish Plaintiff's standing.  Nothing in the Rule 56.1 statements presents a genuine dispute of fact that a "complete" assignment encompassing Plaintiff's claims and rights under the contract occurred.

Plaintiff, acting as the principal, has standing to sue based on the actions taken by its agent, W-NeWeb.  It is undisputed that W-NeWeb was issuing invoices "*on behalf of WNC*" and also "collected payment *on behalf of WNC* for each invoice."  Dkt. No. 70 ¶ 8 (emphasis added).  It is further undisputed that W-NeWeb acted as the U.S. importer for Plaintiff and issued all invoices for payment from Wistron to Genesis under the Distributor Agreement.  Dkt. No. 83 ¶ 36.  The evidence thus shows that W-NeWeb was acting as the agent of Plaintiff with respect to the duties of the Distributor Agreement.  When the aging reports were sent to Genesis and GNET, they came from Plaintiff, with the amount matching those of the unpaid invoices, and the Defendants discussed those invoices as being due to Plaintiff, not W-NeWeb.  Dkt. No. 69-8; Dkt. No. 69-10.  The purchase orders sent to Plaintiff and the invoices filed by W-NeWeb had matching purchase order numbers, demonstrating that the accounts of W-NeWeb and Plaintiff

were linked.  Thus, Plaintiff has standing for both the breach of contract and account stated claims.  *See Tech. Ins. Co., Inc. v. Philadelphia Indem. Ins. Co.*, 2022 WL 17177852, at *23 (S.D.N.Y. Nov. 23, 2022); *Ivory Dev., LLC v. Roe*, 25 N.Y.S.3d 686, 690 (3d Dep't 2016) ("Although a corporation does not generally have standing to exercise the legal rights of another corporation, even when the entities are affiliated through their ownership or management, a principal may sue on claims arising from actions taken by its agent.  Plaintiffs' affidavit, in effect, alleged that Black Creek acted as plaintiffs' agent in making the payments to Roe.  Thus, plaintiffs' first cause of action should not have been dismissed." (internal citations omitted)).

### C.    Implied Novation

Genesis argues that Wistron's conduct created an implied novation of an agreement. Framing the argument in its strongest possible terms, Genesis claims that the Draft Assignment Agreement—had it been signed—would have effected a novation whereby Genesis's obligations were discharged and assumed by GNET, and that Wistron, by its conduct, agreed to the terms of the Draft Assignment Agreement and to the substitution of Genesis with GNET.

As the Court previously noted in its Opinion and Order on the motion to dismiss, an assignment is distinguishable from a novation.  "Under New York law, it is clear that '[a] party to a contract is not relieved of his obligations by a simple assignment of the contract; the assignment must specifically provide for a release from liability upon assignment.'"  Dkt. No. 58 at 29 (quoting *Auerbach v. State Tax Comm'n*, 536 N.Y.S.2d 557, 560 (4th Dep't 1988)).  By contrast, a novation replaces one obligor with another.  If Genesis previously was obligated to Wistron, a novation would extinguish Genesis's obligations to Wistron at least on a going forward basis and replace Genesis's obligations with GNET's obligations.  Mere assignment of a bilateral contract is not enough to effectuate a novation.  *See Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir. 1977) (stating that assignment of a bilateral contract

involves assignment of rights and delegation of duties, but that "[w]hen duties are delegated, however, the delegant's obligation does not end"). "The elements of a novation are: (1) a previously valid obligation; (2) an agreement of all parties to: (a) extinguishment of the old contract; and (b) a new contract; and (3) consideration for the new contract." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc*., 736 F. Supp. 1281, 1283 (S.D.N.Y.1990), *aff'd*, 925 F.2d 566 (2d Cir.1991).

Genesis faces a high hurdle in arguing that it is relieved from its obligations on the basis of a novation. "While it is true that consent to a novation may be implied based upon the facts and circumstances of the parties' continued business relations, '[n]ot only must the intention to effect a novation be clearly shown, but a novation must never be presumed.'" *Sporre S.A. de C.V. v. Int'l Paper Co.*, 1999 WL 1277243, at *4 (S.D.N.Y. Dec. 30, 1999) (quoting *Wang v. Chen*, 1992 WL 7840, at *6 (S.D.N.Y. Jan. 10, 1992)); *see also Trans-Orient Marine Corp*., 736 F. Supp. at 1283 (stating that with respect to a novation, "[n]o one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a manner that satisfies the requirements of a valid contract"). "The burden of proving a novation rests with the party asserting the defense." *Lloyds Bank PIC v. Republic of Ecuador*, 1998 WL 118170, at *10 (S.D.N.Y. Mar. 16, 1998).

Genesis's opposition does not clear that hurdle. The Court assumes, without deciding, that the Draft Assignment Agreement, had it been signed by all parties, would have effected a novation and relieved Genesis of liability for orders placed after the agreement was effective. The Draft Assignment Agreement provides that Genesis (defined as the Assignor) assigns to GNET (defined as the Assignee) and GNET assumes all of Genesis's "obligations and liabilities" under the Distributor Agreement "as if it were the original party thereto." Dkt. No. 69-7 at ECF

p. 3.  It also provides that Genesis "remains liable for all obligations" under the Distributor

Agreement "accrued through the Effective Date."  *Id.*  The Draft Assignment Agreement further

provides that Wistron "consents to the assignment," including the assumption by GNET of all of

Genesis's obligations on a going forward basis.  *Id*.  Genesis's argument, in essence, is that the

Draft Assignment Agreement effected a novation—substituting Genesis with GNET—and that

Wistron, by its conduct, agreed to that novation.

    There are several fatal flaws with that argument.  In the first instance, the Distributor

Agreement to which Genesis and Wistron are parties provides that it "shall not be extended,

varied, changed, modified or supplemented unless in writing *and executed by a duly authorized

representative of each Party*."  Dkt. No. 69-1 § 19.13 (emphasis added).[8]  Wistron never signed

any amendment or modification of the Distributor Agreement.  It follows, therefore, that those

provisions continued in force, including the provision that Genesis remained responsible for

payment on the purchase orders.  Where the original contract includes a clause requiring

modifications to be in writing and there is no such writing, continued dealing is insufficient to

present a jury question as to an implied novation.  *See, e.g.*, *Sporre*, 1999 WL 1277243, at *4

("[N]o such writing was produced, and as such, Sporre's continued dealings with KPG cannot be

used to find an implied novation."); *United Orient Bank v. Lee*, 637 N.Y.S.2d 96, 96 (1st Dep't

1996) (granting plaintiff summary judgment and finding that there was no novation because "the

---

[8] Genesis's argument in a footnote that this provision was waived, Dkt. No. 75 at 12 n.4, is belied by the undisputed evidence showing that the conduct of both GNET and Wistron was consistent with a shared understanding that a signature—*e.g.*, a writing "executed by a duly authorized representative of each Party," Dkt. No. 69-1 § 19.13—was required to effectuate a novation.  None of the behavior indicates that Plaintiff "knowingly, voluntarily and intentionally abandoned" that right.  *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006)).

continuing guarantee expressly provided that it could not be modified or discharged without a writing" and no such writing existed).

Further, "[i]t is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." *Scheck v. Francis*, 260 N.E.2d 493, 494 (N.Y. 1970); *see also Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, 2008 WL 4579758, at *6 (S.D.N.Y. Oct. 14, 2008) (same). "The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain 'complete immunity from all obligation' until a written agreement is executed." *Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 830 (2d Cir. 2019) (quoting *R.G. Grp., Inc v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)). Such a rule "holds even if the parties have orally agreed upon all the terms of the proposed contract." *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d Cir. 1994).

It is clear from the undisputed evidence that all parties understood that the Draft Assignment Agreement would be effective only once Wistron, Genesis, as well as GNET agreed to its terms. The Draft Assignment Agreement sent by GNET to Wistron provided that it would only be "[e]ffective upon execution of this Assignment by all of the parties hereto." Dkt. No. 69-7 at ECF p. 3. It contained signature blocks for each of GNET, Genesis, and Wistron, that required each of the parties to fill in the name of their representative, the representative's title, and the date. All, with the exception of the name and title for GNET's representative (with no accompanying signature), remained blank. *Id.* at ECF p. 4. *See Longo*, 25 F.3d at 97 ("[W]ithout the signatures of both parties, there was neither a binding oral nor written contract in this case."). The signature block had independent legal significance, moreover, apart from

indicating a meeting of the minds.  Under the Draft Assignment Agreement, the "Effective Date" is the "date of the last signature below," Dkt. No. 69-7 at ECF p. 3.  Until the date of that last signature, Wistron was entitled to assume that Genesis—not GNET—enjoyed rights under the Distributor Agreement, that the purchase orders being submitted to Wistron under the Distributor Agreement that Wistron was required to fill came from Genesis and not GNET, and that if Wistron discharged its responsibilities and filled the orders, it would be paid by Genesis as the party placing the orders, and not by GNET who would replace Genesis only after the date of that last signature.  In the absence of such a signature, the novation would have been lacking a material term—the effective date of the agreement.  *See Cambridge Cap. LLC v. Ruby Has LLC*, 2023 WL 3956868, at \*51 (S.D.N.Y. June 2, 2023) (concluding that an agreement had failed to show a meeting of the minds as to all material terms, as "the start date of the agreement" was an "essential term" that was missing from the agreement) (citing cases).

All of the conduct by the parties is consistent with the understanding that neither Genesis nor Wistron had agreed to a novation.  Seago's conduct and communications can be explained only on the assumption that he understood that Wistron would have to affirmatively agree to replace Genesis with GNET before Genesis could be relieved of its obligations with respect to the continued purchase orders.  Seago repeatedly sought the execution by Wistron of the Draft Assignment Agreement through its signature.  In December 2019, Seago stated that "we will need an assignment of the agreement executed as well" which was necessary to "formally move the distributor agreement from Genesis to Goodman."  Dkt. No. 77-1 at ECF p. 2.  That understanding was only confirmed in August 2020, when Seago followed up, and wrote to Wistron that something that has "fallen through the cracks in our transition . . . is the assignment of the distributor agreement between WNC & Genesis.  Attached is the assignment document

that will take care of that.  Can WNC please execute ASAP & then we will counter & return

fully executed?"  Dkt. No. 69-7 at ECF p. 2.  Wistron too expressed the understanding that a

signature would be necessary, writing that it sought to "obtain a formal notification [of the

acquisition] with Genesis' signature before WNC sign the Assignment Contract."  Dkt. No. 77-3

at ECF p. 4–5.  Notably, neither that signature nor any other signature from Genesis was ever

forthcoming.  Seago responded that there would be a mutual signature to effectuate execution of

the parties, stating "there is not a formal notice however, Genesis is a signatory on the

assignment agreement which, in effect, serves as a notice.  WNC will receive a fully executed

copy of the assignment when all parties have executed."  *Id.* at ECF p. 4.  Seago's engagement

with Wistron's insurer, to make sure that the insurer approved GNET, is consistent with his

understanding that Wistron had not yet approved any novation.

Finally, in October 2021, after Wistron sent its aging report to Genesis and GNET, Seago

emailed internally that "this assignment *didn't get done*.  I can not find where they returned it

signed."  Dkt No. 69-8 at ECF p. 2 (emphasis added).  Kincy finally indicated that because "the

reassignment was never executed . . . [it] seems Genesis is on the hook."  Dkt. No. 69-10 at ECF

p. 2.

The conduct of Wistron too is inconsistent with the parties having agreed to a novation.

Throughout September and October 2020, while it explored with its insurer getting credit

approval for GNET, it also extended coverage for Genesis.  Dkt. Nos. 77-3, 77-4, 79-8.  There

would be no reason for Wistron to seek to extend coverage for Genesis if it understood itself to

have executed a novation in the Draft Assignment Agreement, relieving Genesis of any

obligation for which its creditworthiness would be relevant.  In September and October 2020, the

issue as to GNET's credit would be resolved by two consecutive rejections of any credit limit for

GNET.  Dkt. No. 69-9 at 62–63; Dkt. No. 69-11; Dkt. No. 76 ¶ 12.  Further, until August 2021, Wistron sent invoices to Genesis, copying GNET only at GNET's request.  Genesis never objected to being invoiced.  There being no "unequivocal intention" to make the agreement effective, no novation could have arisen as a result.  *Kaloidis v. Petrakis*, 711 N.Y.S.2d 471, 472 (2d Dep't 2000); *see also Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 498 (S.D.N.Y. 2002) (requiring an "unequivocal[] inten[t] to extinguish and discharge the prior obligation"); *Yahaya v. Hua*, 1989 WL 214481, at *4 (S.D.N.Y. Nov. 28, 1989) (requiring a "clear and definite intention" that it was the purpose to effectuate a novation).

Genesis relies on two categories of conduct to argue that the parties nonetheless intended to enter an implied novation despite there being no writing: first, Plaintiff's efforts to obtain trade credit insurance for Goodman Networks and GNET, Dkt. No. 75 at 12, and second, Plaintiff's purported representation in writing that it understood that Genesis would no longer be involved in the business and then its behavior in purportedly only dealing with GNET and Goodman Networks, *id*. at 14.  Neither of those instances is persuasive.  At best, they are indicative of an assignment, and not a novation.

Genesis first points to evidence of "Wistron's efforts to obtain trade credit insurance for Goodman and GNET."  *Id.* at 12.  The sparse evidence does not create a genuine issue of fact. The evidence includes Peacock emailing Seago, seeking to ensure that Atradius had the information it needed to determine whether it could provide insurance for GNET.  That communication was prompted by internal discussions within Wistron once Seago sought written consent for the Draft Assignment Agreement—again, a written consent that was never provided. *See* Dkt. No. 77-3.  There is also an email from Wistron's insurer from September 2020 in which the insurer expressed the understanding from GNET that "Genesis is no longer to be the contract

party" and that it was advised by Goodman Networks that "all contracts pertaining to the purchase of WNC materials previously distributed through Genesis Networks Telecom Services, LLC have been assigned to GNET ATC LLC."  Dkt. No. 79-8 at ECF p. 3.  Genesis asks a series of speculative questions based on this evidence—*e.g.*, asking why Plaintiff would seek insurance for GNET if it still "viewed Genesis as still on the hook?"  Dkt. No. 75 at 12.  But such speculation on scant evidence does not bear the weight Genesis would put on it.  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (stating that "nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation" (internal citations omitted)); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (noting that summary judgment cannot be defeated "on the basis of conjecture or surmise").  Tellingly, none of the cited communications appears to be ones from Genesis (as Seago was no longer an employee at Genesis) expressing Genesis's understanding that it no longer enjoyed the benefits and owed the obligations under the Distributor Agreement and also that Wistron was discharged of any duty toward Genesis.  Nor, critically, does the exchange reflect any understanding on the part of Wistron that it would no longer hold Genesis responsible for orders apparently coming from Genesis.

The fact that Wistron was asking questions about GNET is understandable enough and could not support a jury verdict that Genesis was relieved of its obligations under the Distributor Agreement.  GNET had asked whether Wistron would agree to the assignment of the Distributor Agreement to GNET.  What is notable is that GNET kept on asking, and Wistron never gave an affirmative answer.

The second instance of purported conduct is little different from the first. After Seago wrote that "all contracts with AT&T pertaining to the purchase of WNC materials previously distributed through Genesis Networks Telecom Services, LLC have been assigned to GNET ATC LLC," he further wrote that "WNC views Genesis as making the payments, which they aren't." Dkt. No. 77-5 at ECF p. 2. Peacock of Wistron responded, "Let me see if I can correct this." *Id.* Genesis also points to evidence that, after the purported assignment, GNET employees participated in the biweekly conference calls in which Genesis employees previously had participated. However, evidence of Wistron's knowledge that GNET was paying on the purchase orders placed under the Distributor Agreement is not tantamount to evidence that Wistron agreed to relieve Genesis of its obligations for purchase orders placed under that agreement. "It is important that the consent be more than mere consent to the delegation; it must be consent to the discharge of the delegating party." III Farnsworth on Contracts § 11.11a at 140–41 (2d ed. 1998); *see Wang*, 1992 WL 7840, at *6 ("Although the third party defendants dealt with the Wangs, this behavior . . . is also consistent with an acceptance of Chen's delegation of his duties under the contract, and does not indicate that they intended to discharge Chen from responsibility."). Seago had told Wistron that the Asset Purchase Agreement was a "related party transaction to Goodman," *i.e.*, GNET and Genesis were related. Dkt. No. 77-1 at ECF p. 2. Payment is one of the duties of the "Distributor" under the Distributor Agreement. Dkt. No. 69-1 § 4. GNET's conduct is perfectly consistent with that of a party discharging the obligations of a related party with whom it had a contractual relationship. There is nothing to indicate that Wistron understood that the purchase orders were coming from GNET, that GNET had assumed both Genesis's rights and its obligations under the Distributor Agreement, and that Genesis was discharged from those obligations. A party can accept payment from a third party

in performance of its obligee's duties without agreeing to discharge the obligee of its contractual responsibilities on a going-forward basis. *See Cent. Tr. Co. Rochester, N. Y. v. Bagliore*, 433 N.Y.S.2d 883, 885 (4th Dep't 1980) ("Neither an agreement to accept payment from Mitchell nor actual acceptance of payment therefrom operates to release the original obligors.").

As to the participation of the three employees, they each had been Genesis employees. There is no evidence that they ever identified themselves at the meetings as GNET employees or distinguished between GNET and Genesis. To the contrary, the evidence is undisputed that the parties discussed "Genesis" purchase orders and not "Goodman" purchase orders on the calls. Dkt. No. 69-9 at 126–28.

In short, it was incumbent upon Genesis if it wished to relieve itself from liability under the Distributor Agreement to reach out to Wistron and obtain its agreement that Genesis would be relieved of any further obligations. Genesis never even sought that consent. It did not reach out to Wistron at all. Nor did anyone—whether GNET or Genesis—ever obtain that consent. A novation must be "clearly shown." *Sporre*, 1999 WL 1277243, at *4; *see also Nat'l Dairy Prod. Corp. v. Lawrence Am. Field Warehousing Corp.*, 255 N.Y.S.2d 788, 796 (1st Dep't 1965) ("The intention to discharge the old obligation and the substitution for it of the new must be established by something more than the simple act of delegation, notice to the obligee, failure of the obligee to object, and even acceptance of part performance from the new obligor."), *rev'd on other grounds sub nom. Procter & Gamble Distrib. Co. v. Lawrence Am. Field Warehousing Corp.*, 213 N.E.2d 873 (N.Y. 1965). Genesis identifies no evidence to show either that it requested a novation or that Wistron agreed to it, either in words or through conduct.

## III.    Additional Defenses

The remainder of Genesis's affirmative defenses proceed on the erroneous premise that an assignment itself can effect a novation. It argues that no consent would be required for an

assignment under the Distributor Agreement because there was a change of control, Wistron elected remedies to excuse Genesis's breach of the non-assignment provision of the Distributor Agreement, and Wistron waived its claims against Genesis. Dkt. No. 75 at 8–20. However, even assuming that an assignment would not have required consent, a novation does require consent, and only a novation and not an assignment could relieve Genesis of its obligations under the Distributor Agreement. The remainder of Genesis's affirmative defenses also fail. The Court addresses each of them only for purposes of completeness.

### A.   Implied Ambiguity

Genesis argues that the Distributor Agreement contained an "implied ambiguity" as to whether written consent is required for an assignment effected by a change of control. Dkt. No. 75 at 8. It argues that Wistron interpreted the Distributor Agreement *not* to require Wistron's written consent for the assignment, and that Wistron represented that interpretation to Seago and Seago relied on that interpretation. *Id.* Plaintiff argues that the law of the case governs the interpretation of this clause, which was that written consent was required, and that there is no latent ambiguity in the clause in any event. Dkt. No. 89 at 6–8. The argument does not create a genuine issue of material fact. Even if there was an effective assignment, such assignment would not create a novation and would not relieve Genesis of liability for failure to pay the invoices. In any event, for purposes of completeness, Genesis's arguments lack merit.

A latent ambiguity arises when one of the terms may "apply equally to two different things or subject-matters, and then evidence is admissible to show which of them was the thing or subject-matter intended." *Leather Form S.R.L. v. Knoll, Inc.*, 205 F. App'x 861, 864 n.1 (2d Cir. 2006) (quoting *Petrie v. Trustees of Hamilton College*, 53 N.E. 216, 217 (N.Y. 1899)). "The evaluation of the extrinsic evidence and determination of the parties' intent will be a jury question, unless the extrinsic evidence supports only one reasonable conclusion as to the parties'

intent." *Short v. Churchill Benefit Corp.*, 2016 WL 8711349, at *13 (E.D.N.Y. Apr. 8, 2016)

(citing cases). "Such extrinsic evidence may include the parties' communications, statements

and course of dealing." *Id.* The paradigmatic examples of latent ambiguities are when a term in

a contract describing a location may refer to two different places. *See, e.g.*, *Petrie*, 53 N.E. at

218 (determining whether the "waters" of a certain brook referred to one brook, or both brooks).

Genesis's arguments fail in two respects. First, Genesis does not, and cannot, point to a

term in Section 19.8 that could plausibly refer to two different things. The relevant provision is

Section 19.8, which provides as follows:

> This Agreement may not be assigned by Distributor, in whole or in part, to any third
> party, including any subsidiary or Affiliate of the Distributor or any subdistributor
> without the prior written consent of WNC. A Change of Control shall be deemed
> an assignment for purposes of this Section. WNC may assign its right and
> obligations hereunder to any of its respective subsidiaries or Affiliates. In the event
> of a proposed appointment by Distributor to any sub-distributor, Distributor shall
> obtain and provide to WNC such background and due diligence information with
> respect to such sub-distributor required by WNC. Any approved appointment of a
> sub-distributor may only be made by WNC in writing and in its sole discretion and
> shall not release Distributor from its obligations hereunder.

Dkt. No. 69-1 § 19.8. There is no evidence that any of the terms in Section 19.8 refer to two or

more things.

Instead, Genesis argues that because Plaintiff's in-house counsel concluded that "it's not

necessary for WNC to sign this Assignment Contract since Genesis undertakes a change of

control," there must have been a latent ambiguity. Dkt. No. 77-3. But that is simply a

misreading of the doctrine of "latent ambiguity." The doctrine does not refer two or more

alternate readings of the same contractual language. That is a "patent" contractual ambiguity.

*See L & L Painting Co., Inc. v. Contract Dispute Resolution Bd. of the City of N.Y.*, 892

N.Y.S.2d 55, 57 (1st Dep't 2009), *aff'd*, 926 N.E.2d 1228 (N.Y. 2010). Latent ambiguity applies

where otherwise seemingly unambiguous language is rendered ambiguous by extrinsic evidence

that it could refer to two or more things.  For that reason, Genesis's argument fails.  Genesis does not point to a term in Section 19.8 which could refer to multiple objects or identify what those multiple objects even are.

The Court need not rely on the law of the case doctrine to conclude again that the provision is unambiguous.  In its prior Opinion and Order, the Court concluded that the plain language of the Distributor Agreement required Genesis to obtain written consent for an assignment, and that while a lack of consent would clearly not prevent Defendant from engaging in a merger or sale of its assets to Goodman Solutions, it would still be responsible for damages flowing from the breach of failing to receive Plaintiff's consent.  Dkt. No. 55 at 34.  The Court noted that it made "commercial sense" that Plaintiff would seek to "reserve[] for itself the right to approve any assignment of the Distributor Agreement."  *Id*. at 33.  Admittedly, the in-house counsel had a different understanding.  But the subjective understanding of one or more parties to an agreement cannot control the agreement's objective meaning.  It is hornbook contract law that "[a] term is not ambiguous merely because the parties disagree as to its meaning and 'urge different interpretations.'"  *Short*, 2016 WL 8711349, at *13 (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)).  Instead, "[a]mbiguous language is language that is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"  *JA Apparel Corp*., 568 F.3d at 396 (quoting *Revson v. Cinque & Cinque, P.C*., 221 F.3d 59, 66 (2d Cir. 2000)).  The Court reached its prior determination based on the plain language of Section 19.8 and the Court's reading of the Distributor Agreement as a whole.

Genesis has identified no evidence based on the particular trade or business that would lead the Court to a different conclusion.

## B.       Election of Remedies

Genesis next argues that the election of remedies doctrine bars Plaintiff's breach of contract claim against Genesis.  Under the Distributor Agreement, Wistron had the "right to terminate th[e] Agreement" in the case that Genesis "fail[ed] to meet any such obligations" in the agreement.  Dkt. No. 69-1 §§ 2.2, 16; Dkt. No. 75 at 15.  Genesis contends that, by failing to give Genesis notice of the breach at the time of the assignment and terminating the Distributor Agreement, Plaintiff has "los[t] its right to sue."  Dkt. No. 75 at 14–15.  Plaintiff, relying primarily on *Sporre*, 1999 WL 1277243, argues that Genesis's election of remedies defense is "untenable" because it "flies in the face of the purpose of such anti-assignment clauses."  Dkt. No. 89 at 11 (quoting *Sporre*, 1999 WL 1277243, at *3–4).

The doctrine of election of remedies provides that "[w]hen a party materially breaches a contract, the nonbreaching party must choose between two remedies—[it] can elect to terminate the contract and recover liquidated damages or [it] can continue the contract and recover damages solely for the breach."  *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012) (alterations in original) (quoting *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 387–88 (S.D.N.Y. 1999)).  The party may continue the contract by "continuing to perform under the contract or by accepting the performance of the breaching party."  *Id.* (citation omitted).  Application of the doctrine "requires knowledge of the alleged breach and an affirmative action that constitutes an election to continue performance."  *Id.*  "The doctrine is based on the concept that a party may not 'exercise two alternative or inconsistent rights or remedies.'"  *Id.* (quoting *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969)).  "Once a party elects to continue the contract, [it] can never thereafter elect to terminate

the contract based on that breach, although [it] retains the option of terminating the contract based on other, subsequent breaches." *Id*. (quoting *ESPN, Inc.*, 76 F. Supp. 2d at 387–88).

The election-of-remedies affirmative defense does not, in the words of Genesis, "preclude[] [Plaintiff] from suing Genesis." Dkt. No. 75 at 17. There was no prior breach of Section 4.2 of the Distributor Agreement, the "Payment Terms," for Plaintiff to sue upon before Plaintiff ceased to be paid for the invoices dated from June to August 2021 at issue in this suit. The Distributor Agreement required Plaintiff to be paid and was indifferent to whether the payment was sent by Genesis or by GNET. Until the unpaid invoices, Plaintiff would not have had the right to sue Genesis for failure to pay if, in fact, Plaintiff was paid for the products it delivered. After Plaintiff was on notice of the breach of the obligation to pay at issue here, there is no evidence of conduct of Plaintiff that constitutes an affirmative election not to pursue Plaintiff's claims against Genesis. It is undisputed that Plaintiff ceased sending product after Genesis stated it would not pay. Plaintiff sought payment from Genesis once it had notice of breach of the failure to pay the invoices. For each batch of invoices, Plaintiff sent the invoices to Genesis as well as Goodman Solutions. *See generally* Dkt. No. 69-2. In October 2021, when those invoices were overdue, it sent an "aging report" to both Goodman Solutions and Genesis indicating that "Seventeen Invoices have been due. Total due amount is $7,108,087.12." Dkt. No. 69-8 at ECF p. 4. Payment demand letters were sent to Genesis (as well as GNET and Goodman Solutions) on October 27, 2021. Dkt. No. 69-21. Another payment demand letter was sent to both Defendants and Goodman Solutions on December 3, 2021. Dkt. No. 69-22; *see MBIA Ins. Corp.*, 842 F. Supp. 2d at 711 ("Good faith attempts to realize contractual benefits by negotiating with a counterparty, rather than immediately filing suit, do not constitute an election of remedies."). Genesis never discharged or released itself from the obligations of the

Distributor Agreement through a valid novation.  Plaintiff never elected out of the remedy for breach for nonpayment of the products against Genesis.

*Sporre* is persuasive and on point.  There, the agreement had an assignment provision which indicated that neither of the parties could assign the rights or obligations under the agreement without the consent of the other party.  *Sporre*, 1999 WL 1277243, at *3.  The defendant there argued that the plaintiff's "exclusive remedy upon learning of the forbidden assignment was 'to choose between terminating the Sporre Agreement and holding International Paper liable, or accepting [sic] the assignment and thus releasing International Paper.  Having chosen the latter, Sporre cannot now reverse course and seek to hold International Paper liable.'" *Id*.  The court rejected that interpretation of the provision as "untenable" because it would "fl[y] in the face of the purpose of such anti-assignment clauses, which is intended to allow the vendee to rest assured that unless agreed to, his vendor of choice will continue to provide the goods and services being sought."  *Id*.  Under defendant's theory, "the *innocent party* would shoulder the burden of being forced to *immediately* decide whether to (i) terminate the entire agreement and exercise its rights against the party in breach, or (ii) to continue its relations with the putative assignee without any certainty as to what the future holds."  *Id*. (emphasis in original).  And like here, the court concluded that such an outcome would conflict with the "well settled law in New York that when one's duties under a contract are delegated to a third party, the delegator's obligations under that contract do not end."  *Id*.  The same conclusion applies here.  Any election of remedies as to breach of the assignment provision is irrelevant to the subsequent breach for the failure to pay.  Genesis cannot circumvent the requirements of a valid novation by arguing an election of remedies affirmative defense based on the assignment provision.

C.      Waiver

Genesis also contends that there are genuine disputes of material fact as to whether Plaintiff waived any right to recover from Genesis.  Genesis contends that because Plaintiff collected over $26 million from GNET, that Plaintiff must have waived its right to pursue Genesis for the remaining $9 million in unpaid invoices.  Dkt. No. 75 at 17.

"A contractual right may be waived if it is 'knowingly, voluntarily and intentionally abandoned.'"  *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006)).  "Such abandonment 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.'"  *Fundamental Portfolio Advisors, Inc.*, 850 N.E.2d at 658.  "However, waiver 'should not be lightly presumed' and must be based on 'a clear manifestation of intent' to relinquish a contractual protection."  *Id.* (quoting *Gilbert Frank Corp. v. Federal Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988)).  "'[M]ere silence, oversight or thoughtlessness in failing to object' is insufficient to support an inference of waiver."  *Luitpold Pharms., Inc.*, 784 F.3d at 95 (quoting *Courtney–Clarke v. Rizzoli Int'l Publ'ns, Inc.*, 676 N.Y.S.2d 529, 529 (1st Dep't 1998)).

This affirmative defense first fails for similar reasons that the election-of-remedies defense fails.  Having not completed a valid novation, Genesis is still on the hook for the breach of the failure to pay by GNET.  Therefore, any purported waiver by Plaintiff of its rights as to the assignment provision is not waiver of its rights under the subsequent breach of the failure to pay for the products.  Defendants make no argument that Plaintiff had waived its rights to enforce its breach.  By all accounts, Plaintiff was diligent in seeking payment.  That included its reminder on October 18, 2021, Dkt. No. 69-8 at ECF p. 4, followed by a payment demand letter on

October 27, 2021, Dkt. No. 69-21, and another such letter on December 3, 2021, Dkt. No. 69-22. The breach from the failure to pay did not occur until 2021, years after the purported assignment. There is no "affirmative conduct" or a "failure to act" showing an intention by Plaintiff to waive its rights to payment under the Distributor Agreement. *Fundamental Portfolio Advisors, Inc.*, 850 N.E.2d at 658.

### D.    Equitable Estoppel[9]

Finally, Genesis argues that there is a genuine dispute of material fact as to whether equitable estoppel provides a defense to the agreement. "Equitable estoppel is an extraordinary remedy, that is to be invoked sparingly and only under exceptional circumstances." *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 616 (S.D.N.Y. 2021), *aff'd*, 2022 WL 211702 (2d Cir. Jan. 25, 2022) (internal quotation marks omitted). Equitable estoppel applies when there was "wrongful[] induce[ment] . . . by deception, concealment, threats or other misconduct." *Id.* (internal quotation marks omitted) (quoting *Overall v. Est. of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995)). There also must be "reasonable reliance on the . . . misrepresentations for equitable estoppel to apply." *Id.* (citation omitted); *see also Gen. Elec. Cap. Corp. v. Armadora, S.A.,* 37 F.3d 41, 45 (2d Cir. 1994) (describing elements of equitable estoppel, including an intent requirement and "actual or constructive knowledge of the true facts by wrongdoers"); *DeCarlo v. Archie Comic Publications, Inc.*, 127 F. Supp. 2d 497, 509 (S.D.N.Y.), *aff'd*, 11 F. App'x 26 (2d Cir. 2001) (applying the principles of equitable estoppel to a breach of contract action).

---

[9] Genesis also argues that "WNC's fully-informed decisions [of dealing with GNET as a purported assignee], and GNET's breaches of the individual purchase order contracts, were the proximate cause of WNC's alleged damages." Dkt. No. 75 at 20. But Genesis is responsible for GNET's breaches precisely because of the lack of a novation. Therefore, GNET's breach is also Genesis's breach, and thus damages are proximately caused by Genesis's breach as well.

This defense fails because there is no equitable estoppel related to the breach of the failure to pay for the products.  Again, it is undisputed that Plaintiff sent the unpaid invoices to both Defendants, that they were marked as "Bill To" Genesis, that Plaintiff was diligent about requesting payment for the unpaid invoices from Genesis, and made several payment demands to both Genesis and GNET.  There was no wrongful inducement or misrepresentations from Plaintiff concerning the breach for the failure to pay.  Because the parties never executed a valid novation under the terms of the Distributor Agreement and the Draft Assignment Agreement, Genesis is responsible for the breaches of GNET and could not have reasonably relied otherwise.  No equitable estoppel defense is available here.

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART as to both Genesis and GNET.  Plaintiff's motion is granted with respect to an award, jointly and severally against Defendants, in an amount of $9,212,256.94.  Plaintiff's motion with respect to an award of interest and attorneys' fees is DENIED without prejudice.  Defendants' motion to strike is DENIED.

Plaintiff shall submit any renewed motion for summary judgment by July 31, 2023, demonstrating its entitlement to interest and attorneys' fees and the quantum of such interest and fees.  Defendant shall file any opposition by August 7, 2023.  Plaintiff shall file any reply by August 14, 2023.

The Clerk of Court is respectfully directed to close Dkt. Nos. 67, 73.

SO ORDERED.

Dated: July 12, 2023
      New York, New York
                                         LEWIS J. LIMAN
                              United States District Judge