N6TVWISO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   WISTRON NEWEB CORPORATION,

4                   Plaintiff,

5            v.                              22 Civ. 2538 (LJL)

6   GENESIS NETWORKS TELECOM
    SERVICES, LLC, and GNET ATC,
7   LLC,

8                   Defendants.             Argument

9   ------------------------------x
                                            New York, N.Y.
10                                          June 29, 2023
                                            10:05 a.m.
11
    Before:
12
                        HON. LEWIS J. LIMAN,
13
                                            District Judge
14
                            APPEARANCES
15
    LAZARE POTTER GIACOVAS & MOYLE LLP
16       Attorneys for Plaintiff
    BY:  LAINIE E. COHEN
17       ROBERT A. GIACOVAS

18  VEDDER PRICE P.C.
         Attorneys for Defendant Genesis Networks
19  BY:  COURTNEY M. BROWN
         DAVID M. ROWND
20

21

22

23

24

25

N6TVWISO

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE DEPUTY CLERK:  Starting with counsel for |
| 3 | plaintiff, please state your appearance for the record. |
| 4 | MS. COHEN:  Good morning, your Honor. |
| 5 | Lainie Cohen and my partner Robert Giacovas, for the |
| 6 | plaintiff. |
| 7 | THE COURT:  Good morning. |
| 8 | MR. GIACOVAS:  Good morning. |
| 9 | MS. BROWN:  Good morning, your Honor. |
| 10 | Courtney Brown and David Rownd, on behalf of Genesis |
| 11 | Networks Telecom Services. |
| 12 | THE COURT:  Good morning. |
| 13 | All right.  I'll note that it doesn't appear that |
| 14 | counsel for GNET is here.  And I received a letter from counsel |
| 15 | for GNET agreeing to the entry of judgment against it, which |
| 16 | I'll go ahead and do at the appropriate time.  I'm also deeming |
| 17 | GNET's opposition to the motion for summary judgment to be |
| 18 | withdrawn.  I assume there's no objection to that from any |
| 19 | party. |
| 20 | MS. COHEN:  No objection, your Honor. |
| 21 | MS. BROWN:  No, your Honor. |
| 22 | THE COURT:  Okay.  All right. |
| 23 | So we're here today on plaintiff's motion for summary |
| 24 | judgment against Genesis. |
| 25 | Why don't I hear first from plaintiff, then I'll hear |

N6TVWISO

| | |
|---|---|
| 1 | from defendant, and then I'll hear from plaintiff again.  I've |
| 2 | got no particular questions, but I'm sure that they will arise |
| 3 | as I hear you address the Court. |
| 4 | MS. COHEN:  Thank you, your Honor. |
| 5 | I'm sure that your Honor has been through all of this |
| 6 | paper before us, understands this case very well.  And I |
| 7 | believe that what really is the issue before the Court here is |
| 8 | not WNC's motion for summary judgment on its claims, but I |
| 9 | believe what the dispute here is is over Genesis' affirmative |
| 10 | defenses.  We believe that we have satisfied the burden of |
| 11 | proof on our summary judgment on our claims.  There has been a |
| 12 | clear and unambiguous -- sorry.  The Court's decision on the |
| 13 | motion to dismiss was very clear; it made a decision, |
| 14 | determination, on the unam -- |
| 15 | THE COURT:  Unambiguous. |
| 16 | MS. COHEN:  Unambiguous.  Sorry.  Apologize.  Terms of |
| 17 | the contract.  A consent was required for the assignment that |
| 18 | was made by Genesis to GNET. |
| 19 | THE COURT:  Let me ask you this question:  Assume that |
| 20 | a consent was not required for the assignment.  How would that |
| 21 | affect my decision in this case?  It's not a novation. |
| 22 | MS. COHEN:  Exactly, your Honor.  There was no |
| 23 | novation here.  Even if some way the Court could find that |
| 24 | consent was not required and that consent was given, which we |
| 25 | wholeheartedly disagree with, we believe that all of the |

N6TVWISO

1    evidence shows that there was never an agreement, never a

2    consent, WNC continued to question whether GNET or Goodman had

3    the credit in order to obtain insurance.  When that was denied,

4    they specifically obtained additional credit for Genesis,

5    because they were not interested in agreeing to consenting to

6    the assignment.  Even if they had consented to it, there was no

7    novation here.  And so under clear New York law, Genesis

8    remained on the hook for its obligations to pay for the goods

9    that GNET ultimately stopped paying for.

10        And so I believe that with all of the evidence before

11   the Court, there has been no novation.  A novation requires not

12   just a previously valid obligation; it requires agreement of

13   all the parties to the new contract and an extinguishment of

14   the old contract.  And it needs a valid new contract.  There is

15   no evidence here that if a new contract was signed between WNC

16   and GNET or Goodman --

17        THE COURT:  Could you infer from the course of conduct

18   that there was a novation; that the orders came from and were

19   paid for by GNET, your client accepted the payment from GNET,

20   at least maybe a jury could find that, wouldn't that be enough

21   for there to be novation?

22        MS. COHEN:  No.  Under the case law, it's not, your

23   Honor.  The just conduct could also reflect -- I believe it's

24   the *Wang v. Chen* case.  And that conduct could also reflect the

25   plaintiff's understanding that the assignor was still obligated

N6TVWISO

1    under the original contract; and that the evidence of WNC

2    ensuring Genesis, when GNET and Goodman were denied, goes

3    towards that understanding that WNC was still looking to

4    Genesis as the obligor under that contract and was entitled to

5    look to Genesis throughout.

6          The fact that WNC continued to invoice Genesis,

7    Genesis' name was always on those invoices, it remained on

8    those invoices, and they continued to send those invoices to

9    Genesis all the way through the relationship between these

10   parties.  Up until and through the time that GNET stopped

11   paying, not once did Genesis or anyone else say, Hey, you've

12   got the wrong name on these invoices.

13         And that brings me to a point about this EDI system

14   that I wanted to point out to your Honor.

15         Genesis makes a -- excuse me.

16         THE COURT:  Take your time.

17         MS. COHEN:  Genesis makes a lot of noise about the EDI

18   system, and that they say that WNC failed to change the

19   settings or the information in its EDI system; and that because

20   of that, Genesis and GNET did not realize that WNC still

21   considered genesis to be the counterparty to this distributor

22   agreement.

23         I'd like to point your Honor towards some testimony.

24   When a business relationship started between WNC --

25         THE COURT:  So give me the docket number that

N6TVWISO

1    you're -- I assume you're referring to --

2              MS. COHEN:  Sure.  Apologies.

3              It's Exhibit 9 to the Englander declaration at 69-9.

4    And this is the deposition testimony of Nancy Chu.

5              THE COURT:  Okay.  Page number?

6              MS. COHEN:  Yes.  I've got several page numbers for

7    you.  Page 23, 11 through 13; page 32, line 20, through 38,

8    line 14; page 41, line 6, through 42, line 22; and then there's

9    a longer passage here, page 160, line 7, through 165, line 15.

10             THE COURT:  Okay.  And if you're going to read

11   portions of it, just read slowly so the court reporter --

12             MS. COHEN:  Sure.

13             Well, let me explain what the point of the

14   testimony -- the purpose is.

15             When the business relationship started, the testimony

16   by WNC's representative was that Genesis -- Genesis' IT

17   department worked with WNC's IT department to set up this

18   internal EDI system; and so that all of the information that

19   WNC required to perform under the terms of the contract were in

20   the system, and that was a requirement by Genesis.  And I

21   can -- that is -- let me just find -- I think it's 41.

22             I just want to make sure I get the right contract

23   provision here.  I direct your Honor to Exhibit 1 of the

24   Englander declaration, which is document 69-1, which is the

25   actual distributor agreement.  And on page 21 of 52, paragraph

N6TVWISO

1   11, "Electronic Data Interchange" is the paragraph that's

2   relevant here.  At the request of either distributor or WNC and

3   the mutual agreement of both parties, the parties shall

4   exchange orders, payments, acknowledgements, invoices,

5   remittance notices, and other records, "data" electronically in

6   place of tangible documents.  EDI requirements and transactions

7   are outlined in Exhibit G.

8           Now, Ms. Chu testified that this was -- the EDI system

9   was something that Genesis required.  Genesis helped WNC set it

10  up in the beginning of the relationship.

11          Then, later on, after Genesis alleges to have assigned

12  the distributor agreement to Goodman and GNET, Genesis, through

13  Mr. Seago, according to his declaration, informed WNC that

14  there would be a change from Genesis to GNET, where the -- who

15  would be issuing the purchase orders.  Not once did any of

16  Genesis', Goodman's or GNET's IT people reach back out to WNC

17  to make sure that WNC's system was properly set up for those

18  new purchase orders.

19          It was not WNC's responsibility to make sure that the

20  transition between Genesis and Goodman or GNET went according

21  to plan and was properly initiated and completed.  Those

22  transition services, as Mr. Seago's declaration states, were

23  Genesis' responsibility.  It was Genesis' responsibility to

24  make sure that WNC had all of the information that it needed if

25  this truly was an assignment that WNC was in agreement with and

N6TVWISO

1   was going to continue a relationship with.  No one reached out

2   to WNC.  There was not a single piece of evidence.  It's not

3   addressed by Mr. Seago.  And instead, Genesis is putting the

4   onus on WNC to have changed that information, without knowing

5   what the information they were supposed to have changed it to

6   was.

7         So I believe that the reliance of Genesis on the EDI

8   system and the fact that those -- all of those purchase orders

9   in -- as far as WNC understood, were still coming from Genesis,

10  and WNC continued to issue the invoices in Genesis' name, with

11  no understanding -- nothing provided by the other parties to

12  establish that they should be changing anything in their

13  system.

14        I'd also like to point out Mr. Seago's declaration,

15  which is document 77.  Mr. Seago provided this declaration.

16  There is no indication that he is providing this on behalf of

17  Genesis as a representative of Genesis.  I would submit to your

18  Honor that he could not do that.  According to his own

19  declaration, he no longer was a Genesis employee as of October

20  2019.

21        And it's in paragraph 3 of his declaration where he

22  says:  On October 2019, after the asset sale transaction

23  between Genesis and Goodman Networks, which occurred, it's our

24  understanding, in September of 2019, he formally became an

25  employee of GNET ATC LLC.  GNET is a wholly owned subsidiary of

N6TVWISO

Goodman Networks.  Then, at some point in 2020, he formally

became an employee of Goodman Networks.

         So the entire time that the transition services were

going on, the entire time that GNET is maintaining that WNC

knew or should have known that Genesis was no longer the

counterparty to this distributor agreement, Mr. Seago's

testimony is not binding on Genesis.  He wasn't an employee of

Genesis, he wasn't speaking on behalf of Genesis.  And this

goes to this email -- well, it goes to all of their affirmative

defenses, your Honor.

         Mr. Seago's testimony is supposed to be in support of

Genesis' affirmative defenses.  But Mr. Seago was not an

employee of Genesis at the time.  He cannot speak to what

Genesis' understanding or what Genesis relied on at the time

that he read certain emails or he had certain communications

with WNC employees.  He was not a Genesis employee, by his own

admission in his declaration.

         At the same time, however, he was using two different

email addresses.  When he communicated with WNC up and through,

I believe -- up and through January 2020, he would use a

Genesis email address, and that is reflective in exhibit -- I

believe it's Exhibit B.  I apologize.  With WNC's insurance

company he uses Genesis' email address.  That's Exhibit B.

         If you look at the date on those emails on the first

page are January 10th, 2020, and he's using a

N6TVWISO

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | steve.seago@genesis.net.com email address.  But then if you                  |
| 2  | look at his email, Exhibit C, he's emailing as -- wait, there's              |
| 3  | an earlier one, I apologize.  Exhibit A to his declaration,                   |
| 4  | December 11, 2019, he's using a Goodman Networks email address               |
| 5  | to communicate with Jon Peacock at WNC.                                       |
| 6  | So you can see the confusion that there was,                                  |
| 7  | understanding what Mr. Seago's position was, who he worked for.              |
| 8  | But according to his declaration, he didn't work for Genesis                 |
| 9  | after October of 2019, and so nothing in his declaration can be             |
| 10 | supportive of Genesis' affirmative defenses.                                 |
| 11 | THE COURT:  Okay.                                                             |
| 12 | MS. COHEN:  I wanted to address the motion to strike.                         |
| 13 | THE COURT:  Okay.                                                             |
| 14 | MS. COHEN:  The entire argument made by Genesis on the                        |
| 15 | motion to strike is really just a smoke screen.  Genesis makes              |
| 16 | all kinds of arguments why the declaration of Helen Wang and                 |
| 17 | some of the testimony of Nancy Chu are not admissible and                    |
| 18 | should be stricken from the record.                                          |
| 19 | What their argument really boils down to, I believe,                         |
| 20 | is what they state in footnote 2, on page 2 of the reply brief.             |
| 21 | And that is that Genesis is really only taking issue with WNC's             |
| 22 | unfounded speculation as to GNET's authorization or intent in               |
| 23 | making payments to WNC.                                                       |
| 24 | And I have two points to make on this.                                       |
| 25 | The first is it's irrelevant whether GNET was                                |

N6TVWISO

1   authorized to make payments on Genesis' behalf.  Who made the

2   payments or -- during the course of the relationship, because

3   based on New York law, if there wasn't a novation, Genesis

4   remained on the hook for that responsibility.  So it's

5   irrelevant whether GNET was making those payments or not.

6          The second thing is that Helen Wang's testimony, they

7   claim, is irrelevant, inadmissible; she does not have the

8   personal knowledge to testify to that point that GNET's

9   authorization or intent in making payments to WNC was given by

10  Genesis.  But that's not the purpose of their testimony, it's

11  not -- it's not what their testimony says and it's not what the

12  testimony is important for.

13         THE COURT:  It's important for your client's

14  understanding.

15         MS. COHEN:  Exactly, your Honor.

16         Okay.  Then I don't need to go into that any further.

17         Also though, but Helen Wang, I mean, she is the head

18  of finance for WNC's wholly owned subsidiary.  She has absolute

19  personal knowledge.  She speaks from experience.  She reviewed

20  all the papers.  There's no reason why her testimony should be

21  stricken.

22         It does go to WNC's knowledge and understanding of who

23  they were doing business with.  And that, again, goes towards

24  Genesis' affirmative defenses of waiver and estoppel.  WNC

25  wasn't intentionally misleading anyone, and no one was -- well,

N6TVWISO

1    again, Mr. Seago says he was relying on statements by WNC, but

2    Mr. Seago didn't work for Genesis, so there's no evidence that

3    Genesis was relying on anything.  We believe that Genesis has

4    not been able to establish even the elements of their

5    affirmative defenses.

6            One other thing I'd like to say on the affirmative

7    defenses, and this is also something that was raised by Genesis

8    in their reply brief on the motion to strike.  We believe that

9    the reply brief is actually -- it's an impermissible surreply.

10   We did not move to strike; we did not file any objection to it.

11   Instead, we're addressing it here.

12           There's a footnote, starts on page 6, goes on to page

13   7.  It addresses the latent ambiguity issue in our reply brief

14   that establishes, we believe, that a latent ambiguity is an

15   affirmative defense that they were required to raise, never

16   did, and waived.  They tried to distinguish --

17           THE COURT:  I don't quite understand your argument

18   with respect to it being an affirmative defense.  Isn't it an

19   element of your claim that the contract was violated, and don't

20   you have to establish that the contract means what you say it

21   means?  How is it anything other than -- how is it an

22   affirmative defense?

23           MS. COHEN:  Yes.  Well, your Honor, the case that we

24   cited to, and they say does not state what --

25           THE COURT:  Just explain to me logically, just give me

N6TVWISO

1   logic.

2           MS. COHEN:  Sure.

3           Rule 8(c) of the federal rules requires any matter

4   constituting an avoidance or affirmative defense to be pled.

5           THE COURT:  Right.  I got that.

6           MS. COHEN:  And an affirmative defense is defined as a

7   defendant's assertion raising new facts and arguments that, if

8   true, will defeat the plaintiff's or prosecution's claim, even

9   if all allegations in the complaint are true.

10          Their argument about this latent defect -- or, I'm

11  sorry, this latent ambiguity in the contract, is based on

12  extrinsic evidence, nothing that was in the complaint.  It's

13  also extrinsic evidence that they had, than they've had for --

14          THE COURT:  So would your argument be the same if they

15  were claiming just an ambiguity and not a latent ambiguity?

16  Let's say that their argument was that the contract didn't mean

17  what you say it means because of parol evidence.  You're

18  required to plead that as an affirmative defense?  I don't get

19  it.

20          MS. COHEN:  This whole idea of a latent ambiguity is

21  somewhat -- well, I guess the point is that if Genesis was

22  putting -- intending to argue that they needed parol evidence

23  in order to prove -- for the Court to understand what a

24  contract said, then WNC should have been on notice that that

25  was part of the discovery that was required.  I do believe it

N6TVWISO

1   is an affirmative defense.  The case that we cited to does

2   state that it's an affirmative defense.

3          And what they are doing is they are trying to put

4   parol evidence before the Court, when they knew all along, they

5   knew before, that this email that they are talking about was

6   out there.  Your Honor already ruled on the contract --

7          THE COURT:  I think I've got your argument.  I want to

8   make sure -- I'm keeping this to an hour, and I want to make

9   sure that the other side has a full half hour.

10          MS. COHEN:  Okay.  Yes.

11          THE COURT:  So I'll give you five minutes at the end

12   for any rebuttal.

13          Let me hear from the defendants.

14          MS. COHEN:  Thank you, your Honor.

15          MS. BROWN:  Good morning, your Honor.

16          Courtney Brown again, on behalf of Genesis.

17          We've brought with us a short demonstrative; it's a

18   one-slide timeline.  We understand -- we've shared this with

19   opposing counsel.  We understand there may be some objections

20   to that, but --

21          THE COURT:  You can hand it up.  I'll receive it.

22          MS. BROWN:  Thank you, your Honor.

23          THE COURT:  Okay.  Let me hear from you.

24          MS. BROWN:  Thank you, your Honor.

25          Before I get started, briefly, I wanted to address

N6TVWISO

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | WNC's new argument that has not previously been raised before,           |
| 2  | that Mr. Seago's declaration should not be considered, and               |
| 3  | either is not admissible or cannot be used to support what               |
| 4  | Genesis relies on it for simply because of his employment                |
| 5  | status.                                                                  |
| 6  | First, WNC has waived this argument.  This is                            |
| 7  | brand-new.  We haven't heard of this until today.                        |
| 8  | Second, Mr. Seago has personal knowledge of everything                   |
| 9  | in his declaration.  He was the point person for this business           |
| 10 | under the distributor agreement while he worked at Genesis; he           |
| 11 | was the point person on the same business when he moved over to          |
| 12 | Goodman Solutions.  To the extent there are questions about              |
| 13 | Genesis' intent or knowledge, or WNC's, for that matter, those           |
| 14 | are factual issues that preclude summary judgment.                       |
| 15 | THE COURT:  Well, no.  I think the point is that to                      |
| 16 | the extent that he was no longer Genesis' employee, his                  |
| 17 | testimony might be admissible for other purposes, but it                 |
| 18 | wouldn't be admissible to show Genesis' understanding of its             |
| 19 | obligations.  It might be admissible to show GNET's                      |
| 20 | understanding, but you're asking me to proceed on the                    |
| 21 | assumption that these two corporations are independent of one            |
| 22 | another and should each be given equal dignity.  And so if he's          |
| 23 | not a representative of Genesis, how can he speak to what                 |
| 24 | Genesis' understanding would be?                                         |
| 25 | MS. BROWN:  Understood, your Honor.                                       |

N6TVWISO

 1          Genesis relied on Mr. Seago to conduct this business

 2     under the distributor agreement and to also handle the

 3     transition over to Goodman Solutions.  There were still people

 4     who remained at Genesis, for example, Cathy Kincy, who

 5     submitted a declaration; and Zachary Wryby, who's on some of

 6     the documents that have been submitted.

 7          Mr. Seago was in contact with them.  And Genesis

 8     relied on Mr. Seago's information that he was conveying and

 9     that he was getting from WNC, that they understood that all

10     this business had been moved over to GNET, and that Genesis was

11     no longer involved.  And no one else at Genesis would need to

12     be involved besides relying on Mr. Seago's information that he

13     provided.

14          Putting all that aside --

15          THE COURT:  Maybe you can just confront the big

16     question lurking out here, which is, is there any evidence to

17     suggest that there was a novation?  And isn't all of the

18     evidence that I have consistent, at most, with the notion that

19     there was an assignment pursuant to which GNET could exercise

20     the rights of Genesis, it could order product, but Genesis

21     would still be on the hook.  That's the big question out there.

22          MS. BROWN:  Understood, your Honor.

23          And we do think that there are enough facts in the

24     record to create a material dispute as to whether there was an

25     implied novation.  Novations can be implied through

N6TVWISO

1    documentation and through conduct.  And here we have not only

2    conduct from WNC in accepting payments from GNET, but also --

3             THE COURT:  But that doesn't do anything for you, does

4    it?  If I'm a party to a contract with the plaintiffs here, and

5    one of the people in the gallery pays on behalf of the

6    plaintiffs, the plaintiffs are not relieved of their

7    contractual obligation to me simply because part of their

8    obligation is satisfied by a third party.

9             MS. BROWN:  Yes.  That's just one piece of the puzzle,

10   your Honor.

11            THE COURT:  Okay.  So what are the other pieces?

12            MS. BROWN:  Sure.

13            So Genesis conveyed to WNC that this business had been

14   transferred over to GNET, and that Genesis was no longer

15   involved.  WNC responded to multiple emails, either saying that

16   it would correct an issue with a misunderstanding as to who was

17   making payments and what the nature of the relationship was.

18   WNC also participated in weekly conference calls with AT&T and

19   GNET that involved reviewing materials that had been circulated

20   to WNC, reviewed by WNC, that listed GNET as the vendor.

21   Genesis was not on -- the document we submitted, Genesis' name

22   was not on that.

23            THE COURT:  Right.  Let's indulge that a jury could

24   find that it was GNET who was ordering the product for GNET's

25   own benefit.  That still wouldn't relieve Genesis of the

N6TVWISO

```
 1    obligations to pay.  Genesis would effectively become the
 2    guarantor in that circumstance, and it would be between GNET
 3    and Genesis as to who bore the responsibility.  But the
 4    plaintiff here wouldn't be out of luck, would they?
 5              MS. BROWN:  We think so, your Honor, with the
 6    accumulation of -- at least this creates, again, a factual
 7    dispute as to the numerous statements by WNC in the face of
 8    Genesis' representations that it was not involved in this
 9    business; it was not responsible for payments; it was not
10    making payments; it was not involved.
11              THE COURT:  Again, where does that get you?  Because
12    that's all what would happen if there's an assignment.  It
13    doesn't tell you that there's been a novation; it doesn't tell
14    you that Genesis has been relieved of the obligation to pay.
15    It just tells you that the plaintiff can look to two parties
16    now instead of just the one party.
17              MS. BROWN:  Again, your Honor, we think there are
18    documents in the record that reflect WNC's agreement to the
19    change in business relationship.  I can see I may not be able
20    to persuade you there, and I don't --
21              THE COURT:  No, I mean I'm asking tough questions
22    because they are on my mind, but you're welcome to try to
23    persuade me.
24              MS. BROWN:  Yes, your Honor.
25              I mean, also the cases relied upon by WNC we think are
```

N6TVWISO

distinguishable on the issue of novation.  WNC relies on *Wang*

*v. Chen*.  But in that case, the party who was arguing novation

had also filed a counterclaim for breach of that same agreement

that it said it had novated.  So that was completely

contradictory.

And also, the assignee had been paying the assignor;

so the payments were not going from the assignee to the

plaintiff, they were going -- so the plaintiff didn't -- again,

didn't have knowledge of that situation.  And there was no

written -- there were no written documents or written

confirmation that the plaintiff had agreed to discharge that

obligation.

Similarly, WNC relies on the *Soire* case.  In that

case, again, the original manufacturer didn't even request or

try to obtain consent for the assignment.  And there were no

writings that they could point to; there were no documents they

could point to to show that they had been let off the hook.

And even if the Court does find that there was no

novation, there are still factual disputes that go to Genesis'

affirmative defenses of election of remedies and estoppel.

It's very clear from the record or, again, at best, for WNC a

factual dispute.  WNC did not provide any notice to Genesis

that it viewed the assignment as a breach.  WNC was informed of

this.  And its witness testified there is no document, no

nothing, for them to notify Genesis there was a breach.  WNC

N6TVWISO

1   failed to elect a remedy.  It's been maintaining the position

2   this entire time that the assignment was a breach.

3          THE COURT:  So aren't they arguing that there are two

4   breaches:  One is the failure to get consent to the assignment;

5   the other is a failure to pay.  And even if they have waived

6   with respect to the failure to get -- or elected remedies with

7   respect to the breach of the assignment provision, in other

8   words, they can't assert damages from the fact that your client

9   was the one who was putting in the orders, they haven't waived

10  or elected remedies with respect to the failure to pay; that as

11  soon as they cease being paid, they started objecting pretty

12  vigorously saying, We want to be paid.

13         MS. BROWN:  Understood, your Honor.

14         It's completely inconsistent with WNC's behavior the

15  entire time that it understood that this business was going to

16  GNET.  It wanted to keep this business because it was a key

17  account.  It had its insurance company investigate GNET.

18         THE COURT:  Like it had a great deal, because it had

19  your client ordering the products -- or the other guy ordering

20  the products and your client not having a novation.  So it had

21  both your client's credit and the other guy's credit.  Why

22  wouldn't you want that, to continue that?

23         MS. BROWN:  It does sound like the ideal situation.

24  But here, WNC tried to have it both ways, and clearly that is

25  failing for it.  Even if there was a failure to elect a remedy,

N6TVWISO

1   which we wholeheartedly agree that there was a failure there,

2   then just from a perspective -- from an estoppel perspective,

3   WNC cannot come before the Court, file a complaint, make all

4   these representations that the assignment was a breach, and

5   then take the complete opposite position that now -- because

6   what happened in the beginning, since day one, when Genesis

7   told WNC there was going to be an assignment, Genesis even

8   asked for WNC's consent to the assignment.  And what did WNC

9   do?  It responded that it didn't need to provide consent.

10          So in the face of that, and in the face of all of the

11  emails back and forth explaining the transaction, explaining

12  that this wasn't just assigning the rights or benefits of a

13  business, this was a sale of substantially all of Genesis'

14  assets that was going to GNET, WNC at no point expressed any

15  concerns, objected, said it didn't want to do business with

16  GNET.  And now it's taking the position that it was doing

17  business with Genesis the whole time; that Goodman employees

18  were actually Genesis employees, just with a different email

19  address.  It's taking completely contradictory positions, your

20  Honor, and we don't think that that should be permitted.

21          And again, at best, these issues of intent, these

22  issues of waiver, these issues of who thought what, when, and

23  why they were doing these things, these are all material

24  factual issues that preclude summary judgment.

25          THE COURT:  Do you want to walk me through your

N6TVWISO

1    timeline?

2              MS. BROWN:  Oh, sure, your Honor.

3              THE COURT:  And what I should focus on in it.

4              MS. BROWN:  Sure.

5         So, again, as I mentioned, as early as December 2019,

6    Mr. Seago notified WNC that Genesis has sold its assets,

7    including the distributor agreement, to Goodman Networks.  WNC

8    told Genesis that it didn't need to provide consent.  WNC also

9    had its insurance company investigate the credit of Goodman and

10   GNET.  And on June 3rd, 2020, WNC told its insured that Goodman

11   was placing purchase orders that WNC planned to fulfill.

12        So WNC's claim now that it had no knowledge that

13   Goodman or GNET were involved or that they were placing

14   purchase orders, is simply not true or subject to a factual

15   dispute.

16             THE COURT:  Can you remind me when the last purchase

17   order is that is at issue in this case.

18             MS. BROWN:  Yes.

19             THE COURT:  It's not in your timeline.

20             MS. BROWN:  Sure.

21        So there actually is also a factual dispute with

22   respect to the purchase orders.  Because WNC -- I guess taking

23   a quick step back, WNC set up its own internal EDI system and

24   this can be seen -- I believe this is it.  Yes.  So it's

25   Exhibit 14 to Mr. Englander's declaration.  These are what --

N6TVWISO

1    WNC is taking the position are the EDI transaction

2    notifications that the purchase orders at issue were submitted.

3    And it looks like, according to their records, January 16th,

4    2021, I believe is the date of the last purchase order.

5           However, your Honor, GNET's records reflect that the

6    purchase orders were sent from GNET on a different date, and

7    that's filed as Exhibit F to Mr. Seago's declaration.  And with

8    respect to those purchase orders, I believe the last one is

9    dated August 12th, 2021.

10          In any event, GNET had been making -- placing purchase

11   orders and making payments to WNC for over a year.  And if you

12   look at the end of the timeline, as late as October 16th, 2020,

13   WNC was participating on these weekly planning calls with AT&T

14   and GNET.  And the materials reflected GNET was the vendor.

15   There is no reference to Genesis anywhere.

16          Things go along smoothly; purchase orders are sent,

17   fulfilled, paid for.

18          And then September 17th, 2021, is the last payment

19   made by GNET to W-NeWeb.  And WNC doesn't take the position

20   that Genesis is on the hook until GNET stops paying.

21          And when WNC tried to email only Genesis, Genesis

22   said, Actually, this person is your contact for accounts

23   payable, and referred them back to Goodman Solutions.

24          And earlier on, when the transition was happening,

25   they asked WNC to update the accounts payable --

N6TVWISO

1          THE COURT:  Let me ask you a question.  Why would you

2     expect Genesis to say to GNET that -- I'm sorry, why would you

3     expect WNC to say to GNET that Genesis has to pay, when it's

4     being paid by GNET?  Why would Genesis care?  Why would they

5     have any interest in knowing who was paying them for the

6     purchase orders?  Seems like that actually would be almost an

7     inappropriate question to ask.

8          MS. BROWN:  Well, one reason, your Honor, is that WNC

9     needed insurance coverage for its business so that it could

10    have a credit --

11         THE COURT:  No, I understand the insurance bit.

12         But you made a point of saying, Well, it's not until,

13    you know, they ceased being paid that WNC said Genesis is on

14    the hook.  And I would think that that would be the earliest

15    time that they should reasonably be expected to take that

16    position; that at any time prior to that, as long as they are

17    being paid, it would be a matter of indifference to them who's

18    paying.

19         MS. BROWN:  Your Honor, in light of the record of the

20    insurance company failing to give GNET any coverage whatsoever,

21    and in light of Genesis telling WNC that it sold this business

22    and would no longer be involved, for WNC to then choose to do

23    business with GNET, it took a risk that eventually GNET might

24    stop paying and, because the business was no longer with

25    Genesis, that it would not be able to look to Genesis.

N6TVWISO

1          THE COURT:  Okay.  Anything further?

2          MS. BROWN:  No.  Thank you, your Honor.

3          THE COURT:  Anything further from the plaintiff?

4          MS. COHEN:  Yes, your Honor.

5          I just want to -- I think this email keeps coming up

6    that Genesis is relying on as evidence that WNC consented to

7    the assignment, knew about it, was fine with it.  And I'd like

8    to just direct your attention to it.  It's Exhibit C to

9    Mr. Seago's declaration.

10          What the entire email says is more than what Genesis

11   is quoting from.  And the first sentence -- or the first

12   paragraph of that email, which is from Sonia Wang to Oscar Lu —

13   Sonia Wang is in the legal department.  This was after Steve

14   Seago sent an assignment agreement for WNC's signature.  This

15   was approximately a year after the distributor agreement was

16   purported to have been assigned to Goodman.

17          And so Ms. Wang, what she says is:  According to the

18   distributor agreement, a change of control shall be deemed an

19   assignment.  It's not necessary for WNC to sign this assignment

20   contract, since Genesis undertakes a change of control.  It

21   only needs a one-way notification from Genesis, Genesis to

22   prove such change.

23          Then she goes on to say:  Usually the acquisition

24   parties will send a notice of their M&A first, instead of

25   asking suppliers to consent.  In consideration that we could

N6TVWISO

hardly confirm Genesis' M&A, legal team suggests to obtain a formal notification with Genesis' signature before WNC signs the assignment contract.

Then, if you look at the next email, Oscar responds to Jon Peacock, who then forwards that to Mr. Seago at Goodman, and he says:  Please refer WNC legal's feedback as follows:

Before signing the consent assignment agreement, WNC shall have notice from Genesis for illustration of their company change.  Are Genesis acquired by GNET?  If yes, is there any M&A notice from Genesis?  Goodman Networks acquired certain assets from Genesis, and acquired those assets through a wholly owned subsidiary legally named GNET.  Only certain assets were acquired and not the legal entity of Genesis.

It goes on from there.  There are questions about what was actually assigned, information that WNC wanted from Genesis before they would agree to sign that assignment agreement and provide a novation on this assignment.  And if you look forward through the rest of the emails that go on, not once does anyone from Goodman, who this email is with, Mr. Seago at Goodman, not Genesis, no one ever responds to those questions by legal, nobody gave them the answers that they needed.  They then tried to get insurance for those two companies.  They had no credit.  And so the assignment was never consented to.  There was no novation.  There is no evidence in the record of novation.  This email cannot represent a novation by WNC.

N6TVWISO

```
 1                THE COURT:  All right.  I've got the argument.  I'll
 2      take it under advisement; try to get you an opinion quickly.
 3                MS. COHEN:  Thank you, your Honor.
 4                THE COURT:  Have a good 4th of July, everybody.
 5                I would ask the parties to stay around and order a
 6      copy of the transcript from the court reporter.
 7                Thank you.
 8                               *    *    *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```